**Pages 1 – 40**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**BEFORE THE HONORABLE**

**JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE**

| | |
|---|---|
| JACKSON FAMILY WINES, INC., ) | |
| et al., ) | |
|        Plaintiffs, ) | |
| ) | |
|  VS. ) | NO. C 11–5639 EMC |
| ) | |
| DIAGEO NORTH AMERICA, INC., ) | |
| et al., ) | |
| ) | San Francisco, California |
|      Defendants. ) | Thursday |
| ) | May 23, 2013 |
| _____) | 9:25 a.m. |


**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiffs:       COOLEY, LLP
                      1299 Pennsylvania Avenue, N.W.
                      Suite 700
                      Washington, D.C.  20004
         BY:  BRENDAN JOSEPH HUGHES, ESQ.


For Defendant:       PROSKAUER ROSE, LLP
                      11 Times Square
                      New York, New York  10036–8299
         BY:  ADAM D. SIEGARTEL, ESQ.


Reported by:         BELLE BALL, CSR #8785, CRR, RDR
                      Official Reporter, U.S. District Court

**THURSDAY, MAY 23, 2013**                                          **9:25 A.M.**

                              **P R O C E E D I N G S**

          **THE CLERK:**  Calling Civil Action C 11-5639, Jackson Family Wine versus Diageo North America Inc., et al.

          **MR. SIEGARTEL:**  Good morning, Your Honor.  Adam Siegartel for Defendant.

          **THE COURT:**  Good morning.

          **MR. HUGHES:**  Good morning, Your Honor.  Brendan Hughes on behalf of Plaintiffs.

          **THE COURT:**  Good morning.

     So, what always I find interesting about these things is we all know when it gets down to it, if you have your trial, it's going to be the bottle (Indicating), and the label, and the name.  And all this time we're spending with all these peripheral documents are really going to have very little value.  The actual documents you submit at trial will be this small (Indicating).

     And, we know the jury is going to decide.  And I've actually been involved with these cases.  Look at the label, whose wine -- they happen all the time with wine people, you sue each other all the time over trade names.  It's going to be the label, and the name.  And, does it create confusion.

     So, there are some documents that have some relevance, but I think what we're looking at here is proportionality, and really, why do you need it.  So that's what we need to focus

on.

So, let's start with -- Diageo?  Is that how you pronounce it?

**MR. SIEGARTEL:**  Yes.  That's right.

**THE COURT:**  Diageo, is that also a large --

**MR. SIEGARTEL:**  Very large.  They're actually -- maybe the largest liquor producer in the world.

**THE COURT:**  All right.  Then, I won't feel too sorry if you complain, then, about burden.  Right?

**MR. SIEGARTEL:**  Well, it's all relative, Your Honor.

**THE COURT:**  So, but, you want more marketing documents.  Right?

**MR. SIEGARTEL:**  That's exactly right.  The -- the focus of our motion is the marketing-strategy documents and the consumer-research documents that Jackson has.

**THE COURT:**  And they say, what's wrong with what they've already produced.

**MR. SIEGARTEL:**  Well, they've produced very, very little about it.

In their motion, they mention six documents that they have produced.  A couple of those are pretty tenuous, to begin with.  So, they've produced virtually nothing about it.

And, at the same time, in their complaint and in their initial disclosures, they harp, over and over again, about how well known they are, everybody loves them, how they're the

number-one wine in the country.

And so, I completely agree.  It's all about proportionality.

**THE COURT:**  Well, do you know -- I mean, they must -- they've given you sales figures.

**MR. SIEGARTEL:**  They've given us some sales figures; that's right.  But --

**THE COURT:**  Okay, so you know how many bottles they've sold; you know how many you sell.  So you can -- if they say, "We're the best" -- I guess I don't understand why you need, for example, how they market.  That doesn't really matter.  Maybe they market a particular way, and it's successful or it's not successful; who knows?

What matters is, to some extent -- and again, I don't actually think a very large extent -- how popular is the brand.  And that seems to me to be based on what the sales figures are.

**MR. SIEGARTEL:**  Well, sales figures is one of the issues.

But, for example, one of the six documents they mention says that La Crema actually has very low brand awareness.  That completely contradicts what they say in their complaint, what they say in their initial disclosures.  But the fact is, you know, when we get before the jury, it's much better to have ten documents that say that than just one document that says that.

So with respect to, again, their market research, what

consumers think about their brand is very, very important.  And sales figures would not really tell that part of the story.

And again, for example, they have a California dilution claim that's completely based upon: Is their mark famous or not.  And, fame, you can't really get from sales figures.

You -- again, we really want to know:  What do consumers think about their brand?  When they do their qualitative research, what are consumers saying?

And again, we have one document that says, well, very, very low brand awareness.  But, that's just one.

**THE COURT:**  So that's different, then.  That's -- those are consumer surveys, or consumer survey information.

**MR. SIEGARTEL:**  That's --

**THE COURT:**  So, have you turned over all your consumer survey information?

**MR. HUGHES:**  To the extent that a survey was not privileged, then we searched for documents -- you can see, we searched for, say, "crem," in connection with "presentation," "study," "investigation," "survey," different variations of that.

And we also searched for marketing materials.  As set forth on Page 5 of the Defendants' joint statement, you can see all of the search terms that we employed to try to identify potentially responsive documents.

I mean, in fact, defense counsel is referring to documents

that we've produced.  Those are documents relating to our marketing activities, relating to brand awareness.  So, we clearly have produced documents that relate to those issues.

