PAGES 1 – 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY, MAGISTRATE JUDGE

JACKSON FAMILY WINES, INC., ET AL, )
                                    )
            PLAINTIFFS,             )
                                    )
  VS.                               ) NO. C 11–5639 EMC (JSC)
                                    )
DIAGEO NORTH AMERICA, INC.,         )
ET AL.,                             )
                                    )  SAN FRANCISCO, CALIFORNIA
            DEFENDANTS.             )  THURSDAY
                                    )  AUGUST 1, 2013
_____)  9:27 O'CLOCK A.M.


**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDINGS**

**APPEARANCES**:

**FOR PLAINTIFF**S:         **COOLEY LLP**
                          1299 PENNSYLVANIA AVE. NW, SUITE 700
                          WASHINGTON, DC 20004–2400
                   **BY:  PETER J. WILLSEY, ESQUIRE**

**FOR DEFENDANTS**:         **PROSKAUER ROSE LLP**
                          11 TIMES SQUARE
                          NEW YORK, NY 10036
                   **BY:  BRENDAN J. O'ROURKE, ESQUIRE**

TRANSCRIBED BY:  KATHERINE WYATT, OFFICIAL REPORTER USDC

                 WYATTKATHY994@GMAIL.COM

                 925–212–5224

AUGUST 1, 2013                          9:27 O'CLOCK  A.M.


                        P R O C E E D I N G S

          THE CLERK:  CALLING CIVIL ACTION C 11-5639, JACKSON

FAMILY WINES VERSUS DIAGEO NORTH AMERICA, INC.

          MR. WILLSEY:  GOOD MORNING, YOUR HONOR.  PETER

WILLSEY WITH COOLEY FOR THE PLAINTIFFS JACKSON FAMILY WINES.

          THE COURT:  GOOD MORNING.

          MR. O'ROURKE:  GOOD MORNING, YOUR HONOR.  BRENDAN

O'ROURKE FROM PROSKAUER IN NEW YORK FOR THE DEFENDANT DIAGEO.

          THE COURT:  GOOD MORNING. ARE YOU THE SAME GENTLEMAN

WHO APPEARED BEFORE?

          MR. WILLSEY:  I'M NOT.

          THE COURT:  YOU'RE NOT.

          MR. WILLSEY:  I LOOK A LITTLE LIKE HIM, BUT I'M NOT.

          MR. O'ROURKE:  I'M DEFINITELY NOT, YOUR HONOR.

          THE COURT:  YES, THAT'S WHAT I THOUGHT.  ALL RIGHT.

          MR. O'ROURKE:  I THINK EACH OF US DOES AN OKAY JOB AT

LETTING OUR TEAM BE INVOLVED IN LITIGATING THE CASE, AND I

THINK WE EACH ONE WANTED TO BE HERE AS LEAD COUNSEL.

          THE COURT:  ALL RIGHT.  WELL, GREAT. WELCOME.

          MR. WILLSEY:  THANK YOU.

          THE COURT:  ALL RIGHT.  SO TELL ME TELL YOU, WE HAVE

THREE, RIGHT?  THREE DISCOVERY DISPUTES.  AND I'LL SORT OF GIVE

YOU MY TENTATIVE VIEWS, AND THEN YOU CAN DECIDE WHAT YOU WANT

TO DO ABOUT IT.

FIRST WITH RESPECT TO THE DEPOSITION OF MS. JOSEPHSON, I THINK WHAT I WOULD DO IS SAY THAT THE PLAINTIFF, YOU CAN DO IT IF YOU CAN DO IT BY AUGUST 15TH,  AND YOU CAN HAVE FOUR HOURS. SO YOU ARE GOING TO NEED TO FIND -- SHE'S A THIRD PARTY, AND YOU ARE GOING TO HAVE TO GET HER SERVED AND DO IT BY AUGUST 15.

I DON'T SEE ANY PREJUDICE TO THE DEFENDANT HERE.

THEN, WITH RESPECT TO -- AS I UNDERSTAND WHAT THE DEFENDANT WANTS ARE FOR THE QUARTERLY REPORTS -- THIS IS ALL I THINK IS THAT IS LEFT NOW.

MR. WILLSEY:  AND MR. O'ROURKE IS WITH THE DEFENDANTS.

THE COURT:  RIGHT.

MR. WILLSEY:  OH, SORRY. YES.

THE COURT:  HE'S THE DEFENSE.  YOU'RE THE PLAINTIFF.

MR. WILLSEY:  THAT'S RIGHT.

THE COURT:  RIGHT.  BUT YOU WANTED THE QUARTERLY -- DID YOU GET ON JULY 24TH THE OTHER THINGS THAT --

MR. O'ROURKE:  TO BE CLEAR, YOUR HONOR, WE GOT THE MARKETING TEAM MONTHLY EXECUTIVE STATUS REPORTS.  THAT'S RESOLVED.

THE COURT:  YES.

MR. O'ROURKE:  AND WE ALSO GOT THE WINE AND SPIRITS RESTAURANT POLL INFORMATION.  SO THE FIVE CATEGORIES, TWO ARE RESOLVED. THE ONES THAT ARE REMAINING ARE THE LA CREMA ANNUAL

OPERATING PLANS, THE LA CREMA FIVE-YEAR PLANS AND THE QUARTERLY BUSINESS REVIEWS.

THE COURT:  ALL RIGHT. I THOUGHT I HAD UNDERSTOOD FROM YOUR LETTER THAT THE ONLY THING THAT YOU WERE NOT GOING TO PRODUCE WERE THE QUARTERLY REPORTS.

MR. WILLSEY:  THAT'S RIGHT, YOUR HONOR.  AND WE SUBSEQUENTLY CHANGED OUR POSITION AND ON TUESDAY PRODUCED THE QUARTERLY BUSINESS REVIEWS, BUT THEY WERE REDACTED TO TAKE OUT ALL THE INFORMATION ABOUT OTHER WINE PRODUCTS.

BUT THOSE WERE PRODUCED ON TUESDAY, LATE TUESDAY NIGHT.

THE OTHER CATEGORIES OF DOCUMENTS WE PRODUCED EVERYTHING THAT WE HAVE ON JULY 24. SO IN OUR VIEW THIS IS MOOT. WE'VE PRODUCED EVERYTHING WE HAVE. WE CAN MAKE A FORMAL REPRESENTATION TO THAT EFFECT. BUT WE WERE HOPING TO RESOLVE THIS.

THE COURT:  YES.

MR. WILLSEY:  DECIDED LET'S JUST REDACT THE QBR'S, PRODUCED THEM ON TUESDAY, WHICH IS THE SOONEST WE COULD PRODUCE THEM.  IT TOOK QUITE SOME TIME TO REDACT ALL THE NON LA CREMA-RELATED INFORMATION.

AND I APOLOGIZE TO MR. O'ROURKE IF YOU DIDN'T KNOW THAT.

MR. O'ROURKE:  I APPRECIATE THAT.  THERE WERE TWO PRODUCTIONS THIS WEEK.  I HAVEN'T SEEN THE SECOND ONE.  WE GOT ANOTHER ONE YESTERDAY, APPARENTLY.  SO I'LL --

THE COURT:  THEY ARE AGREEING TO PRODUCE THEM, SO IF

YOU DON'T HAVE THEM, MR. WILLSEY WILL GIVE THEM TO YOU.

