Brendan J. O'Rourke\*
Adam D. Siegartel\*
David A. Munkittrick\*
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
Tel.: 212.969.3000
Fax: 212.969.2900
*Admitted pro hac vice*

Attorneys for Defendants
Diageo North America, Inc. and
Diageo Chateau & Estate Wines Co.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JACKSON FAMILY WINES, INC. and LC TM HOLDINGS, LLC, | Case No. CV-11-5639 (EMC) |
| Plaintiffs, | **DIAGEO'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE FOCUS GROUP STATEMENTS CONCERNING LA CREMA WINE AND RELATED EVIDENCE** |
| v. | |
| DIAGEO NORTH AMERICA, INC. and DIAGEO CHATEAU & ESTATE WINES CO., | |
| Defendants. | |

Defendants Diageo North America, Inc. and Diageo Chateau & Estate Wines Co. (collectively, "Diageo") respectfully move this Court for an order excluding statements made by focus group participants concerning La Crema wine. Jackson Family Wines, Inc. and LC TM Holdings, LLC (collectively, "Jackson") seek to introduce written, video, and testimonial evidence as probative of a likelihood of confusion between Diageo's Crème de Lys wine and Jackson's La Crema wine, but this should be excluded pursuant to F.R.E. 403, 802, and 805.

**I.   BACKGROUND**

A plaintiff in a trademark infringement action must prove, *inter alia*, that defendant's use of its allegedly infringing mark is likely to cause confusion as to the origin of defendant's goods *in the marketplace*. *See* 15 U.S.C. §§ 1114, 1125(a); *Airwair Int'l Ltd. v. Vans, Inc.*, No. 12 Civ. 05060, 2013 WL 3786309, at *5 (N.D. Cal. July 17, 2013); *see also* caselaw in Part III below.

In April 2010 – before Diageo selected the Crème De Lys mark and months before the wine was introduced to the market – Diageo commissioned non-party Northstar Research Partners ("Northstar") to conduct focus groups concerning potential names and labels for the wine that eventually became known as "Crème De Lys" (the "April Focus Groups"). Three focus groups were conducted in each of two geographic locations (Sacramento and suburban Chicago), each of the six groups lasted for approximately 90 minutes, and each group included approximately seven women participants pre-screened as to age, income, education, affinity for particular chardonnay flavor profiles, number of children, and other characteristics. *See* Exhibit A (Jeffrey Histed Deposition Transcript) at 87:13-88:6, 94:17-23; Exhibit B (Exhibit 12 to the Histed Deposition – Focus Group Discussion Guide).

Critically, **neither** the Crème De Lys name **nor** the label used on the product actually launched, nor the label currently in the marketplace for the product, were part of the April Focus Groups. Instead, those focus groups tested two alternate names – "Buttercream" and "Crème De Lees" – as well as different label designs, and when Diageo's representatives were deposed, they catalogued the list of name, bottle, and label changes that occurred after these focus groups, and before Crème De Lys wine was launched in August 2010. *See* Exhibit C (Mary Light Deposition

1   Transcript) at 104:3-106:9; Exhibit D (Sylvie Schwarze Deposition Transcript) at 145:10-146:20;
2   Exhibit E (Noelle Campbell Deposition Transcript) at 206:11-207:21.

3         Furthermore, when Jackson deposed Mr. Histed (the moderator of the April Focus Groups
4   and a Northstar Executive Vice President who testified to having moderated more than 500 focus
5   groups over 25 years), Mr. Histed testified <u>unequivocally</u> that the April Focus Groups were not
6   designed to <u>and indeed did not</u> simulate or replicate any environment in which a consumer
7   purchases or consumes wine – that is, the marketplace relevant to a likelihood of confusion
8   analysis.  *See, e.g.,* Exhibit A at 139:19-140:6; 160:2-161:19; 229:2-13.  Instead, the April Focus
9   Groups were roundtable discussions in which participants – compensated for their time and seated
10  in a conference room – were asked and exposed to Mr. Histed's many comments and questions, as
11  well as those of other focus group participants.  *See id.* at 149:9-15; 150:5-10.  Mr. Histed testified
12  that the April Focus Groups differed greatly from the marketplace for all of the following reasons:

- The focus group participants were in a conference room (not a liquor store, restaurant, bar, etc.), and monitored behind one-way glass.  *See id.* at 155:5-10;
- When a consumer goes to a liquor store to purchase wine, they do not spend 90 minutes in the liquor store examining the wine in minute detail.  *See id.* at 154:10-14;
- Mr. Histed was tasked with asking many questions, drilling down repeatedly, and trying to get "as deep" as possible in order to "understand at a deeper and deeper level, the continuous why, why, why is that."  *See id.* at 144:16-145:1, 145:16-22, and 147:3-24.  This is critical because as Mr. Histed explained "[i]f you look at how focus groups happen, people commenting in the real world are not subject to trained level of inquiry, right?  So they're not subject to a deep level of questioning like that.  ***In some cases they may not even think about some of the things that we're asking them about***."  *See id.* at 156:18-23 (emphasis added);
- Not only was the moderator leading the participants, but the focus group participants were also leading each other and responding to the discussion surrounding them. *See id.* at 150:16-17; 151:11-13 (*e.g.*, "there are definitely times where people can be

2

led by others. . . . [Y]ou cannot discount the fact that people are responding to what other people say in that room");

- Unlike the marketplace where a consumer may pick up and examine physical bottles, April Focus Group participants were only shown proposed concepts on boards and not given bottles or anything tangible to pick up and examine. *See id.* at 186:8-187:9;

- The demographic composition of the April Focus Groups did <u>not</u> reflect the general market but instead "only a small sliver of female chardonnay drinkers." *See id.* at 155:11-156:1; and

- As mentioned above, the April Focus Group participants were paid to participate. *See id.* at 156:24-157:10 ("They're not paid for their opinions in the real world. And in this world, they're being paid to come in, and spend an hour and a half and discuss a topic with us, and that's what they get for compensation of their time").

In short, as Mr. Histed testified, "<u>it is eight people in a room, you cannot project the findings of that to the marketplace</u>. . . . [P]eople try to project what they see in that room to the general marketplace, in terms of order of magnitude, and that doesn't happen. . . . Market simulation is not the job of focus groups," and accordingly, "<u>I agree that [the April Focus Groups] could not have simulated the marketplace</u>." *See id.* at 143:7-9, 144:6-15, 155:2-4, and 161:1-19 (emphasis added).

Further underscoring the artificiality of the focus groups, Mr. Histed asked participants many questions about La Crema wine – whether or not participants mentioned La Crema on their own – and participants were shown physical bottles of La Crema wine. *See id.* at 181:6-184:21; *see also* Ex. B. Mr. Histed testified that participants were "deliberately exposed" to La Crema, and accordingly, "La Crema would of course be put into their minds if I was asking the questions directly related to it." *See* Ex. A at 187:17-20; 190:16-22; 193:14-194:9; 194:22-198:16. Consider the following (*id.* at 195:11-23):

Q: So if I understand you right, La Crema became a natural reference point based on the detailed discussion about La Crema that took place?

3

A: I believe that would be the case.

Q: And do you also agree that because of the detailed discussion about La Crema that took place at the start of the focus group, that the focus group was inviting comparisons between [Crème De Lees] and La Crema?

A: As a reference point, by virtue of being a reference point, yes, it would invite comparison.

The unreliability of the "La Crema" mentions during the April Focus Groups is plainly demonstrated by the fact that at least two focus group participants expressed confusion between La Crema <u>and Buttercream</u> – a mark so different from La Crema that it could not possibly cause confusion in the marketplace.  *See id.* at 221:5-224:20.