THE COURT:  But, have you produced them all?  I guess that's the question.  I mean, you know.  They're your client's documents.  It shouldn't be -- we shouldn't have to rely necessarily on a search term.  Right?

Your client should be able to say, "This is our consumer survey, this is our brand manager."  Right person.

MR. HUGHES:  Right.

THE COURT:  "Give me all your consumer surveys with respect to this brand."  Have those all been produced?

MR. HUGHES:  Well, we -- any of the documents, if they were hit on these terms, have been -- have been reviewed and produced.  And we can follow up with that brand survey -- whoever was in charge of brand awareness or brand management, to confirm that all of them have been produced.

I can't make that representation right now, but I believe that's the case.

THE COURT:  Okay.  You should do that.  And you should always do that.

MR. HUGHES:  Right.

THE COURT:  You can't -- the search terms are an aid.

MR. HUGHES:  Yes.

THE COURT:  They're not a substitute.

**MR. HUGHES:**  Right.

**THE COURT:**  I mean, before we had that, what you had to do -- and what you still do -- is you go and you talk to the people that would know where those documents are.  And you get them first, that way.

Then, you use the search terms as a backup --

**MR. HUGHES:**  Right.

**THE COURT:**  -- for what you may have missed.

**MR. HUGHES:**  Yes.  And I assure you that we did talk to all the document custodians.  We did identify publicly-shared -- you know -- or rather, internally-shared folders that contain such documents, collected from those sources.  So in that regard, this wasn't a key-word searching that was conducted in a vacuum.  We did follow the necessary steps.

And that's why we're here, having spent -- you know, reviewed over 120,000 documents, over 4,000 attorney hours on this, alone, and spending well over $300,000 on the document collection, review, and production efforts thus far.

I mean, by no means have we been shirking our responsibilities in this case.

**THE COURT:**  No, I understand.

So, I'm just going to order -- reorder -- maybe you've already produced them, but to the extent that you haven't, all consumer survey information with respect to La Crema

Chardonnay, I guess.

It's just the Chardonnay?

**MR. SIEGARTEL:**  We only have a Chardonnay.  They have a bunch of different varietals.

**THE COURT:**  So, it would be just the La Crema brand.

**MR. HUGHES:**  Okay.

**THE COURT:**  Because, if I recall, it's not a high-end brand, right?  And so consumers -- well, I'm sure it's delicious.

**MR. HUGHES:**  Yes.

**THE COURT:**  And a real bargain.

**MR. HUGHES:**  It's wonderful, yes.

**THE COURT:**  Value.  It's a value wine.

**MR. HUGHES:**  Exactly.

**THE COURT:**  But it's one of those wines that people probably -- they buy La Crema when they might buy any particular variety, depending on how they're feeling that day.

**MR. SIEGARTEL:**  Actually, Your Honor, I'm sorry; can we stay on the consumer research issue for a second?

**THE COURT:**  Yes.

**MR. SIEGARTEL:**  I'm just -- I'm a little bit unclear on how Jackson is going to go about finding that.  Because, listen, I agree.  I believe Mr. Hughes.  Everything that came up in the key-word searches, they've produced.  But, the problem is that their key word searches were totally

insufficient.

And so, I just -- I have a little bit of hesitation on Jackson now going back and just, quote-unquote, getting them. I'm not really sure I have a solution to the issue. I just -- I don't know, I --

THE COURT: You know, I actually don't think that I should micro-manage that.

MR. SIEGARTEL: Okay.

THE COURT: I think, as officers of the Court, lawyers have an obligation to do what is necessary to find all those documents.

They've heard your concerns. And maybe they will go back, having heard that, and just run that search, and see what comes up. I can't imagine that -- or they'll do something a little different, to make sure.

MR. SIEGARTEL: Okay.

THE COURT: Because he knows if it turns out he missed something, there will be big trouble. Right? They're going to produce it.

It is what it is. I don't think they're hiding anything.

MR. HUGHES: No, that's right. I mean, we've -- we've already employed searches that look for surveys in connection with "crem" and "lc."

And what we'll do is follow up with the relevant custodians to make sure that we have captured everything that

they are aware of.

THE COURT:  Yeah.  But, have you done the search as they wanted, just to see how many documents it comes up with?

MR. HUGHES:  That's right.  And the searches they requested comes up with about 21,000 additional documents.

THE COURT:  Just -- just that one.  I'm not talking about aggregate.  I'm just talking about this one.

MR. HUGHES:  This, this one search that they proposed at the very beginning of their joint statement?

THE COURT:  Yes.

MR. HUGHES:  We conducted that search across the database of all the collected documents.  And it generated over 21,000 additional documents for us to review.

THE COURT:  Okay.

MR. SIEGARTEL:  Can I say one thing about that?

THE COURT:  Yes.

MR. SIEGARTEL:  During our meet-and-confer discussions, we told Jackson that when it comes to their marketing strategy and consumer research, we only want them to go back to January 1st, 2009, to the present.  We don't need documents older than 2009.

Mr. Hughes -- the number that he's saying, the 21,5, goes back indefinitely.  We don't need them to go back indefinitely.  We certainly want to be reasonable about this.  And so, again, I would reiterate our search terms.

Again, the one that we're talking about now, I think it's on Page 2 of our motion, just from January 1, '09 to the present. And that, for us, would satisfy both the consumer research and the marketing strategy. We were talking about marketing strategy before, Your Honor.