**MR. O'ROURKE:**  DOES THIS MAKE SENSE, YOUR HONOR? COULD WE LOOK AT THE DOCUMENTS WE'VE GOTTEN AND WE CAN TABLE THIS UNTIL WE CAN CONFIRM?  I'M NOT SAYING THAT MR. WILLSEY WOULD MAKE A MISREPRESENTATION, BUT I WOULD LIKE TO -- I CAN'T SIGN ON.  I HAVEN'T SEEN THE DOCUMENTS.

**THE COURT:**  I GUESS WHAT I'M SAYING IS HE SAYS HE'LL PRODUCE THEM, AND I'M ORDERING THEM TO PRODUCE THEM.

**MR. O'ROURKE:**  OKAY.

**THE COURT:**  SO YOU DON'T NEED TO COME BACK.

**MR. O'ROURKE:**  FAIR ENOUGH.

**THE COURT:**  HE SAID HE'LL PRODUCE THEM.

**MR. O'ROURKE:**  OKAY.

**MR. WILLSEY:**  AND I BELIEVE WE HAVE.  IF YOU LOOK AT THE DOCUMENT AND SEE THAT'S NOT THE CASE --

**MR. O'ROURKE:**  OKAY.  THEN, WE'LL WORK IT OUT.

**THE COURT:**  AND TO THE EXTENT THEY DON'T HAVE SOMETHING HE'LL SUBMIT A DECLARATION OR WHATEVER YOU NEED.

ALL RIGHT. AND THEN, THE LAST IS, I GUESS, THE PLAINTIFFS' 30 (B) (6). I THINK SOME OF THE TOPICS ARE OKAY AND SOME ARE NOT.

I THINK THAT TESTIMONY WITH RESPECT TO THE ATTEMPTS TO ACQUIRE LA CREMA BRAND IS POTENTIALLY RELEVANT. IT'S PART OF THE NARRATIVE OF THE WHOLE -- RIGHT -- STORY OF INFRINGEMENT. BUT THE COMMUNICATIONS CONCERNING LA CREMA, THAT'S JUST WAY TOO

BROAD.  SO I'M GOING TO DENY WITH RESPECT TO THAT TOPIC.

THE DISTRIBUTION OF THE CREME DE LYS WINE PRODUCTS, I THINK THAT'S AN APPROPRIATE 30 (B) (6) TOPIC.

BUT THEN WITH RESPECT TO THE DISCOVERY REQUEST AND THE RESPONSES, I'M GOING TO DENY THAT.  I FAIL TO SEE WHY THAT'S NECESSARY.

SO THOSE ARE MY TENTATIVE VIEWS.

**MR. WILLSEY:**  YOUR HONOR, I'LL START OFF.  I'LL ADDRESS THE ISSUE OF THEIR EFFORTS TO COLLECT AND PRESERVE DOCUMENTS.  THE REASON WE DO THINK THAT IT IS PARTICULARLY RELEVANT NOW IS THAT VERY LATE IN DISCOVERY THE DEFENDANTS PRODUCED, AT OUR REQUEST, DOCUMENTS FROM THE CUSTODIAL FILES OF JENNIFER JOSEPHSON, THE WOMAN WHO WE SEEK TO DEPOSE BY AUGUST 15TH NOW.

THOSE DOCUMENTS CONSISTED OF NINE CALENDAR INVITES. THREE HAD E-MAILS ATTACHED TO THEM, BUT THAT'S ALL THERE WAS. PREVIOUSLY THEY HAD NOT PRODUCED DOCUMENTS FROM MS. JOSEPHSON'S FILES.

SHE'S A FORMER EMPLOYEE. SHE WAS AN EMPLOYEE AT THE TIME THAT THE LAWSUIT WAS INITIATED, SO ALL OF HER DOCUMENTS SHOULD HAVE BEEN PRESERVED. NOW, I WILL GRANT MR. O'ROURKE THAT WE DID RECEIVE E-MAILS ON WHICH SHE WAS COPIED OR SOMETIMES SHE WAS A SENDER, FROM FILES OF OTHER CUSTODIANS. BUT, OF COURSE, THAT WOULDN'T PICK UP ANY E-MAILS THAT MS. JOSEPHSON SENT TO SOMEBODY WHO WASN'T ONE OF THEIR DESIGNATED DOCUMENT

CUSTODIANS.

AND IF ALL WE GET IS THE LIMITED ABILITY TO DEPOSE THEM ON THAT ISSUE, THAT'S REALLY THE ONLY ISSUE WE HAVE RIGHT NOW.

**MR. O'ROURKE:**  I AM NOT SURE WHERE YOU GET THAT SHE WAS AN EMPLOYEE OF DIAGEO AT THE TIME YOU FILED SUIT.  SHE WAS OBVIOUSLY AN EMPLOYEE OF DIAGEO AT THE TIME SHE WORKED ON THE FOCUS GROUP INFORMATION.

HONESTLY, WE HAD NOT -- TWO THINGS. THE PARTIES NEGOTIATED THE TERMS THAT WOULD BE SEARCHED, AND WE SPECIFICALLY NEGOTIATED THE EMPLOYEES WHO WOULD BE SEARCHED.  AND THAT WAS STIPULATED TO.

THE REQUEST FOR MS. JOSEPHSON CAME LATER, AND WE COMPLIED WITH IT. I REALLY THINK THEY HAVE ALL THE JOSEPHSON DOCUMENTS, BECAUSE IF YOU SEE SOME OF THEM, SOME OF THEM ARE ACTUALLY TROUBLING FROM OUR PERSPECTIVE. WE DIDN'T WITHHOLD ANYTHING. SO ANYTHING SHE DID ON THIS CASE WAS IN CONNECTION WITH COMMUNICATING WITH THE BRAND.

AS YOU KNOW FROM YOUR OWN PRIVATE PRACTICE, YOUR HONOR, IN TRADEMARK CASES YOU HAVE THE BRAND SIDE, AND THEN YOU HAVE THE RESEARCH SIDE WHICH SUPPORTS THE BRAND IN DOING NEW LAUNCHES. AND SHE WAS IN COMMUNICATION WITH THE BRAND.

AND EVEN IN THEIR OWN MOTION THEY HAVE ADMITTED THAT THERE WERE OVER A HUNDRED E-MAILS THAT SHE EITHER AUTHORED OR RECEIVED ON THE TOPICS RELEVANT TO THE LAUNCH. THEY HAVE HAD THOSE FOR OVER A YEAR, MANY OF THEM.

ALL OF THEM WERE PRODUCED WELL BEFORE ANY OF THE KEY DEPOSITIONS IN THIS YEAR.  SO, YOU KNOW, WE STIPULATED TO A PLAN.  COULD I GET SOME REPRESENTATIVE AND EXPLAIN TO THEM WHAT WE DID SO THEY CAN TELL YOU WHAT I'M TELLING YOU NOW?  YES, I GUESS I COULD DO THAT.

AT THIS LATE DATE DOES IT MAKE SENSE?  I DON'T THINK SO.

THE COURT:  I DON'T KNOW WHY.