Despite all of this – (1) the Crème De Lys name and packaging at issue in this litigation <u>not</u> being in the focus groups; (2) the irreconcilable differences between the April Focus Groups and the relevant marketplace; and (3) the artificial manner in which participants were exposed to La Crema wine – Jackson nevertheless intends to focus on these April Focus Groups because during the approximate 9 hours of focus group brainstorming, there were isolated references to La Crema (*e.g.,* "your husband might get the La Crema instead"; "I might buy La Crema by accident"; "can't decide if want Crème de Lees or La Crema").  Such sporadic statements and other references to La Crema in a focus group not focusing on the mark or packaging at issue in this action are not only inadmissible hearsay, but considering the misleading manner in which Jackson is likely to present this evidence to the jury (unrepresentative snippets lifted from approximately 9 hours of focus groups time), such evidence is plainly and significantly more prejudicial, misleading, and wasteful than probative of whether Crème De Lys wine will create a likelihood of confusion with La Crema or Jackson.  Accordingly, the focus group references to La Crema in both video and written form (including, for example, informal notes, Northstar's report following the focus groups, and a video of the Chicago focus groups) should be excluded.

## II. THE STATEMENTS AT ISSUE ARE INADMISSIBLE HEARSAY

The Federal Rules of Evidence expressly preclude the admission of out-of-court statements offered to prove the truth of the matter asserted.  *See* F.R.E. 801(c), 802.  Furthermore, an out-of-

4

1    court statement that itself contains an additional out-of-court statement may not be admitted unless
2    an applicable hearsay exception can be identified for each layer of hearsay.  *See* F.R.E. 805;
3    *Buckheit v. Dennis*, No. 09 Civ. 5000, 2011 WL 835468, at *4 (N.D. Cal. Mar. 4, 2011).
4           Participants' statements during the April Focus Groups are clearly out-of-court statements
5    and, if offered to prove the truth of the matter asserted, unquestionably hearsay.  *See, e.g.*,
6    *Hubbard v. Sheffield*, No. 12 Civ. 36, 2013 WL 3994458, at *10 n. 2 (D. Mont. Aug. 5, 2013)
7    (statements made in recorded interviews were inadmissible hearsay).  In turn, any recordings or
8    transcripts of these statements and any testimony or documents containing a recitation of these
9    statements, if offered to prove the truth of the matter asserted, must also be excluded as hearsay.
10   *Id.; see also Zurich Am. Ins. Co. v. Employers Ins. Co. of Wausau*, No. 03 Civ. 29282, 2005 WL
11   1719928, at *2 n. 3 (W.D. Wash. July 25, 2005) (interview transcripts inadmissible hearsay).
12          Written summaries of and commentaries on such statements, if offered to prove the
13   statements were made, are also inadmissible hearsay.  *See, e.g.*, *Wills v. Diehl*, No. 09 Civ. 01316,
14   2013 WL 5592957, at * 11 (D. Or. Oct. 10, 2013) (excluding written interview summary as
15   hearsay); *E.E.O.C. v. Wal-Mart Stores, Inc.*, No. 11 Civ. 03327, 2013 WL 3061170, at * 2 (E.D.
16   Cal. June 14, 2013) (excluding notes of witness interviews as hearsay); *Mattel, Inc. v. MGA Entm't,
17   Inc.*, 782 F. Supp. 2d 911, 964 n. 14 (C.D. Cal. 2010) (excluding meeting notes as hearsay).
18          Finally, if such written summaries or commentaries are offered to prove not only that
19   these statements were made, but also the truth of the matter asserted therein, then they must be
20   excluded as double hearsay.  *See Masden v. Risenhoover*, No. 09 Civ. 5457, 2013 WL 1345189,
21   at * 12 (N.D. Cal. Mar. 29, 2013) (summaries of out of court statements constitute double
22   hearsay); *United States v. Collins*, No. 11 Cr. 00471, 2013 WL 1089908, at * 4 (N.D. Cal. Mar.
23   15, 2013) (summaries of communications to prove the truth of the matter asserted therein are
24   double-hearsay).  Because Jackson is offering these statements for the truth of the matter asserted
25   – namely, that focus group participants were confused – these statements are inadmissible
26   hearsay and should be excluded for this reason standing alone, as well as for the reasons below.
27
28

**III.     THE STATEMENTS SHOULD BE EXCLUDED UNDER F.R.E. 403**

Statements concerning La Crema from the April Focus Groups are not probative concerning likelihood of confusion and are substantially outweighed by considerations of unfair prejudice, misleading the jury, and wasting time.  *See* F.R.E. 403.  "Likelihood of confusion" in the context of the Lanham Act means likelihood of confusion <u>in the marketplace</u>.  *See, e.g.*, *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012) ("[T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally") (quoting *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005)) (emphasis added); *accord Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1535 & n. 5 (9th Cir. 1989) (explaining that "likelihood of confusion" analysis must remain focused "upon confusion in the marketplace, as opposed to generalized public confusion").