And again, there's other issues that don't come up just in the price. For example, you know, Jackson says that the prices are equivalent. But that's not true. They brand their wine much -- at a much higher quality. And, there's other kinds of marketing-strategy documents -- I just don't -- that are not captured just from sales figures alone.

So, I guess what I'm getting at is I would just reiterate the importance of marketing-strategy materials to how are they branding the wine, what are they emphasizing to the consumer.

And, again, we're only looking from 2009 to the present. Jackson, on their own, decided, "Okay, we're going to go all the way back in time." But we don't need them to go back --

THE COURT: How many documents does it find when you went back to just 2009?

MR. HUGHES: Well, in the context of the joint statement, they did not have a date limitation. So when we conducted the search --

THE COURT: Well, when you did your meet-and-confer, and --

MR. HUGHES: Right.

THE COURT:  -- and he said that, did you go back and run it, and see how many documents it came up with?

MR. HUGHES:  Your Honor, at the time of the meet-and-confer, I asked Counsel for a proposed search time. And at that point, he refused to provide me with a proposed search term.

It was only in the context of this joint statement that this very broad search term proposed on Page 2, without a date restriction, was provided to us.  We then ran that, and came up with 21,500 documents.

THE COURT:  Let me see.  Does your -- is that 2009, is that here in your joint statement?

MR. SIEGARTEL:  It's not.  That came up only in our meet-and-confers.

THE COURT:  See, that -- you can't go backwards. That's why I had you guys come in.

MR. SIEGARTEL:  Oh.  I'm sorry --

THE COURT:  This joint statement is what you're proposing, that it just be from January, 2009, that they do this search.

MR. SIEGARTEL:  Oh, that was absolutely contemporaneous with this motion.  Is it in our paper?

THE COURT:  Yes.

MR. SIEGARTEL:  It might not be in the paper, but -- but absolutely contemporaneous with the meet-and-confer.

**THE COURT:**  Is it in this paper that you sent me?

**MR. SIEGARTEL:**  I don't believe, no.

**THE COURT:**  Okay.  So, that's what you need to do, is you need to do what your best reasonable offer is.  It's not okay to, then, to go backwards.

So, what I want you guys to do after today, I want you to go up to the attorney lounge.  Are you -- are you local, or are you not?

**MR. SIEGARTEL:**  We're both flying.  We flew in, New York and D.C.

**MR. HUGHES:**  D.C., yes.

**THE COURT:**  Good.  You can thank me for giving you the trip.

**MR. HUGHES:**  San Francisco is incredible.

**THE COURT:**  I know.  Exactly.

**MR. HUGHES:**  Great weather.

**THE COURT:**  So, but I want you to go to the attorney lounge, and I want you to sit down, and then -- and you call your people, and run it.  And that's what you need to do. Okay?

It's not -- it's not, you know, "No, I'm taking it back, no, I'm doing this."  The information is relevant, to a point. It can't be disproportionate.  21,000 documents coming up to search for these particular is disproportionate.

**MR. SIEGARTEL:**  I agree.

THE COURT: So, apparently he offered less. So then, find out how many documents it is. Maybe it's not that many. It just shouldn't be that many documents. It's 2009 to the present.

MR. HUGHES: Right.

THE COURT: For this one particular brand.

MR. HUGHES: Your Honor, I also note that he's proposing that we conduct a search that Diageo, itself, is unwilling to conduct.

THE COURT: We'll -- we'll get there.

MR. HUGHES: Okay. Thank you.

THE COURT: We'll get there. All right? I noticed that.

MR. HUGHES: Thank you.

THE COURT: I noticed that. That's why I wanted you to come in, because I think actually you're both -- not you, necessarily, personally, but you're both taking unreasonable positions, to some extent.

Again, going back to the fact, trust me. When you get to trial, you actually won't even have those ten documents. Even, you'll -- you'll prepare your trial exhibit books, and it'll be this big (Indicating). And at the end, what goes to the jury is like this (Indicating). Always. Always.

MR. HUGHES: Right.

THE COURT: All right. So, what was the only other

thing?

There was third-party products with "Crem" terms.  Well, can't you find out what those third-party products are?

MR. SIEGARTEL:  We can, and we've looked for them.  But, the commentary about what Jackson has to say about those, that's what we're looking for.

So, for example --

THE COURT:  Why?

MR. SIEGARTEL:  Because when the marketing person sends the product to another marketing person, they tend to comment upon, "Well, we don't think this is a problem.  Well, here's one more using 'Crem.'"

That's the kind of stuff that we're looking for: How does Jackson, themselves, feel about those third-party products?

Mr. Hughes mentioned that --

THE COURT:  But, why?  How does that fit into the *Sleekcraft* factors?

MR. SIEGARTEL:  Because that speaks to what the corporation thinks about the weakness of their mark, or the strength of their mark.

The extent of how --

THE COURT:  (Inaudible)

MR. SIEGARTEL:  Jackson is saying that their mark is super-strong, that La Crema is a super-strong and inherently distinctive mark.

Diageo's position is that there are many factors weakening their mark.  For example, it's a descriptive mark.

But, another reason why La Crema is a very weak mark is because there are so many other third parties out there who are using a "crem" term -- quote, C-R-E-M, end quote -- for liquor -- for wine.  And, that's what we are looking for: What does Jackson have to say about all of these other third parties?