MR. WILLSEY:  WELL, WE DON'T NEED TO EXPLORE OTHER AREAS OF DOCUMENT QUESTION. MR. O'ROURKE IS EXACTLY RIGHT.  WE AGREED ON A SET OF SEARCH TERMS.  IT TOOK SOME TIME.  THAT'S WHY OUR COLLEAGUES WERE HERE ON A PREVIOUS MOTION TO COMPEL.

THE COURT:  MORE THAN ONE, I THINK.

MR. WILLSEY:  YES, THERE WERE TWO. BUT WE ENDED UP COMING OUT WITH A PLAN, AND I THINK THERE WAS A GOOD LEVEL OF COOPERATION. THE ISSUE IS ALTHOUGH WE GOT A HUNDRED E-MAILS WITH JOSEPHSON'S NAME ON THEM, WE DIDN'T GET THESE DOCUMENTS IN HER CUSTODIAL FILES.

IF SHE WAS AN EMPLOYEE OF THE DEFENDANTS AT THE TIME THE LAWSUIT WAS INITIATED THOSE DOCUMENTS SHOULD HAVE BEEN PRESERVED.  AND HERE'S SOME EXAMPLES OF THINGS THAT WOULDN'T HAVE PICKED UP.

THE COURT:  BUT HAVE YOU HAD THIS CONVERSATION WITH MR. O'ROURKE?

MR. WILLSEY:  NO.

THE COURT:  SEE, THAT'S THE THING.  SEEMS TO ME YOU

GENTLEMEN ARE COOPERATING, AND SO WHY DON'T YOU JUST SIT DOWN AND HAVE THE CONVERSATION, AND HE CAN FIGURE OUT, AND YOU CAN EXPLAIN TO HIM WHY THEY DIDN'T HAVE IT.

AND WHAT YOU REALLY WANT TO KNOW IS:  IS THERE SOMETHING MORE OUT THERE, RIGHT?

**MR. WILLSEY:**  THAT'S EXACTLY RIGHT.

**THE COURT:**  SO HAVE THE CONVERSATION WITH HIM AND SEE IF YOU CAN BE SATISFIED THAT YOU HAVE EVERYTHING.

**MR. WILLSEY:**  YES.  WELL, THERE ARE TWO THINGS. YOU'VE IDENTIFIED THE SECOND ONE.  THE FIRST ONE, THOUGH, IS WE WANT TO MAKE SURE THE DOCUMENTS WERE APPROPRIATELY PRESERVED.

I BELIEVE SHE WAS AN EMPLOYEE OF DNA, DIAGEO NORTH AMERICA, INC., BASED ON DEPOSITION TESTIMONY OF ANOTHER WITNESS IN THE CASE, BECAUSE I THINK SHE LEFT IN 2012.  I DON'T KNOW FOR A FACT.

**MR. O'ROURKE:**  OKAY.

**THE COURT:**  IF WE CAN HASH THAT OUT, AND IT TURNS OUT SHE WASN'T AN EMPLOYEE AT THE TIME THE LAWSUIT WAS INITIATED, WE DON'T HAVE AN ISSUE.  BUT IF SHE WAS, WE WANT TO MAKE SURE THE DOCUMENTS WERE PRESERVED.  AND WE WANT TO KNOW WHAT ELSE IS OUT THERE THAT WE SHOULD BE GETTING.

THAT'S THE LIMITED AREA OF FOCUS FOR THAT TOPIC THAT WE WOULD WANT TO -- BUT --

**MR. O'ROURKE:**  I'M HAPPY TO LOOK INTO THAT.

**THE COURT:**  RIGHT.

**MR. WILLSEY:** BUT WE CAN TALK ABOUT --

**THE COURT:** I MEAN, WHO WOULD BE DEPOSITION BE OF? MR. O'ROURKE? WHY NOT JUST -- PROBABLY NOT.

**MR. O'ROURKE:** MR. SIEGARTEL, PROBABLY.

**THE COURT:** WHY NOT JUST HAVE THAT CONVERSATION, AND THEN JUST WORK TOGETHER?

**MR. O'ROURKE:** OKAY, YOUR HONOR. WE WILL.

**THE COURT:** SO WE DON'T HAVE TO GO -- BECAUSE, LOOK, THEY DON'T WANT TO BE WITHHOLDING ANYTHING, RIGHT? SO IF THEY HAVE SOMETHING, THEY WILL PRODUCE IT. IF THEY MISSED SOMETHING THEY WILL FIGURE IT OUT. AND IF IT WAS PRODUCED LATE OR IT'S NOT THERE, THEN THEY WILL TELL YOU.

AND IF THEY DIDN'T PRESERVE WHAT WAS IN THE FILE WHEN SHE WAS AN EMPLOYEE, THEN YOU'LL KNOW THAT, AS WELL. SO --

**MR. WILLSEY:** YES. I ONLY HAVE ONE OTHER REQUEST BECAUSE, I MEAN I'M NOT GOING TO ARGUE WITH YOUR RULING TOPIC NUMBER SEVEN: "ANY COMMUNICATIONS BETWEEN YOU AND ANY THIRD PARTY."

QUITE FRANKLY, ONE OF OUR MOST IMPORTANT TOPICS THERE WAS THE DISTRIBUTION. THAT, TO US, WAS VERY IMPORTANT. HOW THESE PRODUCTS GET ON THE SHELVES, HOW THE DEFENDANTS TELL RETAILERS TO PUT THE PRODUCTS ON THE SHELVES, THAT IS HIGHLY RELEVANT. SO I WON'T GET INTO THAT.

THE ONLY THING THAT I ASK IS WITH RESPECT TO THE DEPOSITION OF JENNIFER JOSEPHSON, WE WOULD APPRECIATE ONE

ADDITIONAL WEEK, BECAUSE SHE'S PROVEN TO BE A VERY DIFFICULT PERSON TO SERVE.

WE HAD TO HAVE A PROCESS SERVER CAMP OUT IN FRONT OF HER RESIDENCE. HE WAS NOT ALLOWED IN THE PREMISES BY ORDER OF THE DOORMAN. THERE'S SOME MYSTERY AS TO WHETHER HE WAS THE REAL JENNIFER JOSEPHSON.  I KNOW THAT --

**MR. O'ROURKE:**  IT WAS NOT.

**MR. WILLSEY:**  WELL, WE HAVE A PROCESS SERVER'S AFFIDAVIT WHO SAID THEY SERVED SOMEONE WHO SAID "I'M JENNIFER JOSEPHSON," AND THEN OPPOSING COUNSEL CONFIRMED THAT WAS HER ADDRESS, SO IF IT WAS A FRIEND --

**MR. O'ROURKE:**  WHY DON'T WE DO IT THIS WAY?  I WOULD LIKE A SHOT AT TELLING YOU WHY YOU ARE, WITH DUE RESPECT, WRONG, SO AFTER --

**THE COURT:**  WHAT, ABOUT ALLOWING HER DEPOSITION?

**MR. O'ROURKE:**  YES.  I WOULD LIKE TO BE HEARD ON THAT.

**THE COURT:**  WHY DON'T YOU TELL ME HOW YOU ARE PREJUDICED?

**MR. O'ROURKE:**  I'LL TELL YOU WHY. FIRST OF ALL, THEY NOT ONLY HAD TEN DEPOSITIONS ALREADY. THEY ARE NOW GOING TO GET ANOTHER SHOT ON 30 (B) (6) TOPICS THAT WERE ONLY SERVED ON US IN JUNE.