Consequently, in assessing whether there is a likelihood of confusion, a jury must look to <u>actual market conditions</u>.  *See J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 Civ. 4060, 2013 WL 1903883, at *20 (S.D.N.Y. May 8, 2013) ("The Lanham Act does not protect against confusion in the abstract, instead, it protects consumers from confusion in the marketplace.  Accordingly, courts have repeatedly emphasized the importance of looking to actual market conditions in assessing likelihood of confusion.") (internal citations omitted).

For all of the reasons above, and as Mr. Histed clearly testified, the April Focus Groups did not simulate or reflect any environment in which a consumer purchases or consumes wine (conference room with one-way glass; 90 minutes intently focused on wine bottles – far longer than in the marketplace; a moderator forcing dialogue and introducing ideas a participant would not reach on their own; participants leading each other; no physical specimens; unrepresentative demographics; participants paid to participate; etc.).  In turn, the April Focus Groups could not possibly be probative concerning whether Crème De Lys wine is likely to cause consumer confusion with La Crema in the marketplace because the "Crème De Lys" name, label, and bottle at issue in this litigation were <u>not</u> addressed in those groups, because Diageo changed the concepts that <u>were</u> addressed in the focus groups before Crème De Lys entered the market, and

6

1  because during the focus groups La Crema wine was presented and discussed in an artificial and
2  forced manner, rather than as presented to relevant consumers in the marketplace.
3       As the court in *Merisant Co. v. McNeil Nutritionals, LLC* concluded, "the results of a
4  focus group are inherently different than the results of a survey[: w]hereas a survey is designed
5  to collect data from an appropriate numerical sample of individual respondents, focus groups are
6  designed to gather data from 'groups' of people assembled together for that very purpose. . . .
7  [T]he participants in a focus group freely voice their opinions, [so] the opinion of a participant can
8  be shaped by those of the others." 242 F.R.D. 315, 331-32 (E.D. Pa. 2007). This conclusion
9  directly accords with Mr. Histed's testimony cited above, *e.g.,* "it is eight people in a room, you
10 cannot project the findings of that to the marketplace." *See* Ex. A at 143:7-9 and other cites above.
11      Given the lack of probative value of the April Focus Groups on the issue of likelihood of
12 confusion, the admission of testimony or documents recounting, referencing, or summarizing
13 participants' statements mentioning La Crema at those focus groups poses a substantially greater
14 danger of misleading the jury, prejudicing Diageo, and wasting time. Jury members will likely not
15 be well-versed in focus group methodology and could well draw <u>incorrect and improper inferences
16 regarding the applicability of the focus groups to the marketplace</u>. Considerable time will need to
17 be spent educating the jury – a task not necessary to resolve this case on the merits – and Diageo
18 would need to play long durations of video to clarify and contextualize participants' statements.
19 Even following that lengthy presentation, however, Diageo would remain substantially prejudiced,
20 as the jury would likely remain confused and mistaken regarding the import of the focus groups.
21      For all of the forgoing reasons, Diageo respectfully request that this Court issue an order
22 excluding all evidence, whether documentary, video, or testimonial, relating to statements by
23 April Focus Group participants concerning La Crema wine. Otherwise, Jackson's case would be
24 premised on hearsay and substantially prejudicial and misleading information.

[Signature Block on Next Page]

7

| | | |
|---|---|---|
| 1 | DATED: January 17, 2014 | Brendan J. O'Rourke |
| 2 | | Adam D. Siegartel |
| | | David A. Munkittrick |
| 3 | | PROSKAUER ROSE LLP |
| 4 | | By: _____/s/ *Brendan J. O'Rourke* |
| | | Brendan J. O'Rourke |
| 5 | | |
| 6 | | Attorneys for Defendants |
| | | Diageo North America, Inc. and |
| 7 | | Diageo Chateau & Estate Wines Co. |

8