And it's what -- and so -- I'm sorry; so to get back to the *Sleekcraft*, it speaks directly to the strength of their mark, or in this case, the weakness of their mark.

Mister -- Jackson, in their opposition, said there was 41,000 documents that would come up from the search that we've proposed.  I agree, that would be overly broad.  I'm sorry, that's way too burdensome.  We do not want them to review 40,000 documents for this issue.  But, we don't think that zero documents is the answer, either.

And so, you know, again, I certainly want to be reasonable about this.  But, when it comes to third-party products, it's a very important issue.  They --

**THE COURT:**  Okay.  So, what's your proposal?  If agree that 41,000 is disproportionate --

**MR. SIEGARTEL:**  Right.  Sure.  Sure.  So, our proposal was what we put in -- it would be Point No. 2 in our motion, on Page 3.  It's what we put there.

The -- their search string had the first parenthetical, and the second parenthetical.  The first parenthetical was deficient, because it mentioned "cream" or "krem" or "kream," with a "K."  But, it didn't mention "crem*."

And that's the mark at issue here.  Their search wouldn't pick up "crema," and wouldn't pick up "crem."  And those are the parties' marks at issue.  So, that was the problem with their first parenthetical.

Their second parenthetical, which covered things like, "wine," "alcohol," "spirit," the problem with that is if a marketing person is speaking about wine, it's quite likely they're not going use the word "wine."

And so, what we did there was we proposed a bunch of different wine varietals.  And this is towards the bottom of our Point No. 2.  So, "chard," "pinot," such things, because these are the -- these are the varietals that Jackson makes.

**THE COURT:**  I know, but I guess I don't understand.

**MR. SIEGARTEL:**  Sure.

**THE COURT:**  I thought you were saying that when they ran their inadequate search, they came up with 41,000.

**MR. SIEGARTEL:**  No, I'm sorry.  They came up with 41,000 with this search that we're proposing.  I'm sorry about that, Your Honor.

**THE COURT:**  Oh, with yours.

**MR. SIEGARTEL:**  And so, again, listen: I don't want

them searching 41,000.  I agree, that would be too burdensome.  It's not warranted.  But zero is, again, not the answer, either.

THE COURT:  So then, what's the proposal?

MR. SIEGARTEL:  Well, I guess what I would propose, a date restriction, again, would be fine.  I would prefer to go -- and I don't want to bargain against myself here, but I would say let's go a little bit further back than the 2009.

THE COURT:  When did the project start?

MR. SIEGARTEL:  The Crème de Lys project started in October of 2009.

THE COURT:  Started in October, 2009.  So, if you go back one year from that, to 2008 -- when you ran and came up with your 41,000 documents, what was the date restriction?

MR. HUGHES:  Again, there wasn't a date restriction, because the joint statement didn't have a date restriction.

THE COURT:  Okay.  But so, then, as a compromise, since you're the one that was actually -- you know, you don't want a date restriction.

MR. HUGHES:  No, we don't want a date restriction.

THE COURT:  Well, you can't have it both ways.

MR. HUGHES:  Well, we're not asking for a date restriction.

THE COURT:  But, but, you say 41,000 is too many.

MR. HUGHES:  What we said was 41,000 was too many,

because we were running the searches that Diageo asked us to run.

THE COURT: With no date restriction.

MR. HUGHES: With no date restriction.

THE COURT: But if you put in a date restriction, then what do you get?

MR. HUGHES: I can figure out that number when I talk to the vendor. But at the time, that wasn't even a proposal.

MR. SIEGARTEL: That's not -- I'm sorry; that's actually not accurate.

THE COURT: But if you're claiming that it's too burdensome, then you also have to then come up with -- I mean, obviously, a date restriction matters. Let's just use some common sense. Okay? What matters the most is the strength of the mark at the time the competitor wine came out.

So we can go back, one year, say, 2008. Run it. What does it come up with? I don't know how you can't put the -- the "crem" or the "lc" -- why wouldn't you include that in your search?

MR. HUGHES: Well, see, originally, when we ran the search, let's see -- so, on Page 5 is our complete list of our terms.

You see, we ran very broad terms in connection with "creme" or "kreme," within 25 of -- of all sorts of terms like "trademark" or "mark" or "brand," "select" or "adopt." So, we

had already covered --

        (Reporter interruption)

            **MR. HUGHES:**  In connection with -- searching for "crem" in connection with "trademark" or "brand" or "mark," as well as with "select" or "adopt."

        And then also, we had run the "cream" or "krem" or "kream" search on the right side of that column there, in connection with "wine" or "alcohol" or "spirit."  So, we had already conducted that search.

        Now, what they have asked for us to do is search for "crem" or "lc" in connection with those terms, as well as the varietals.

        Essentially, though, the equivalent is asking, say, Budweiser to conduct a search for "Budweiser" or a variation of that, within 25 of the term "beer."

            **THE COURT:**  Right, I know.  No, I know.

        And the point is what you're looking for actually are documents that go to what they think of the strength of the mark.  So, to get that, you need to add additional search terms.  Your search is too broad.

            **MR. SIEGARTEL:**  Well, I'm not sure about that.  They haven't told us about what happened with the date restriction.  C-R-E-M isn't a --

        (Simultaneous speakers)

            **MR. HUGHES:**  It wasn't at the time, Your Honor.

(Reporter interruption)

**MR. HUGHES:** I apologize. Both -- that was -- the date restriction wasn't even on the table at the time.

**THE COURT:** I understand. And you guys are going to get a chance to do it over, and do your meet-and-confer again.

And, it seems to me that you're going to have to narrow it. Because you've identified some very particular narrow -- which, there probably aren't going to be very many, if any, documents. So your search should be married to that. Narrowed.