**THE COURT:**  YOU SERVED A 30 (B) (6) ON THEM IN JUNE, AS WELL.

**MR. O'ROURKE:** WE DID.

**THE COURT:** OKAY.

**MR. O'ROURKE:** WE DID.

**THE COURT:** SO IT APPEARS TO ME TO BE THE END OF THAT ARGUMENT.

**MR. O'ROURKE:** I SHOULD BREAK THESE DOWN TOPIC BY TOPIC, BECAUSE THE ARGUMENTS ARE SLIGHTLY DIFFERENT FOR EACH. SO IF I MAY, I'LL DO THIS AS QUICKLY AS I CAN, YOUR HONOR.

WITH REGARD TO MS. JOSEPHSON, IT ISN'T RIGHT FOR THE PLAINTIFF TO COME IN HERE AND CREATE THE IMPRESSION WITH YOUR HONOR THAT THEY HAD THIS VOILA MOMENT AT THE DEPOSITION OF JEFF HISTEAD (PHONETIC) FROM NORTHSTAR, WHO WAS THE OUTSIDE ORGANIZATION WHO CONDUCTED THE FOCUS GROUPS.

THEY ACTED AS IF THEY GOT THE NORTHSTAR PRODUCTION. DIAGEO HAD BEEN HIDING THE BALL, AND ALL OF A SUDDEN THEY HAD THIS EUREKA MOMENT THAT MS. JOSEPHSON SOMEHOW WAS A VITAL WITNESS. THEY HAVE KNOWN ABOUT MS. JOSEPHSON FOR WELL OVER A YEAR. AND IN PARTICULAR, YOUR HONOR, AT THE DEPOSITION OF MARY LIGHT, THE DEPOSITION THAT YOU ORDERED, MS. LIGHT TESTIFIED AD NAUSEAM ABOUT MS. JOSEPHSON AND HER ROLE.

AND, SPECIFICALLY, YOUR HONOR, AT THAT DEPOSITION THE EUREKA MOMENT THAT THEY REPRESENTED TO THE COURT THAT THEY FOUND OUT ABOUT ONLY QUITE RECENTLY WAS -- IT OCCURRED AT THAT DEPOSITION. AND I HAVE --

**THE COURT:** WELL, LET'S SAY I AGREE WITH YOU.  LET'S

SAY I AGREE WITH YOU. BUT THEY NOTICED HER DEPOSITION WITHIN THE DISCOVERY DEADLINE.  IN MY EXPERIENCE --

**MR. O'ROURKE:**  DID THEY, THOUGH, YOUR HONOR?  CAN YOU NOTICE A DEPOSITION FOR JULY 2ND WITH A DISCOVERY CUTOFF ON JULY 5TH AND ATTEMPT TO SERVE THAT THE THURSDAY BEFORE THE JULY 2ND WITHOUT -- WITHOUT ACTUALLY MAKING SERVICE?  POINT ONE.

POINT TWO:  CAN YOU THEN, SINCE YOU COULDN'T SERVE HER -- AND, BY THE WAY, WE WERE NOT IN CONTACT WITH HER, CONTRARY TO WHAT HE SAID.  WE WERE NOT IN CONTACT WITH HER UNTIL OVER FOURTH OF JULY WEEKEND.  THERE APPARENTLY WAS A PROCESS SERVER TRYING TO GET INTO HER BUILDING, AND SHE CALLED UP DIAGEO AND SAID:  "WHAT IS GOING ON?"

SHE DIDN'T CALL ME.  I HADN'T TALKED TO HER.  SHE TALKED TO MY IN-HOUSE LAWYER WHO WAS THE HEAD OF THE LITIGATION, AND SAID:  "WHAT'S GOING ON?  I'M NOT EVEN GOING TO BE IN THE COUNTRY NEXT WEEK. WHAT'S GOING ON?"

SO THEY CLAIM THAT THEY SERVED HER ON JULY 2ND -- THEY DIDN'T SERVE HER -- FOR A DEPOSITION ON JULY 5TH, THE LAST DAY OF DISCOVERY CUTOFF.

NOW, IN CONNECTION WITH TRYING TO WRAP-UP DISCOVERY, MR. WILLSEY HAD REPRESENTED TO US THAT THEIR OFFICES WEREN'T EVEN OPEN ON JULY 5TH.  THAT WOULD BE A PRETTY TERRIBLE DAY FOR A DEPOSITION. SO A JULY 2ND NOTICE, EVEN IF IT WAS SERVED, WHICH IT WASN'T, FOR A DEPOSITION ON THE LAST DAY OF DISCOVERY,

WHICH IS THE FRIDAY IN-BETWEEN FOURTH OF JULY AND THE WEEKEND, CLEARLY IMPROPER NOTICE UNDER THE RULES. YOU CAN'T GIVE THREE DAYS' NOTICE.

**THE COURT:**  OKAY.  BUT WHAT IS THE PREJUDICE?

**MR. O'ROURKE:**  THE PREJUDICE IS WE'VE BEEN TAKING DEPOSITIONS AD NAUSEUM.  WE'VE BEEN SPENDING A LOT OF THE CLIENT'S TIME, MONEY AND EFFORT.  THEY'RE KNOWN ABOUT HER FOR WELL OVER A YEAR, INCLUDING THIS EUREKA MOMENT WHERE SHE SAID: "BY THE WAY" -- WHEN THE BRAND TOLD UPPER MANAGEMENT ABOUT WHAT HAPPENED AT THE FOCUS GROUPS SHE SAID:  "BY THE WAY, THERE WAS THIS ISSUE WITH LA CREMA.  YOU SHOULD MENTION THAT."

THAT WAS THE EUREKA MOMENT.

**THE COURT:**  I UNDERSTAND, BUT THAT'S NOT -- WHETHER YOU TOOK HER DEPOSITION NOW OR YOU TOOK IT SIX MONTHS EARLIER, THAT'S NOT PREJUDICE, BECAUSE THE SAME TIME AND MONEY IS SPENT. SO WHAT IS THE PREJUDICE?

**MR. O'ROURKE:**  THE PREJUDICE, YOUR HONOR, IS THEY ARE GOING TO GET MORE THAN TEN DEPOSITIONS.  THAT'S PREJUDICE.

**THE COURT:**  THAT ISN'T ENOUGH.

SO WHAT ABOUT THAT?

**MR. WILLSEY:**  YOUR HONOR, THIS IS THE TENTH DEPOSITION.  THE WAY THEY'VE COME UP WITH US GETTING TO NUMBER 11 IS THAT THEY COUNT THE 30 (B) (6) AS TWO SEPARATE DEPOSITIONS.

THIS IS A UNIQUE SITUATION. WE WERE IN THIS LIMITED PHASE

OF DISCOVERY AT JUDGE CHEN'S ORDER PRIOR TO THE SETTLEMENT CONFERENCE, WHICH EVERYONE HOPED WOULD GO WELL.  AND JUDGE CHEN ORDERED THAT THE PARTIES COULD ONLY TAKE DISCOVERY ON ISSUES THAT WERE NECESSARY TO FACILITATE THE SETTLEMENT CONFERENCE.