**MR. SIEGARTEL:** Your Honor, here's what I would say about this, simply, is that "crem*," when it comes to third-party products, it simply has to be in there. I mean, that's their mark; that's our mark. To look for third-party products but not include "crem" is just -- you know, that's the most important term.

So, I completely agree. We should talk about it more; we should be reasonable. I completely agree, 100 percent. But, we simply -- Diageo cannot move off of including "crem," because that's -- that's the mark at issue. It would be like Budweiser not wanting to do "B-U-D." So --

**THE COURT:** That's fine.

**MR. SIEGARTEL:** Yeah.

**THE COURT:** That's fine, so -- but think about additional terms that you're going to add, so you don't get

every single document that has that in it.  That would be everything.  That would be too many.

And then, you have your vendor, and -- I mean, how long does it take to run a search?  Right?  You can be on the phone with them, and they can just do it.  "This is how many hits we have."

Right?

MR. HUGHES:  That's correct.

THE COURT:  So, just figure it out.  Do it.  With date restrictions.

I understand that you don't want date restrictions for your discovery.  That's fine.  But, that doesn't mean you can then say, "Because when they ask for something we're not going to run any date descriptions -- restrictions; therefore their request is unreasonable."

That's not fine.  All right?

MR. HUGHES:  Yes.  I understand, Your Honor.

THE COURT:  And there, I've given you some guidance.

Let's see.  Next, we have the cream or off-white color.

MR. SIEGARTEL:  And I think the party -- I'm sorry, Your Honor, to interrupt.

Actually, Jackson agreed to run our -- our parchment-related search, Jackson agreed to run it.

THE COURT:  Great.

MR. HUGHES:  Compromise, Your Honor.

**THE COURT:**  Great.  All right.  And, then, what about the capital-letter, dark-colored font?

**MR. SIEGARTEL:**  Okay.  Here's the problem:  In their complaint, they list several reasons why consumers are going to see the Diageo product, and think that it's the Jackson product.  One of the factors they list is that both parties use a capital-letter, dark-colored font.

So, again, going to, well, how many other third parties out there are using a capital-letter dark-colored font?  It's directly relevant to the strength of their trade-dress elements.  Jackson has refused to search for that.

And, our position is either they have to look for it, or they have to take it out of the case.  They can't rely upon a factor, and then not give us discovery on that factor.

**THE COURT:**  Okay.

**MR. HUGHES:**  Your Honor, we did search for "crem" or "lc" in connection with "label," "font," "design," or "logo."  So that's directly relevant to essentially the label or font that's employed on the La Crema product, as well as other products that would have the "crem" extension.

In addition, you know, to search simply for "dark" within 25 of "font," that would result in, you know, an incredible amount of documents, I imagine, or something --

**THE COURT:**  Well, how many?

**MR. HUGHES:**  The -- a search wasn't proposed to us,

so we did not conduct a search for "dark" within 25 of "font."

THE COURT:  Okay, because I wasn't surprised, I don't know as to why, why would "dark" and "font" come --

MR. HUGHES:  If that will satisfy opposing counsel, then perhaps that's something that we can -- we can test out.

THE COURT:  That's what -- you will.  You will talk about it today.  But, you can't -- you can't say "I imagine" or "I believe."  You run the search, and you see.

MR. HUGHES:  I understand.

THE COURT:  And then you come with information.  Then you can actually have a conversation.

MR. SIEGARTEL:  Okay.  One thing.  We skipped over a point in our motion about the within-25 connector, and it just came up because Mr. Hughes is talking about what they ran.

The within-25 is -- is really insufficient.  You know, to have two words within 25, they have to be pretty much within a single sentence, and so --

THE COURT:  Twenty-five?

MR. SIEGARTEL:  Yeah.

THE COURT:  You know, what kind of Westlaw searches you do -- I always do, like, within less than 25, or five, or four.  So that didn't strike me, necessarily.

But, as I said, I'm not going to micro-manage --

MR. SIEGARTEL:  Right.

THE COURT:  -- that.  They have an obligation to

produce the documents.  We'll have to see what comes up.  They're now going to run the searches, and you can have a conversation, and then you can play around with it and make compromises.

Can you do it in real time?  Can you call the vendor, and they can say, "Oh, this comes up with this many," or --

MR. HUGHES:  Well, Your Honor, I know you've been in private practice for a while, and so you know how vendors are, sometimes.  But it is relatively real-time, or at least within a day.

THE COURT:  Okay.

MR. HUGHES:  So --

THE COURT:  And then, and then, and then you see, you get to see what comes up that's not responsive, and then you propose compromise.  That's how it's supposed to work.

Let me ask you: When you met and conferred in person -- was it in person, or not?

MR. SIEGARTEL:  It was not.  It was telephonically.

THE COURT:  Because, what -- you're in two different cities?

MR. SIEGARTEL:  That's right.  New York, that's right.

THE COURT:  So, I think that's a -- not through any fault of your own, it's much easier to sort of, "No, we can't agree," when you're on the phone.  And it's much harder to do

that when you're in person.