SO WE WORKED WITH THEM, AND WE CAME UP WITH THIS VERY NARROW SET OF TOPICS.  IN FACT, IN OUR DEPOSITION NOTICE WE ONLY INCLUDED SEVEN.  WE ENDED UP ADDING EIGHT, AN EIGHTH, NEGOTIATING DOWN TO FIVE, FIVE 30 (B) (6) TOPICS THAT MS. LIGHT TESTIFIED ON BECAUSE THAT'S WHAT WE AGREED WAS RELEVANT FOR THE SETTLEMENT CONFERENCE.

CONVERSELY, THEY CAME UP WITH A DEPOSITION NOTICE THAT HAD, I THINK, 16 TOPICS ON IT.  WE NEGOTIATED THAT DOWN A BIT. THOSE DEPOSITIONS WENT FORWARD.

ONCE WE MOVED OUT OF THAT LIMITED PHASE OF DISCOVERY THE 30 (B) (6) IS STILL ONGOING WITH THE OTHER TOPICS THAT WE WOULD HAVE TAKEN BUT FOR THE FACT THAT WE WERE IN THIS SOMEWHAT UNIQUE SITUATION BACK BEFORE THE SETTLEMENT CONFERENCE.

SO THE 30 (B) (6) IS ONE STANDING DEPOSITION. THAT'S THE WAY THE FEDERAL RULES TREAT IT.  THAT'S THE WAY THE COURTS TREAT IT. THIS IS THE TENTH.

**MR. O'ROURKE:**  OKAY.  THERE WAS FURTHER PREJUDICE, AND I DIDN'T WANT TO RAISE THIS BECAUSE WE GET ALONG VERY WELL, AND I DON'T -- BUT WE WERE PREJUDICED.  AND I'LL TELL YOU TWO OTHER THINGS THAT HAPPENED TO US THAT WEREN'T COOL.

NUMBER ONE, THE IN-HOUSE LAWYER FOR DIAGEO WHO CLEARED

THIS MARK, DIANE PLAUT, WAS NOTICED FOR DEPOSITION IN HER INDIVIDUAL CAPACITY. I HAD PREPARED HER. WE GOT THE DOCUMENTS. WE PRODUCED THEM.

THE AFTERNOON BEFORE SHE WAS TO BE DEPOSED, AFTER THE WORK WENT INTO PREPARING HER, THEY WITHDREW THE NOTICE IN HER SPECIFIC CAPACITY, BECAUSE THEY WERE RUNNING UP AGAINST TEN DEPOSITIONS.  POINT ONE.

POINT TWO: SOUTHERN DISTRIBUTORS IS PROBABLY THE MOST IMPORTANT BUSINESS RELATIONSHIP WITH MY CLIENT AND WITH THEIR CLIENT, BECAUSE THEY DISTRIBUTE FOR BOTH PARTIES. SOUTHERN DEPOSITION WAS SUBPOENAED FOR BOTH DOCUMENTS AND THE DEPOSITION.

OF COURSE I HAD TO BE AT THAT DEPOSITION. ADAM HAS BEEN AT SOME OF THE DEPOSITIONS, AND MILLER, AN ASSOCIATE AT MY FIRM HAS BEEN AT DEPOSITIONS.  I HAD TO GO TO THAT.  THAT WAS AN IMPORTANT BUSINESS RELATIONSHIP.

AFTER I GOT ON THE PLANE TO GO TO THE WEST COAST FOR THAT DEPOSITION WE GOT AN E-MAIL CANCELLING THAT DEPOSITION. SO THEY HAD LIKE 13 DEPOSITIONS NOTICED. WE WERE SCRAMBLING AROUND LIKE CRAZY TO COVER THEM.  AND THIS IS JUST MORE OF THE SAME STUFF THAT HAPPENS AT THE END OF A CASE.

AND GUESS WHAT?  THERE'S A DEADLINE SO THAT PARTIES DON'T HAVE TO CONTINUE TO KEEP DISCOVERING THE CASE. MY CLIENT SHOULDN'T HAVE TO SPEND THE TIME, MONEY AND EFFORT NOW REACHING OUT TO MS. JOSEPHSON.

OF COURSE, WE'RE GOING TO REACH OUT TO HER NOW AND TRY TO, YOU KNOW, DEFEND HER DEPOSITION AS A FORMER EMPLOYEE. BUT ENOUGH IS ENOUGH.

**MR. WILLSEY:** TWO POINTS. NUMBER ONE, THEY DID THE EXACT SAME THING TO US. AND I KNOW THIS IS THE LAST THING YOU WANT TO HEAR, ATTORNEYS SAYING: "WELL, YOU DID THIS," BUT LET ME --

**THE COURT:** CAN I JUST SAY SOMETHING? WE'RE NOT TALKING ABOUT BIG COMPANY VERSUS LITTLE COMPANY. YOU'RE TALKING ABOUT BIG COMPANY VERSUS BIG COMPANY. AND I WOULD BE -- I WOULD BE MORE SYMPATHETIC TO YOUR ARGUMENT IF IT WAS, YOU KNOW, THEY ARE JUST BIG COMPANIES TRYING TO BROWBEAT US INTO --

**MR. O'ROURKE:** WELL --

**THE COURT:** -- RUN UP OUR COSTS, SO WE GIVE UP. BUT THAT'S NOT IT.

**MR. O'ROURKE:** IF THIS WERE --

**THE COURT:** DIAGEO EVEN BIGGER.

**MR. O'ROURKE:** DIAGEO NORTH AMERICA IS MUCH BIGGER. DIAGEO NORTH AMERICA DOESN'T MANUFACTURE WINE. DIAGEO CHATEAU & ESTATES DOES.

ENTIRE P AND L ON THIS PRODUCT IS GOING TO BE EATEN UP BY THIS LAWSUIT. THIS IS NOT A BIG PRODUCT, SO THERE IS PREJUDICE. AND THE PEOPLE AT DIAGEO CHATEAU & ESTATES DO HAVE A P AND L THAT THEY HAVE TO BE WORRIED ABOUT.

YOU KNOW, YOU'VE SEEN THE FINANCIAL INFORMATION.  IT'S UNDER HIGHLY CONFIDENTIAL RIGHT NOW. BUT I WILL JUST TELL YOU, YOU WOULD BE SURPRISED HOW LITTLE MONEY IS INVOLVED IN THIS CASE ON OUR SIDE.  SO THIS IS PREJUDICIAL.  THERE ARE JOBS AT STAKE AT DC&E OVER THIS LITIGATION AND WHAT HAPPENS AND HOW MUCH MONEY IS BEING SPENT ON THIS CASE.  IT IS VERY IMPORTANT TO THEM.  IT'S A SMALL COMPANY, RELATIVELY.

**MR. WILLSEY:**  DC&E IS THE WHOLLY OWNED SUB OF DNA.

**THE COURT:**  WELL --

**MR. WILLSEY:**  DNA PROVIDES MANY OF THE SERVICES THAT RELATE TO LA CREMA. IN FACT, MS. JOSEPHSON WAS A DNA EMPLOYEE. MS. PLAUT, WHO MR. O'ROURKE MENTIONED, IS A DNA EMPLOYEE.