So, I want you to meet in person now.  And going forward -- I don't know how many more disputes there will be; maybe there won't -- I want you to meet in person.  And you can take turns flying to each other.

What cities are you in?

MR. SIEGARTEL:  I'm in New York City, and Mr. Hughes is in Washington, D.C.

THE COURT:  Well, that's easy.  You can even take a train.

MR. HUGHES:  That's right.

THE COURT:  But I want you to meet and confer in person, before you bring the dispute to me.  Okay?

Because I just do think a lot of this probably could have been -- you both actually, when you get here, you seem pretty reasonable, and like you get along okay, and probably could have worked a lot of this out if you actually just sat there.

And when you invest the time to actually travel to the other person's office, then you're more willing to actually sit there and put in the time that you need to work it out.

So, okay?

MR. SIEGARTEL:  Sure.

MR. HUGHES:  And Your Honor, I note, we did run the within-100 as proposed, and that resulted in 25,900 additional documents.

So, again, this would be one that we'd either want additional terms for, or some sort of -- you know, maybe the date restriction, as proposed by opposing counsel.

THE COURT:  I think date restrictions are, of course -- I mean, your client's been around forever, right?  Or not forever, but for a very long time.  So, of course, there have to be date restrictions.  Otherwise, you're just going to capture tons and tons of irrelevant documents.

And lastly, let's see.  The bottle labels, they say to the extent they can find them, they'll get them.

MR. SIEGARTEL:  And -- I'm sorry --

THE COURT:  I don't know how relevant that is.

MR. SIEGARTEL:  Because, again, they're saying that the labels are -- what they're saying is that the Diageo label replicates the Chardonnay label, the La Crema Chardonnay label.

And we're like, "Yeah, but you guys have eight other varietals.  And those labels looks completely different."

Like, to only -- that's why it's relevant.  We want to see all their labels out there, because they're harping on the label, over and over again, about this parchment-colored label.

But the fact is there's a lot of --

THE COURT:  But, there's no date restriction.

MR. SIEGARTEL:  Because, here's why.  Because normally --

(Reporter interruption)

**MR. SIEGARTEL:** Oh. Of course.

Normally, a big company like this has corporate archives. So, okay, give us the labels. All right. We go to the archives, we grab the labels. It's normally a -- normally -- a pretty simple process.

And so, we don't put a date restriction on that one, because we didn't think that one was a function of e-discovery. We thought that one was just: Go to the corporate archives, and grab the labels.

**THE COURT:** But, how does it matter?

**MR. SIEGARTEL:** Sure, sure.

**THE COURT:** I understand maybe it's not hard, but how does it matter?

**MR. SIEGARTEL:** Okay. Because when a consumer is exposed to the La Crema wine in the marketplace, they're not just seeing the parchment-color label. They see many different La Crema labels. The consumer does not associate La Crema with a parchment-colored label, because the consumer going to the wine store sees eight different La Crema labels.

So, that's our point. That's why we are looking for what labels had they used the past. Because I think -- what we suspect is that the documents would show that La Crema labels are the entire spectrum. Some are white, some are black. Some use this kind of lettering. Some use that kind of font.

There's no "La Crema label." That's the -- that's the

issue.

THE COURT:  Well, I don't know why no date restriction would matter.  I mean --

MR. SIEGARTEL:  Okay, sure.

THE COURT:  You only -- you came out at a certain point, I guess, in 2009 or 2010.

MR. SIEGARTEL:  That's right.

THE COURT:  You can go back a little while; I understand that.  But sort of -- well, I don't know.  When did La Crema first hit the market?

MR. HUGHES:  It's been on the market since -- I believe it's the late eighties.

THE COURT:  Yeah.  I can't imagine why what it looked like in 1989 --

MR. SIEGARTEL:  Yeah.

THE COURT:  -- matters as to whether there's a likelihood of confusion in 2010.

MR. SIEGARTEL:  Sure.  Here's what I would say:  If Jackson is representing that it's really burdensome -- that there's not a single repository for all their labels, if that is what Jackson's representing, I totally agree with Your Honor.  Sure.  I mean, go back to 2000 or 2002.

If it's really -- there is a single repository, I think it's very easy for them to give us everything going back to the late eighties.  If there's --

THE COURT:  But, why -- but, you know what?

MR. SIEGARTEL:  Right.

THE COURT:  The first thing that you have to show is that it's relevant.

MR. SIEGARTEL:  Right.

THE COURT:  It's not because it's easy, you get it anyway.

MR. SIEGARTEL:  Sure.

THE COURT:  So what I don't know is why 1989 is relevant.

MR. SIEGARTEL:  Fair enough.  Fair enough.  You know what?  Fair enough.  2000.  Ten years.  Ten years.  We would be happy with ten years of labels.

THE COURT:  Fine, okay.

MR. SIEGARTEL:  So --

THE COURT:  Ten years.  But, you were already looking for it.  But what I'm telling you, you don't have to look past more then ten years from when their product came out.

All right.

MR. SIEGARTEL:  Thank Your Honor.

THE COURT:  Now, let's go to -- okay, I think your search of -- what was it, just --

MR. SIEGARTEL:  It's everything having to do with the Crème de Lys product.

THE COURT:  Right.

**MR. SIEGARTEL:**  From the moment someone first thought of, "Hey, maybe let's come out with this product," we've given them everything.  When it was not even called "Crème de Lys," we've given them every single document related to this project, going all the way back to October of '09.