THE 30 (B) (6) DESIGNEE FOR FINANCIAL TOPIC INFORMATION IS A DNA EMPLOYEE. THESE ARE NOT TWO SEPARATE COMPANIES WHERE DC&E IS THIS TINY, BOOTSTRAPPED COMPANY ABOUT TO GO OUT OF BUSINESS. IT'S PART OF THE DNA EMPIRE. AND IT'S NOT PREJUDICIAL.  AND TO CLEAR UP THE FACTS FOR THE RECORD, I SHOULD STATE THAT ON JUNE 24 WE SENT A NOTICE OF DEPOSITION TO OPPOSING COUNSEL REGARDING MS. JOSEPHSON.

THE REASON WE DID THAT INSTEAD OF SERVING HER WITH A SUBPOENA AT THAT TIME IS THAT EARLIER IN THE CASE WE SOUGHT TO TAKE THE DEPOSITION OF SILVIE SCHWARTZ, ANOTHER FORMER EMPLOYEE OF THEM.

COUNSEL WORKED IT OUT. WE DIDN'T HAVE TO SUBPOENA THEM. THEY AGREED TO BRING HER FOR DEPOSITION. WE THOUGHT THE SAME

THING WOULD HOLD TRUE WITH JOSEPHSON, WHO IS A FORMER EMPLOYEE.

SO WE SENT THEM A NOTICE OF DEPOSITION.  WE DIDN'T HEAR ANYTHING MORE. WHEN WE DID HEAR SOMETHING IT WAS TWO DAYS LATER ON JUNE 26TH.  AND IT WAS THIS VERY EVASIVE E-MAIL, IN MY OPINION, FROM MR. SIEGARTEL, THAT DIDN'T INDICATE WHETHER THEY WERE GOING TO ACTUALLY TALK TO JOSEPHSON AND BRING HER TO DEPOSITION OR NOT.

SO JUNE 26 IS THE FIRST DAY THAT WE SAID WE HAVE TO SERVE HER BECAUSE THEY ARE NOT MAKING HER AVAILABLE. THAT'S WHEN THE SERVER FIRST MADE HIS ATTEMPTS AND WHEN HE WAS BARRED FROM THE BUILDING AND COULDN'T GET IN.

SO HE REPEATEDLY WENT BACK, AND THEN FINALLY MANAGED TO ON JULY 1ST.  AT THE END OF THE DAY, THOUGH, THERE'S NO PREJUDICE TO THESE VERY LARGE DEFENDANTS. THIS IS A WITNESS WITH HIGHLY RELEVANT INFORMATION. SHE LIVES IN NEW YORK.

THAT'S WHERE MR. O'ROURKE AND HIS FIRM ARE LOCATED. WE'RE WILLING TO DO IT THERE, OF COURSE. WE'RE WILLING TO EVEN LIMIT THE HOURS. WE COULD DO IT IN FOUR HOURS. THAT'S ALL WE NEEDED TO QUESTION HER. WE'LL COME TO NEW YORK.  WE'LL DO IT.  WE'LL DO IT BY -- I WAS GOING TO PROPOSE AUGUST 22ND, BECAUSE IT'S DIFFICULT TO SERVE HER.

**THE COURT:**  WELL, YOU KNOW, I'M GOING TO GIVE YOU AUGUST 15TH.

**MR. WILLSEY:**  OKAY.

**THE COURT:**  BECAUSE THE CUTOFF WAS JULY 5TH.  AND IN

THE MEANTIME, FRANKLY, YOU COULD HAVE BEEN TRYING TO SERVE HER OR FIND HER.

MR. WILLSEY:  OKAY.

THE COURT:  AND THERE IS SOME POINT, AND YOU HAVE YOUR DISPOSITIVE MOTION DEADLINE COMING UP TO BE HEARD, RIGHT, IN THE END OF SEPTEMBER.  SO EVERYBODY --

MR. O'ROURKE:  I DON'T THINK THAT'S GOING TO BE AN ISSUE.

MR. WILLSEY:  THAT'S RIGHT.

MR. O'ROURKE:  I DON'T THINK EITHER SIDE IS FILING FOR --

THE COURT:  IS THAT RIGHT?

MR. WILLSEY:  THAT'S RIGHT.

THE COURT:  THAT'S PROBABLY RIGHT, BECAUSE YOU KNOW WHAT HAPPENS IS --

MR. O'ROURKE:  THERE ARE SO MANY FACTS IN THIS CASE.

THE COURT:  THERE'S SO MANY FACTS.

MR. WILLSEY:  WE'VE HAD SEVERAL DISCUSSIONS, THE MOST RECENT OF WHICH WAS ACTUALLY THIS MORNING BEFORE --

THE COURT:  ARE YOU GOING TO TRY TO SETTLE THIS CASE.

MR. O'ROURKE:  IT'S NOT SETTLEABLE. THE CASE CAN'T SETTLE UNLESS WE CHANGE OUR BRAND.

MR. WILLSEY:  IT'S THE NAME. SO I THINK THIS IS GOING TO GO TO TRIAL. I MEAN, WE'VE ALWAYS SAID WE'RE OPEN TO SETTLEMENT DISCUSSIONS, BUT MY CLIENT'S BEEN PRETTY CLEAR THEY

WANT THE NAME -- I MEAN, WE'RE WILLING TO NEGOTIATE ON A LOT OF OTHER ISSUES:  MONEY, THINGS LIKE --

THE COURT:  CAN'T THEY BUY THE NAME?

MR. O'ROURKE:  CAN WHO BUY THE NAME?

THE COURT:  THEY.  I MEAN, OBVIOUSLY CHANGE THE NAME -- ANYWAY --

MR. O'ROURKE:  YOUR HONOR --

THE COURT:  SEEMS TO ME THAT THESE CASES, RIGHT, THESE WINE TRADEMARK CASES HAPPEN ALL THE TIME. WHAT JUDGE BREYER DID WITH ONE CASE IS THEY CAME -- AND YOU ARE RIGHT. THEY MOVED FOR SUMMARY JUDGMENT. HE SAID:  "HOW CAN I DO SUMMARY JUDGMENT?"

SO WHAT THEY DID IS THEY CONVERTED IT RIGHT THEN AND THERE TO A BENCH TRIAL, AND THEN HE JUST RULED.

YOU COULD THINK ABOUT THAT.

MR. WILLSEY:  WE HAVE RESEARCHED JUDGE CHEN'S DECISIONS ON SUMMARY JUDGMENT MOTIONS, NINTH CIRCUIT CASE LAW. AND OUR CONCLUSION WAS TRADEMARK CASES ARE NOT --

THE COURT:  YEAH.  YEAH.  YEAH.  I THINK YOU ARE RIGHT. THAT'S ACTUALLY SMART.

MR. WILLSEY:  SO THAT REDUCES THE PRESSURE IN TERMS OF TIMING, BUT AUGUST 15 --

MR. O'ROURKE:  WELL, YOUR HONOR, ONE THING -- AND, AGAIN, I DON'T WANT TO ARGUE AGAINST MYSELF -- IT'S LIKELY WE'RE GOING TO REPRESENT MS. JOSEPHSON. WE'RE GOING TO OFFER TO

DO THAT.

I HAVE NO IDEA WHAT HER SCHEDULE IS.  AND SHE'S A THIRD PARTY AND DOES NOT WORK FOR DIAGEO, SO CAN WE WORK WITH THE OTHER SIDE ON THE TIMING OF IT?