**MR. HUGHES:**  Your Honor, if I may, we obviously dispute that.  Because the searches that were -- the key words that were employed by Defendants were inadequate.

As you can see, on Page -- on the first page of our joint statement, these are the terms that were used in connection -- see the quotation marks around there?  So, that means that they were used without any sort of wild-card extenders.

In addition, this assumes that when an e-mail or document was prepared, or PowerPoint, that internally at Diageo, they did not refer to it as "creme" (Phonetic) alone, or make any misspellings of "creme," or anything like that.

Further, so you would not have pulled in necessarily every document since the inception of the Crème de Lys brand, or even before that, when they referred to it internally as "butter cream" or "cream puff."  Instead, what you would have gotten is simply exact hits on these terms.

Perhaps that's why, to date, Defendants have only produced less than 5,000 documents.  Perhaps that's why, to date, we do not believe that their searches were adequate.

Further, this is per -- the -- maybe the only

trademark-infringement case that I've ever heard of in which the defendants have not searched for the mark at issue, "La Crema," or variations thereof.

Further, they haven't searched for Plaintiff's names. When we're talking about instances of actual confusion, when we're talking about discussions amongst executives, I mean, those are two examples of situations or communications that would not have been pulled in by these search terms.

**THE COURT:**  (Inaudible) you not search for "La Crema"?

**MR. SIEGARTEL:**  Because the parties have many varietals in the marketplace that are overlapping.  Searching for "La Crema" brings us up tens and tens of thousands of documents.

**THE COURT:**  I thought you said it brought up 27,000 documents.

**MR. SIEGARTEL:**  It brought up 27,000, with respect to the custodians who relate to the Crème de Lys product.

Jackson -- what they're looking for isn't that we limit our search to those custodians.  Jackson wants us to go back, forever, for every single document that talks about "Jackson" or "La Crema."

**THE COURT:**  You get to go back one year before their wine hit the market.  I mean, one year before the project started.

So they -- as I understand it, you went to when your product -- you said, "We gave you everything when our project started."  Well, but you said when your project started, and you know what happened.

So you get to go back one year earlier from that.  Okay?

**MR. SIEGARTEL:**  Can --

**THE COURT:**  Your (Indicating) search is too narrow.  Maybe theirs is too broad.  You need to work something out.  But, yours was too narrow.  And, completely inconsistent with the positions that you were taking with respect to your motion.  That's how I found it.

So, I think you need to use the extenders.  And, the fact that it's other varietals doesn't really matter.  So, I don't understand how that matters.  Just, as I was saying, La Crema, people just buy La Crema.

**MR. SIEGARTEL:**  Okay.  So, we've run the searches.  So, we've now run, now, the searches.  "Jackson."  If we run a search for "Jackson," it's going to pick up tens of thousands of documents.  Your Honor, it's irrelevant.

We did a quality-control search of the 27,000 documents.  It's -- it has nothing to do with this case.  The parties have many wines in the marketplace.

**THE COURT:**  Did you do a search of "Jackson Family Wines"?  Or "Jackson Family"?

**MR. SIEGARTEL:**  We ran a search for "Jackson,"

"Jackson Famil," and "Kendall-Jackson," because these were the terms that Jackson proposed to us.  They called --

THE COURT:  So if you exclude just "Jackson" -- because I imagine that would come up with all sorts of people, right?

MR. SIEGARTEL:  Right.

THE COURT:  If you exclude that, how many did it come up with?

MR. SIEGARTEL:  Okay.  Perfect.  If we -- if we only run the search for "La Crema," and we omit the "Jackson" stuff, we get down to a much more manageable number of -- I'm looking at my chart, I want to make sure I'm on this right.

If we search for "La Crema," Your Honor, from October, '09 to the present, it calls up about 1,500 documents.

THE COURT:  Okay.  Why didn't you offer that?  Why didn't you do that?

MR. SIEGARTEL:  It was -- it was never on the table.

THE COURT:  No -- oh, no.  It's always on the table.

MR. SIEGARTEL:  Okay.  Fair enough.  Okay.

THE COURT:  Because you meet and confer, and you work together.  It's not they have to ask.  You know what your documents -- so, it's always on the table.

MR. SIEGARTEL:  Okay.

THE COURT:  So I'm not -- look.

MR. SIEGARTEL:  Here's --

**THE COURT:**  Your search terms --

**MR. SIEGARTEL:**  Uh-huh.

**THE COURT:**  -- were unreasonable.  It's too narrow.  Just like the other ones.  You guys need to go upstairs, and you need to talk.  And you need to be reasonable about it.

Look.  I actually find what they're searching here much more relevant and likely to lead to relevant than what you were -- I'm just giving you some guidance -- than what you were looking for in yours.

This goes directly to intent.  Right?  Intent.  And knowledge of copying.  Which, frankly, of all the factors, is not particularly important, but at least goes directly to one of those factors.  It may or may not be there.

**MR. SIEGARTEL:**  Can I speak to that?

**THE COURT:**  Yes.

**MR. SIEGARTEL:**  About the intent issue?

Okay.  The way this happened in real life was that in October of '09, when Diageo started looking into this product, La Crema was not on the radar at all.  There was a completely different product that was the competitive benchmark.

La Crema only became a competitive benchmark in 2010.  By that time, we had the names of the products.  Everything related to intent, they have.  We've given them 350 documents that mention "La Crema."

So, Your Honor, I don't dispute that intent is relevant.

Of course, it is.  But, they have all those intent documents.