**THE COURT:**  OF COURSE YOU CAN.  ANYTHING YOU WANT YOU CAN AGREE TO.  YES.

**MR. O'ROURKE:**  OKAY.  SO IF THERE'S A DATE BEFORE THE 22ND THAT SHE'S AVAILABLE, AND WE COULD DO THAT.  OR IF NOT, WE CAN WORK OUT AN APPROPRIATE --

**THE COURT:**  IF YOU ARE GOING TO BE WORKING WITH HER, FINE.  AND YOU WANT TO WORK OUT SOMETHING ELSE, FINE.  DO WHATEVER YOU AGREE TO.

**MR. WILLSEY:**  YOUR HONOR -- YOU MIND IF I TELL HER? THERE ARE OTHER DEPOSITIONS THAT WILL TAKE PLACE. WE HAVE A WITNESS WHO SHOULD BE DEPOSED.  THEY HAVE SERVED HER WITH NOTICE OF DEPOSITION, BUT SHE'S BEEN OUT ON MATERNITY LEAVE. SO SHE WAS OUT THE ENTIRE FACT DISCOVERY OR LAST THREE MONTHS.

**MR. O'ROURKE:**  AND, OF COURSE, WE'LL TAKE THAT WHENEVER, ANY TIME BEFORE TRIAL.

**MR. WILLSEY:**  RIGHT.  BUT AS FAR AS SAYING WE'RE GOING TO WORK TOGETHER TO FIGURE A SCHEDULE THAT MAKES SENSE FOR EVERYBODY.

**THE COURT:**  YES.  YES.  YOU GUYS CAN DO WHATEVER YOU WANT.  I MEAN, JUDGE CHEN WOULDN'T CARE AS LONG AS YOU AGREE.

DO YOU HAVE A TRIAL DATE?

**MR. O'ROURKE:** DECEMBER 16. YOUR HONOR, COULD --

**THE COURT:** THE JURY IS GOING TO LOVE YOU GUYS.

**MR. O'ROURKE:** YOUR HONOR, COULD --

**THE COURT:** YOU SHOULD REALLY THINK ABOUT THAT. YOU SHOULD REALLY THINK ABOUT THAT BENCH TRIAL ISSUE.

**MR. O'ROURKE:** YOUR HONOR, COULD WE TALK ABOUT THE PRIOR ATTEMPT TO ACQUIRE LA CREMA?

**THE COURT:** YES.

**MR. O'ROURKE:** SO, INTERESTING -- AGAIN, I'LL HARKEN BACK TO YOUR DAYS IN PRIVATE PRACTICE WHEN YOU WERE REPRESENTING COMPANIES IN TRADEMARK DISPUTES. THINK OF THE BRAND TEAM AND THINK OF RESEARCH, AND THEN THINK OF DISTRIBUTION.

THE BRAND TEAM IS THE ONE WHO CAME UP WITH CREME DE LYS AND BROUGHT THIS PRODUCT TO MARKET. IT INVOLVED NOEL CAMPBELL, WHO WAS THE BRAND MANAGER, AND SILVIE SCHWARTZ, WHO WAS THE BRAND DIRECTOR.

ABOVE SILVIE NOW IS MARY LIGHT, ALL THREE OF WHOM HAVE BEEN DEPOSED IN THIS CASE. NONE OF WHOM, NONE OF WHOM, YOUR HONOR, TESTIFIED -- ALL OF WHOM WHO TESTIFIED UNDER OATH: "I HAVE NO IDEA ABOUT THAT ATTEMPTED ACQUISITION."

NOEL DIDN'T EVEN WORK AT THE COMPANY AT THE TIME. NEITHER DID SILVIE. MARY KNEW NOTHING ABOUT IT. SO WE HAVE THE PEOPLE WHO BROUGHT THIS PRODUCT TO MARKET WHO KNEW NOTHING ABOUT AN ATTEMPTED ACQUISITION OF THIS PRODUCT.

THE PROFFER WE GOT ON THIS ISSUE WAS THAT IT'S INTENT OF -- IT'S EVIDENCE OF BAD FAITH. WE TRIED TO BUY IT.  WE COULDN'T BUY IT, SO WE STOLE IT.

THAT'S NOT WHAT HAPPENED. I'M NOT SAYING WE'RE GOING TO WIN OR LOSE THIS CASE. THAT HAS NOTHING TO DO WITH THE PRIOR POSITION, POINT ONE.

POINT TWO: WHEN THIS BRAND WAS FIRST NAMED IT WASN'T EVEN NAMED "CREME DE LYS."  IT WAS CALLED "BUTTERCREAM."

AND THE TESTING CAME BACK FROM THE FIELD DISTRIBUTORS, AND EVERYONE ASSOCIATED WITH THE PRODUCT SAID:  "THAT'S A TERRIBLE NAME. IT SOUNDS LIKE A DESSERT."

WELL, NOT SURPRISING, BECAUSE THE ORIGINAL COMPETITIVE BENCHMARK WAS CUPCAKE. AND SO THEY WERE GOING AFTER A VERY SWEET, VERY BUTTERY PRODUCT. IT DIDN'T PLAY WELL, SO THEY WENT: "OKAY, BACK INTO NAME DEVELOPMENT."

THE WOMAN WHO CAME UP WITH THE NAME -- HER NAME IS NICOLE LOCKWOOD -- ALSO DEPOSED.  SHE'S THE ONE THAT SPECIFICALLY CAME UP WITH THAT NAME. THERE WERE HUNDREDS OF NAMES THAT WERE CONSIDERED, ABOUT HALF OF WHICH HAD THE WORD "CREAM" IN IT SOMEWHERE, BECAUSE THE PROFILE CHANGED FROM A BUTTERY PROFILE TO A CREAMY PROFILE.

NICOLE LOCKWOOD KNEW NOTHING ABOUT THE ATTEMPTED ACQUISITION OF LA CREMA.  NOW, THIS -- AND WHEN YOU READ THE TOPIC CAREFULLY THEY TALK ABOUT CONFIDENTIAL DOCUMENTS THAT THEY GAVE TO DIAGEO IN THE CONTEXT OF THE DUE DILIGENCE ON THE

ACQUISITION AS IF WE USED THEIR CONFIDENTIAL INFORMATION OR WE TRIED TO BUY IT, AND NOW WE'RE GOING TO STEAL IT.

IT SIMPLY HAS BEEN ALREADY SHOWN THAT THAT DID NOT HAPPEN. AND THE PLAINTIFF DOESN'T DISPUTE THAT. SO WHAT IS THE RELEVANCE?  AND I KNOW THAT'S NOT THE STANDARD. I KNOW THAT THE STANDARD IS: IS IT LIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE?

AND THE ANSWER IS "NO, IT CAN'T."

THE COURT:  ALL RIGHT. LET ME HEAR FROM --

MR. WILLSEY:  OKAY. NUMBER ONE, IN THE THOUGHT SESSION THAT LED TO SOMEONE PICKING THE NAME "CREME DE LYS," NICOLE LOCKWOOD, THERE WERE, I BELIEVE, SOMEWHERE BETWEEN TEN AND 15 PEOPLE.  WE HAVEN'T DEPOSED ALL THOSE PEOPLE. WE DON'T HAVE THE TIME OR RESOURCES.  WE ARE NOT GOING TO ASK FOR IT.