Here's my position, at the end of the day: Searching for "Jackson" is a nonstarter.  Or "Jackson Family."  Like, we're going to be right back here, in person, if that's going to be what Jackson demands.  But -- so, I just can't agree to that.

But, searching for "La Crema," that is more reasonable.  We're willing to do it.  And so -- you know, again, Mr. Hughes and I will talk about it more.

But I just want to be really clear about our position.  Searching for "Jackson" is just -- we can't do it.  The parties -- there's a tr- -- there's -- not a trillion, obviously, but they're all over the place.

Again, we did the quality-control search.  This stuff has nothing to do with the Crème de Lys product.

**THE COURT:**  Well, so that's another thing you should do, is when you do that, and you say that, then you give them examples.  And you come up with but-nots or those kind of things, to narrow.

Because, I don't actually think they want to spend the time going through documents which are irrelevant, because that's just wasting their client's money as well.

So, that's what each of you should do.

**MR. HUGHES:**  Your Honor, when they used all of the search terms that we proposed, again, it only amounted to 27,000 documents.

In the world of review here, that is not a substantial amount of documents, especially for a client as big as Diageo and a law firm as big as Counsel's.  They could whip through that in a week, maybe.

MR. SIEGARTEL:  May I respond to that?

THE COURT:  If it's 27,000 irrelevant documents, then that's a waste of everyone's time.

MR. HUGHES:  I'm being told that this is irrelevant documents.  But, these are documents that mention the mark at issue.  These are documents that mention -- and, first of all, you can't just search for a term like "La Crema," because that means that in an e-mail correspondence or in a document, someone -- you're relying on someone using that exact term.

All these other extenders that we have here with "crem" or variations thereof, that's geared to the fact that perhaps people only refer to it as "crema" internally.  Perhaps people refer to it as, you know, "kreme," with a misspelling.  These are why we -- these are, frankly, the same terms that we ran, ourselves.

And to the extent that you're requiring -- you know, or that the Court requires Plaintiffs to run additional terms, we just ask that Defendants be required to run the same terms.

I mean, these terms -- as you stated, Your Honor -- directly go to, you know, the issues in the case.  "Crem" within 25 of "trademark" is a search term that we need

Defendants to run.

Further, we're only talking about the intent issue, but with respect to instances of actual confusion -- say, for instance, an alcohol distributor contacted, you know, Diageo, post our launch on the market, and said, "Hey, I need to buy a hundred more units La Crema," and nowhere in that correspondence would the terms "Crème de Lys" be used, or "cream puff" or "butter cream," any of the terms in which Defendants initially searched for potentially responsive documents.

That's why we believe that the proposed search terms that we have here running from Page 3 to 4 are reasonable, and in fact, only yielded 27,000 documents.  I mean, we're being told that these are irrelevant, but I have no idea what their responsiveness rate was.  I have no idea whether or not this -- these were, in fact, truly irrelevant.

**THE COURT:**  That's what I'm talking about.  That's what you share in your meet-and-confer.  That's what you share.

So, this is what comes up.  Let's figure out a way to get at what you want.  That's what I'm talking about.

**MR. HUGHES:**  Right.

**THE COURT:**  So, this is what I'm going to do.  I'm denying without prejudice both of your motions, so that you can all -- with the guidance I've given you today, you can go and meet and confer.  And, and come up with -- and you've heard

what I said, so that if you came back to me, you won't come back with the same thing, because I've told you what I've said.

MR. HUGHES:  Yes.

THE COURT:  If you're going to come back, you have to meet and confer in person.

The other thing you want to do is -- you've received documents.  So if there's a reason, for example, that you want to go back farther in time, then you'd better show me a document that's been produced thus far that gives you a reasonable belief that something farther in time will actually be there.

In other words, you have the documents from the relevant -- most relevant time period.  So if you want to go back, you have to show me something more.  If you believe that what you have thus far is inadequate, then show me that document.  Or, if that documents suggests there are other documents out there that have been missed, then show me that document that gives it.

It's not enough to say, "Well, this search term didn't really" -- you know -- "isn't enough."  It can't be -- it has to be in the context of what's been produced thus far.

MR. HUGHES:  Yes.

THE COURT:  But, I'm hopeful and optimistic that you won't have to do that, with this guidance.

And what you need to do is, you know, run all the

different -- I want you guys to actually work together.  The idea is: Let's get all the documents produced, so we can get to the fun part, which is actually trial.  Right?

So we can get to that, which is what you really want to do, get past all this sort of stuff, get those documents out there, and just work together on it.  There's nothing to hide.  Right?  As we said, it's going to come down to the label and the name, anyway.

So just sit down, figure it out, get it out there.  If you have to come back, do the joint letter again.  You can attach exhibits.  And like I said, please do so, with those kind of things.

But -- and then -- but, I'm going to tell you, next time, I'm not going to do it again.  Next time you come with your position, I'm going to do like baseball arbitration.  One or the other.

And so, you'd better be as reasonable, and offer your best thing in your joint letter.  And no going backwards.

**MR. HUGHES:**  Thank you, Your Honor.

**THE COURT:**  All right?

**MR. HUGHES:**  Thank you.

**THE COURT:**  Thank you.  Thanks for making the trip out.

**MR. SIEGARTEL:**  Thank you.

(Conclusion of Proceedings)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Friday, May 24, 2013

Belle Ball, CSR 8785, CRR, RDR