THERE WERE A LOT OF PEOPLE INVOLVED IN THE DISCUSSION. THERE WERE NO WRITTEN RECORDS OF THAT MEETING.  THEY WROTE THINGS UP ON A BOARD, ON A WHITEBOARD, BRAINSTORMED.

THE THREE PEOPLE WE HAVE DEPOSED SAID:  "I DIDN'T KNOW ABOUT THIS ATTEMPT TO BUY LA CREMA."  THERE WERE 13 -- SOMEWHERE BETWEEN TEN AND ANOTHER 15 PEOPLE IN THAT MEETING.

NUMBER TWO:  EVERY STEP OF THE WAY THEY HAVE A GATING PROCESS WHEN THEY ARE DEVELOPING A NEW PRODUCT.  AND THEY HAVE TO GET APPROVAL FROM SENIORS. THESE ARE PEOPLE WHO WE HAVE NOT DEPOSED WHO ARE MUCH HIGHER UP IN THE CORPORATION AND WHO VERY WELL MAY HAVE INFORMATION CONCERNING THE ATTEMPT TO BUY LA

CREMA AND COULD SHAPE THE DECISIONS.

THEY WERE INVOLVED IN THE DECISION TO TRANSITION AWAY FROM THE BUTTERCREAM NAME, WHICH LED TO CREME DE LYS, WHICH UNDERWENT A COUPLE OF DIFFERENT SPELLINGS.

BUT, FINALLY, IF THE FACTS ARE AS MR. O'ROURKE SAYS THEY ARE, THEN PUT SOMEONE UP TO TESTIFY AS SUCH ON BEHALF OF THE COMPANY. THEN YOU HAVE SOMEONE TELLING US THERE WAS NO KNOWLEDGE BY ANYONE INVOLVED.  YOU KNOW, THAT THIS IS WHAT HAPPENED. THIS IS WHAT WE DID WITH THE INFORMATION WE GOT FROM JACKSON FAMILY WINES WHEN WE LOOKED INTO BUYING LA CREMA, WHICH WE'RE VERY CONCERNED ABOUT. AND IT SHOULD BE AN EASY, SHORT DEPOSITION.

**MR. O'ROURKE:**  BUT THE PEOPLE WHO WERE INVOLVED IN THIS, THAT BROUGHT THIS PRODUCT TO MARKET WERE DEPOSED, AND THEY ALL UNEQUIVOCALLY TESTIFIED THAT THEY DIDN'T KNOW.

AS TO THE THEORY THAT SOME SUPER SENIOR LEVEL MANAGEMENT DARTH VADER CHARACTER HAD IN THEIR MIND AS THESE PEOPLE INDEPENDENTLY FROM THEM CAME UP WITH "CREME DE LYS" AFTER THEY CAME UP WITH "BUTTERCREAM" HAD THIS NEFARIOUS INTENT TO NOW STEAL "LA CREMA," WHEN IT CAME BACK UP TO UPPER MANAGEMENT THAT WE WERE SHIFTING FROM "BUTTERCREAM" TO "CREME DE LYS," THE MOST SENIOR MANAGER WHO EVER LOOKED AT THIS PROJECT SAID: "I DON'T LIKE 'CREME DE LYS.' STICK WITH 'BUTTERCREAM.'"

AND THEN, THEY WENT BACK TO THE FOCUS GROUPS. THERE'S NOT A SCINTILLA OF A HINT THAT THE ATTEMPTED ACQUISITION HAS

ANYTHING TO DO WITH HOW THIS PRODUCT GOT TO MARKET.

**THE COURT:** WELL, GOOD. THEN, WHEN YOU DO THE 30 (B) (6) THEN IT WON'T BE THERE. AND MAYBE IT WON'T COME IN OR YOU'LL BE ABLE TO EXCLUDE IT IN LIMINE, OR SOMETHING LIKE THAT, BECAUSE THE ARGUMENTS NOT THERE. BUT THIS IS DISCOVERY. AND YOU CAN'T LIKE SAY: NO, I CAN'T FIND AS A FACT NOW TO PRECLUDE THE DISCOVERY.

**MR. O'ROURKE:** OKAY.

**THE COURT:** THAT'S JUST NOT HOW DISCOVERY WORKS. I THINK IT'S A RELEVANT TOPIC.

**MR. O'ROURKE:** OKAY. SO WE HAVE NOW HAD SEVERAL WITNESSES ON 30 (B) (6). THE LAST ONE IS GOING TO BE THE FINANCIAL PERSON. AND WE'RE GOING TO FAR EXCEED SEVEN HOURS ON THE 30 (B) (6). WE HAVEN'T REALLY HELD EACH OTHER TO THAT BECAUSE IT'S COMPLICATED, AND WE COOPERATE WITH EACH OTHER.

SO AT A MINIMUM DOESN'T THERE NEED TO BE SOME REASONABLE LIMITATION ON HOW LONG THEY GET FOR THAT ONE TOPIC?

**THE COURT:** FOR THIS TOPIC?

**MR. O'ROURKE:** YES.

**THE COURT:** YES, AN HOUR.

**MR. WILLSEY:** CAN I HAVE TWO? I MEAN, THAT'S NOT MUCH. AN HOUR WITH THE: WHO ARE YOU? WHAT'S YOUR BACKGROUND? WHERE DID YOU GO TO SCHOOL?

**THE COURT:** WELL, THE TOPIC.

**MR. O'ROURKE:** YOU'RE LIKELY TO BE TALKING TO SOMEONE

YOU ALREADY SPOKE TO.

THE COURT:  YOU SAID: "ON THE TOPIC."  AS I TOLD YOUR COLLEAGUES WHO CAME TO ME, SEEMS TO ME THIS CASE IS:  THIS BOTTLE AGAINST THIS BOTTLE.  THAT'S REALLY HOW THE JURY IS GOING TO DECIDE IT, RIGHT?

ALL THESE OTHER THINGS THEY GO INTO THE SLEEKCRAFT FACTORS. BUT IN THE END IT'S GOING TO BE THIS BOTTLE FOR THIS BOTTLE.  SO I THINK AN HOUR IS ENOUGH.

THIS IS WHAT -- YOU CAN TELL YOUR STORY. YOU'LL HAVE YOUR NARRATIVE.  THEY WILL COUNTER YOUR NARRATIVE.  BUT I THINK THAT'S ENOUGH.

MR. O'ROURKE:  I APPRECIATE THAT, YOUR HONOR.

THE COURT:  ALL RIGHT.

MR. WILLSEY:  ALL RIGHT.

MR. O'ROURKE:  I THINK WE'RE DONE.

THE COURT:  YOU THINK WE'RE DONE?  GREAT.  IT'S NICE TO MEET YOU.

MR. O'ROURKE:  NICE TO MEET YOU, TOO.

THE COURT:  GOOD LUCK.  LOOKS TO BE A FUN TRIAL.

MR. WILLSEY:  THANK YOU.

(THEREUPON, THIS HEARING WAS CONCLUDED.)

**CERTIFICATE OF TRANSCRIBER**

I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE ABOVE MATTER.

I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTIONS IN WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

SIGNATURE OF TRANSCRIBER

Kathy Wyatt          8-2-13 DATE