UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

JACKSON FAMILY WINES, INC.,      )
et al.,                          )
                                 )
        Plaintiffs,              )
                                 )
     vs.                         )      No. C 11-5639-EMC (JSC)
                                 )
DIAGEO NORTH AMERICA, INC.,      )
et al.,                          )
                                 )
        Defendants.              )
_____)

                                    San Francisco, California
                                    Thursday, February 6, 2014

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                        RECORDING


APPEARANCES:

For the Plaintiff:
                        Cooley, LLP
                        1299 Pennsylvania Avenue NW
                        Suite 700
                        Washington, DC 20004
                   BY:  BRENDAN JOSEPH HUGHES, Esq.

                        Cooley Godward Kronish, LLP
                        777 6th Street NW
                        11th Floor
                        Washington, DC 20001
                   BY:  PETER JOEL WILLSEY, Esq.

For the Defendant:
                        Proskauer Rose LLP
                        11 Times Square
                        New York, New York 10036
                   BY:  ADAM D. SIEGARTEL, Esq.
                        BRENDAN J. O'ROURKE, Esq.

*Echo Reporting, Inc.*

2

Transcribed by:                    Echo Reporting, Inc.
                                   Contracted Court Reporter/
                                     Transcriber
                                   echoreporting@yahoo.com

3

Thursday, February 6, 2014                          10:02 a.m.

                    P R O C E E D I N G S

                        ---oOo---

          THE CLERK:  Calling Civil Action C11-5639, Jackson Family Wines versus Diageo North America.

     (Pause.)

          MR. HUGHES:  Hello, your Honor.  My name is Brendan Hughes with the law firm Cooley, LLP along with my colleague, Peter Willsey.  We're here on behalf of the Plaintiffs, LCTM Holding and Jackson Family Wines.

          THE COURT:  Good morning.

          MR SIEGARTEL:  Good morning, your Honor.  Adam Siegartel from Proskauer for Defendants, and also with Brendan O'Rourke also from Proskauer.

          THE COURT:  Good morning.

          MR. O'ROURKE:  Good morning, your Honor.

          MR. HUGHES:  Your Honor, before we begin, I'd also like to mention that we're here also with Mr. Jeff Wesselkamper, the executive vice president and chief legal officer for Jackson Family Wines, Inc.

          THE COURT:  Good morning.

     All right.  This motion doesn't have quite the discussion of Supreme Court Law and Ninth Circuit (indiscernible) and the like as the other.  But this is what it comes down to, and you're going to be on the hot seat

4

here.  So, we had several proceedings involving Ms. Josephson (phonetic) and documents whatever.  As I understand that at least as of June 2013, Defendant -- I'm going to refer to not making any aspirations to cancel -- Defendant Diageo, had to have been aware that her hard drive had been destroyed.  And yet, when Jackson came here asking about those -- seeking those documents when I ordered the parties to meet and confer, and Diageo to say -- just say what happened to those documents, it was never disclosed to the Court, or to Jackson, that that hard drive had been destroyed.

I, for the life of me, can't think of an explanation for that.  There certainly is none in the papers.

MR. SIEGARTEL:  The explanation is, your Honor, we didn't know.  We had vetted it with our client.

THE COURT:  No.  No.  I'm not making any aspirations on the lawyers at all.

MR. SIEGARTEL:  Okay.  Diageo didn't know.  The people that we discussed it with looked into it, came back to us and didn't know about there being any hard drive that had been wiped.  That's – that's the --

THE COURT:  But, how could that even have been a reasonable investigation?  I mean they produced, in June 2013, an email to Ms. Josephson that had not been produced by Diageo that was relevant.  It came from the third party.

You were put on notice then that something happened to that email.  A reasonable inquiry would have turned that up, any reasonable inquiry at that point would have turned it up.

          MR. SIEGARTEL:  The reason was, your Honor, and it actually goes back even further, to be honest, June 2012, May 2012 because that's when we produced the wealth of documents that included Ms. Josephson on them just to be clear.  She had left the company and as part of what's called the "leaver's" process, leavers in quotes, it had gotten lost in the shuffle.  They had looked into it and they simply didn't know about it.  They had spoken to the in-house lawyers, the IT personnel, the people in charge of the "leaver's" process, IBM, the outside consultant who handles the "leaver's" process.  And it just didn't come up.  We wish it did.  Diageo wishes it did.  Proskauer --

          THE COURT:  I'm sure they did because --

          MR. SIEGARTEL:  We hate the fact that it didn't come up.

          THE COURT:  I mean look at what was said and this is after all this, you know.  We've already collected every single document Diageo and his custodial files for Ms. Josephson.  Diageo counsel then applied every single key word searched every single -- I mean this is – this is -- maybe was unintentional.  It's a misrepresentation to the Court.  I mean what was said --

6

MR. SIEGARTEL:  Sure.

THE COURT:  – to Jackson when I said in August -- I denied their motion.  I said there's probably some innocent -- this is what I said, innocent explanation for the failure -- for the fact that these documents haven't turned up.

What was then reported to Jackson as to why they didn't have it?

MR. SIEGARTEL:  During meet and confer, we told them the same thing we told the Court which agreed 100-percent, it was factually inaccurate.  But, it wasn't malicious.  There was no bad faith.  We had gone back to Diageo.  We had spoken to them again about it.  We had done the entire --

THE COURT:  No.  I'm sure the attorneys – but, what did Diageo do?  Tell me where's the evidence in this record that when this lawsuit was filed -- I'm not even talking about the cease and desist letter, that there was a do not destroy, a preserve document thing sent to everyone; where is the evidence of that in this record?

MR. SIEGARTEL:  Because that's privileged, we haven't produced the litigation holds.  But, I can tell you the litigation holds went out --

THE COURT:  Why is that privileged?  That's produced all the time when these kind of spoilation issues

7

come up.

MR. O'ROURKE: Your Honor, we – it actually went out two to three weeks after the case was filed.

MR. SIEGARTEL:  It went out in December of 2011 right after the case was filed, I can tell you that.  And as Mr. O'Rourke said, we can get that to you.

But, to go back to your question of June, July of 2013.  Again, we spoke to our in-house counsel.  We spoke to the IT people.  They discussed.  They looked into it.  It just never came up and – but I can tell you there was, again, no bad faith.  Nobody was ever trying to hide anything.  We wish it had come out earlier.  And, again, that representation from the motion factually inaccurate.  But, at the time we made that representation, we believed that to be the case.

THE COURT:  Well, somebody at Diageo knew that it had been destroyed.  Right?  Somebody knew that.  People at Diageo knew what the process was.  So, why wouldn't that have been the first thing that would come to their mind if they weren't trying to cover it up?  I mean, what it looks like quite honestly -- because it would be fine, but then there were all these motions.  I mean at a minimum I think Diageo would have to say they should at least pay their fees and costs for all those motions, the 30(b)(6) and the like. If I hadn't ordered that 30(b)(6), it would have never been

8

uncovered.

So, what it looks like was that Diageo was simply hoping it would never be uncovered that that hard drive was destroyed.  I mean that's what it looks like because Diageo fought tooth and nail to keep them from even discovering what happened to it.

MR. SIEGARTEL:  So, if I may, can I just tell you all of the other facts that demonstrate Diageo's good faith so that your Honor doesn't, you know, retain the impression that it was bad faith?

We went back in June of 2013 before Jackson asked us to.  We started collecting Josephson documents before there was a court order, before Jackson asked us.  We started collecting Josephson documents the day after the deposition with North Star where Ms. Josephson came up.  The very next day we started collecting that stuff.  When we started collecting, we were going to court sure.  We weren't trying to leave any stone unturned.  We were trying to do everything to get Josephson's documents as quickly and as comprehensively as we could.  So, that's point number one.

Point number two, we went back to North Star for DVDs.  North Star had already said no DVDs exist.  Diageo did a follow up search for DVDs.  We didn't find anything.  Diageo went back to North Star for the DVDs on their own before anybody even asked, and at that second time that North Star

looked that's why they found DVDs.  Jackson wouldn't even have those DVDs except for Diageo unilaterally going to get those DVDs, or at least asking North Star a second time.

We disclosed Ms. Josephson in our interrogatories in January of 2013.  Jackson says in their papers we did not disclosure Ms. Josephson in our interrogatories.  It's not true.  If you look at Exhibit 6 to the motion which Jackson attached, they focus on response number five but that didn't concern Ms. Josephson.  Response number seven we did disclose Ms. Josephson.  We were never trying to hide the ball.  In April and May of 2013, when the parties exchanged the custodians who had been collected, we gave them our comprehensive list.  Ms. Josephson was not on that list.  We were never ever trying to hide the ball about Ms. Josephson.

What really happened here, your Honor, and it's unfortunate, but what happened is both sides just lost sight of Ms. Josephson.  In June of 2012, was when she was first mentioned in the deposition.  Documents from her, or including her, had already been produced.  It wasn't until a year later --

THE COURT:  You mean June of --

MR. SIEGARTEL: Sorry.  June of 2012.  Let me back up.  May of 2012 Diageo makes their first production.  There are a wealth of documents in there that included Ms. Josephson on them.  In June of 2012, Mary Lake, Diageo's

witness, is deposed.  She testifies to Ms. Josephson's involvement.  Nothing happens for another year until June of 2013.

I agree Diageo's obligations had kicked in already, and I wished we had preserved her earlier.  The point being both sides, both Diageo and Jackson, had lost sight of Ms. Josephson until a year later in June of 2013.  And by the time Jackson had raised the issue with us, we had already started collecting Ms. Josephson's documents in preparation for production.  It's in my declaration.  I swear to it under oath.  These are the kind of facts that just indicate Diageo was not trying to obstruct anything because, for example --

THE COURT:  I don't think you were trying to hide Ms. Josephson.  What I said was why come June 2013 it wasn't disclosed that the hard drive had been destroyed, right?  All that motion practice, all that would have been avoided.  We wouldn't have been here if they just said in response to their inquiry about why are these documents missing?  Why wasn't this email produced?  We accidentally destroyed her hard drive.

MR. SIEGARTEL:  Sure.  In our – the first motion that Jackson made was to depose Ms. Josephson.  We didn't say in our opposition that Ms. Josephson was not relevant.  We opposed it on a prejudice ground.  It was prejudicial, we

took the position, for Jackson, a week before fact discovery closed, to mention Ms. Josephson for the very first time. Just to be clear, our opposition to that initial motion in July of 2013, we didn't take – we were not trying to take the position that, you know, she was unimportant.  She wasn't relevant.  She was relevant.  She had a small but discreet role in this case.

Your Honor, why didn't it come up?  Why wasn't it disclosed?  I wish I could give you a more definitive answer.  What I can also say is this case has just been fast and furious the whole way thorough.

THE COURT:  Well, I know that.

MR. SIEGARTEL:  Even discovery.  It's so complex. And to put it into context, I think both sides are trying to do the very best they can.  We questioned some of Jackson's tactics.  But, we're not coming here – we're not claiming bad faith.  The fact that they're going to have trial witnesses whose documents have never been produced --

THE COURT:  Don't talk about them.

MR. SIEGARTEL:  Right.  Exactly.

THE COURT:  This motion is about the fact that --

MR. SIEGARTEL:  I totally agree.

THE COURT:  – that Diageo destroyed her hard drive, number one, which was a violation of a duty to preserve.  There's no dispute about that.

MR. SIEGARTEL:  Absolutely not.

THE COURT:  That was an error.  Perhaps unintentional, fine.  I don't -- but it was destroyed.  But, the real problem is is that come June 2013 I don't understand how the people -- if the right people were being asked about those documents it had to have been disclosed that that hard drive had been destroyed.  And there's no question that that should have been disclosed to Jackson at that time.  No question.  There's just no explanation for not doing that.  Everything opposing Ms. Josephson's deposition, right?  Don't you think it would have mattered to the Court in terms of whether it would be relevant the fact that her documents had been destroyed?  Of course.  That's completely relevant to whether she should be deposed or not.  To oppose that without disclosing that that hard drive, or other documents was missing, was misleading.  You can say it's unintentionally misleading, okay.  But, negligently unintentionally misleading because there's no way, if the right people had been asked, it shouldn't have been disclosed to their lawyers, and to the people responsible for the litigation, that that hard drive had been disclosed.

I'll let Mr.  --

MR. HUGHES:  Your Honor, you're hitting the nail right on the head here.  The issue is with Defendants and

13

Defendant's knowledge.  So, Defendants themselves received our cease and desist letter back in -- and if you look, we have this time line for you --

THE COURT:  No.  No. No.  They agree --

MR. HUGHES: Yeah.

THE COURT:  -- that she – that there should have been a litigation hold.  They say they have evidence -- I'll allow them --

MR. HUGHES: Right.

THE COURT: You did it as a joint -- it's a serious motion.  You did it as a joint discovery.  So, I'll let either side supplement at some point, if you want, to do a litigation hold, whatever.

They breached their obligation to preserve.  You don't need to go back there.  That's them.

MR. HUGHES:  The reason why I'm bringing up that date back in 2011 is that what's – in August of 2011 that's when she first left the company.  That's when they first got her hard drive.  But, interestingly enough, she was hired back in October of 2011.  Our complaint wasn't filed until November 2011.  That means Ms. Josephson was at Diageo.  Ms. Josephson could have been asked, "Where are your documents?  Where did you store your documents?"  She never was approached.  They never asked her about those documents.

She didn't tell them -- no one had even bothered to

14

inquire from her what happened to that hard drive.  She could have said, "Oh yes, it was taken away.  It's now come back."  They could have figured out where this was.  Instead, time went on and while she was seated there she even said in her deposition that she never received a litigation hold.  So, she was – she should have been identified long ago as being a relevant custodian because she was the person that was having direct communications with North Star, and she wasn't.  She should have been asked for --

THE COURT:  Well, about they say she was identified in response to interrogatory number seven?

MR. HUGHES:  She wasn't identified for the purposes of collecting her documents.  They identified her in their interrogatories -- we're talking about what, in response to interrogatories to us.  Back in -- let's see -- the first time was January 7, 2013 in connection with -- as a person with knowledge of defendants adoption of Creme de Lys mark, but earlier they didn't identify her in connection with the selection adoption or use of the mark Creme de Lys.

Furthermore, what that's doing -- this is interesting argument from the defense, is it's putting the burden on the Plaintiffs to identify for them what custodians are relevant to this – to this matter.  That's not our duty.  That's their duty.  It was their duty to identify the people who

15

might have documents that would be potentially responsive to our requests, relevant to the claims or defenses, and they failed to meet that burden.  They obviously had the duty to preserve arise.  They did destroy her documents after the duty to preserve arose.

Then, subsequently, as time went on, as you pointed out, over and over again, opportunity after opportunity, Defendants told us that we didn't have anything to worry about, that there was no -- that our claims did not hold water.  That was said in Court.  The worst statement, as your Honor pointed out, was that July 18th joint statement where at the end of it, and your Honor stops before the last sentence,

> "There's simply nothing left to be done in connection with Ms. Josephson's documents.  As Diageo has complied fully and in good faith with Jackson's requests and Diageo's discovery obligations."

That is patently false.  It is false.

Time and again we pursued this.  Time and again we were told that essentially all of our claims were meritless, that we were just wasting the Court's time.  It's extremely frustrating, especially when we deposed – when we had eventually deposed Ms. Josephson and she tells us that no

16

one even talked to her about collecting her documents and that she didn't receive a litigation hold.

They testified today, or they said today, that a litigation hold went out. Well, according to Ms. Josephson when we deposed her, she didn't receive anything. She was back as an employee, yes, maybe as a consultant, but as an employee, from October 2011 to August 2012. In the midst of discovery, she was there. During this relevant time period, that hard drive from her first lap top was sitting at Diageo. In the midst of discovery, in August 2012, a year later, after the duty to preserve arose, that's when it was destroyed.

Now, opposing counsel says in June 2013 that's when they began in earnest trying to identify what happened to Ms. Josephson's documents. Again, this isn't about Diageo's counsel and their efforts. The point is that this is Defendant's obligation, Diageo's obligation, to identify relevant documents, to preserve those documents. They failed to do so. And, as time went on, it becomes -- and you see this constant, repeated, repeated -- telling us that there's nothing to worry about. The bottom line here is that she's a very relevant custodian, and that the emails that were in her archives and the documents that were on her hard drive we'll never be able to see. We've lost that forever. These are documents -- rather the emails are

17

direct communications with North Star.  She didn't cc other people.

THE COURT:  No.  But, you subpoenaed North Star.

MR. HUGHES:  Yes.  And we've received the documents, 17 emails, that were between her and the contact at North Star.  However, that's not sufficient for us to feel as if we have the full universe of potentially relevant documents.

THE COURT:  But, what is it that you think that she would have that would have been destroyed, and what would it be relevant to?

MR. HUGHES:  Well, we know that Ms. Josephson was the person that was at each of these focus group sessions. We also know that DVDs were produced from one set of the focus groups.  However, the Sacramento DVDs were never produced.  Now, Diageo says well, we've looked for them.  We don't think they exist.  North says we looked for them.  We don't think they exist.  Why would DVDs be found from one set of focus group sessions but not the other?  There was a separate order saying they weren't going to order DVDs?  I doubt it.

The reality is -- and they've never shown us anything that indicated that DVDs weren't ordered for that session. Ms. Josephson was the perfect person.  She's there to see all these, to take notes about those DVDs, and she recorded

18

all her notes and documents, right?  We received some of those notes.  But, I don't know whether I received all the notes.  I don't know whether I received tracks --

THE COURT:  Well, did you ask her at her deposition?

MR. HUGHES:  She said, during her deposition, that, for instance, with the emails that she would save her emails to email archives that only she could access.  Those are emails that were on her hard drive.  Subsequently, when they – when we deposed the 30(b)(6) witness, he said those were -- the email accounts that he was able to access through back ups were only from their live account.  So, therefore, it wouldn't have captured the archives.

Likewise, let's focus on the documents.  The documents -- she said it was her standard practice basically -- she said, "There was the personal drive that I would store documents on and then every once in a while, when I would be asked, I would put it on the shared drive."  So, normally, she is saving things on her hard drive.  It was only every once in a while when she was asked that she would put it on her shared drive.  So, anything -- any of those drafts, any of those communications that she saved to her hard drive would have been lost.  What is -- of course, what is surrounding this all, and I know you've heard this over the course of at least four or five motions now --

19

THE COURT:  At least.

MR. HUGHES:  At least, relating just to her, the whole point here is that she wrote perhaps one of the most important emails in this whole case.  She witnessed the focus group sessions.  She reviewed the North Star focus group report, and then she wrote "Wait a second -- I want you – I notice there was potential confusion in the focus group sessions and why didn't you mention that?  Why didn't you mention the potential confusion with respect to Creme de Lys in your report?"  And she wrote that email directly to North Star.  The only reason why I have that email -- the only reason why we have that email is because North Star did that and gave it to us in response.

I don't know what else went on, whether or not there were other communications about that issue.

THE COURT:  With whom?

MR. HUGHES:  With North Star, or internally.

THE COURT:  But, if there were email -- but, it seems to me what you're missing --

MR. HUGHES: Yeah.

THE COURT:  I mean if it was internally, then you would have had it from the –  whoever it was shared with.  But, -- and you deposed her about what it was she witnessed at those focus groups, correct?

MR. HUGHES:  Yes.  That's right.

THE COURT:  So, you have that.

MR. HUGHES:  That's right.  But, we do not have whatever -- she said when she received a report or email attachments, she would sometimes save it to her hard drive.  We don't have that information.  We don't have any of her email archives.  While – I would hope that what we have from North Star is the full universe.  I have no belief, especially now with all these repeated representations and hiding the ball here and eventually destroying relevant documents in the midst of discovery, I have no belief that I have the entire universe here.

Furthermore, in the context of spoliation, or rather an adverse inference assessment, at this point the presumption of spoliation of whether that or not that -- what was destroyed was relevant, that now shifts to them to prove that I have the entire universe of relevant documents, and they can't show that.  Why can't they tell me that I have everything?  Because they didn't even talk to Josephson when she was there about what was on that hard drive.  They never did, and then they destroyed it.  So, noone really knows what was at issue, or what was on that hard drive.

THE COURT:  So, what is the inference instruction you're looking for?

MR. HUGHES:  First of all, just to frame this procedurally, the reason why this came up is because when we

21

first saw -- I guess it's the second time -- we saw Judge Chen, we raised this issue.  He said "Has the issue of spoliation been adjudicated?"  We informed him not.  And he said "Well, I need -- " and I'll quote the exact language. He said that,

          "The factual predicate of spoliation
           is something Judge Corley – "
And I'm inserting Judge Corley,
          "Should address in the first
           instance."
So, that's the issue here.  So, the factual predicate of spoliation -- I mean frankly, this is – as you said, I mean that's not even really at issue because it is a fact that they spoliated information.  What we're asking for is a recommendation to Judge Chen that he create, or issue, an adverse inference.  What we ultimately would be looking for is one stating that Diageo destroyed, spoliated relevant evidence, that the evidence was possessed by Jennifer Josephson, and obviously he can craft it whatever way he sees fit.  But, this is what we're looking for because we feel like we're missing something critical from a critical witness and there's nothing that can ever make that -- there's nothing that can remedy that.  There's no lesser sanction.  You know, I've read the case law regarding these issues.  I've read your previous decisions regarding these

22

issues.

The bottom line though is that in the relevant cases you don't really have something as egregious as this where you have a key witness who was the person that was visiting that was going to each of these focus groups that was fully involved at the origin here, at the selection adoption of Creme de Lys, and witnessing people warning them about potential confusion in the marketplace and that her hard drive, which they possessed for a whole year since the duty to preserve arose, is wiped, gone, gone forever.  I can't do anything about that.  This is, to me, those are the highest levels of spoliation.  This goes to the highest levels of warranting an adverse inference instruction.

UNIDENTIFIED SPEAKER:  Your Honor, could I?  First of all, this is not going to answer all that he's -- but I do want to get to the last point about whether there should be an adverse inference directed by the Court.  The last part of the factors that your Honor would look at is prejudice to the Plaintiffs here.  I would submit to you, notwithstanding all of the problems that we have here, there is no prejudice, and I'd like to take just a few minutes just to briefly explain to you why.

As you know, Ms. Josephson did have a role but her role was very limited.  We had a brand new development.  We had a product that was originally named Butter Cream.  There was

23

feedback from the trade that the trade didn't like the name Butter Cream because it implied too much fattiness, and it was more like frosting and butter.  So, the feedback caused Diageo to say, you know, we probably should look at another name.

So, that is what they did.  They looked at Butter Cream.  The looked at Creme De Lys when it was still spelled L-E-E-S not L-Y-S, and they contacted Ms. Josephson and said "Hey, we should probably take a look at this.  We'd like to take a look at the concepts, and we'd like to take a look at what the focus group respondents feel about those two names."  The big take aways from that were they didn't like Butter Cream.  They thought Creme de Lys was better.  The other big take away that's helpful to the Plaintiff in this case is that there were some women at the focus group who made a connection between La Crema and Creme de Lys and they commented on it.  That was not good for us.  We'll argue at trial that's hearsay and it's not admissible and all those things.  But, from a discovery stand point, not good.

We got those documents.  Noel Campbell (phonetic) who was the brand manager at the time, received those documents, including Jennifer Josephson's notes in which it was referenced, including an email from Jen Josephson to Noel Campbell saying, "I have now looked at the report you wrote on the focus groups.  You mention in there that there was

24

similarity between the labels.  You didn't mention anything about there also being feedback that there was similarity on the name.  You should add that to the report that goes to management."  Those comments were inputted.  The draft of the report was changed.  The Plaintiffs have seen all of that.  Those were produced very early in the case.  They've had them all along.

What is it that happened at those focus groups that could have been worse for my client than that?  I can't think of anything but that's what happened at the focus groups.  They have her notes.  They have the report.  They have the emails where Ms. Josephson said, "Hey, you got to revive the report to mention not just the labels but there was some concerns on the two names."  They have all that.  Those were the take away.  We have collected the documents that are, you know, I would say in the category of -- in our worse case scenario and these are the ones that they have. We didn't want to submit them because they are highly confidential. But, we do have an appendix that we can hand to the other side, and we can hand to your Honor if you find that to be helpful.  We think they are.  We've even highlighted the sections of them that demonstrate they've gotten full discovery on the issue of whether people at the focus groups made a connection between La Crema and Cream de Lys.  So, they have all that information.

25

The one thing -- again, I know that this is our problem, not their problem.  But, the one thing that hasn't been articulated by the Plaintiffs, with all due respect to them, is that what is it that occurred – that they think occurred there that, a, they didn't discovery and, b, what inference on a fact in this case could have been in those documents that they don't already know about, and that could have been more incriminating to my client then the ones we produced early on in the case.  There is no intent to hide the ball on this.

Lastly, your Honor, I know you're not interested in their comment on this case, but with all due respect, it is relevant that in this case there are two witnesses that they tried to put on at trial after discovery where they have never even searched for their documents, including Matt Brown who now is apparently going to testify at trial.  You know the president was precluded by your Honor because they didn't identify him, but they said "He's highly relevant and we will get you the documents."  We still don't have those documents.  I'm just saying there's a balancing here.  It doesn't mean we didn't do something --

THE COURT:  You're saying a la Judge Ko (phonetic).

UNIDENTIFIED SPEAKER:  No.  I'm just saying in litigation things happen that aren't perfect.

26

THE COURT:  I agree with that, and I understand that to a point.  What I have a hard time understanding is post June '13, and the motion practice before that.

UNIDENTIFIED SPEAKER:  I get that, your Honor.

THE COURT:  I understand that stuff gets destroyed.  They're big companies.  I understand all that.  That's why the cover up is always worse.  I'm not saying cover up but --

UNIDENTIFIED SPEAKER: Right.

THE COURT:  – you know what I'm saying, than the crime, that come June, July it should have been disclosed to Jackson that that hard drive had been destroyed.  It just should have.

UNIDENTIFIED SPEAKER:  Had my client, or we, knew about that we --

THE COURT:  Your client knew.  Your client knew.  The question is who at your client knew.

UNIDENTIFIED SPEAKER:  Fair enough.

THE COURT:  Had your client asked the right people they should have known.  I haven't heard anything that suggests that there was some impediment to finding out.  The only impediment was they didn't do the right search and ask the right people.  So, there has to be some consequence to that.

UNIDENTIFIED SPEAKER:  I agree.

THE COURT:  Whether it's an adverse instruction, or what it is, is debatable.  I agree that goes to prejudice and that's why I asked them.  I actually do think if you're going to propose something, you have to propose something because it has to be in context, right?  Because it's not – it was Ms. Josephson.  It wasn't whoever.  It's to one of the sleekcraft factors.  I told you guys at the very beginning of this case, and I don't understand, the jury is going to take those two bottles and look at them.  That's what it's going to come down to more than anything.  All this fighting about this small thing is such a small – such a small piece of it.  It's one factor.  It's one factor.

So, that's why I -- So I hear what you're saying and I would maybe wouldn't disagree that at a minimum, at a minimum – and all of this could be -- about how much the costs are due after trial, right?  You guys have plenty to do now in terms of amounts and money.  But, a minimum that would be monetary sanctions, because post June they should have never had to go through all that motion practice before the Court because it should have been disclosed to that.

Whether there's an adverse inference instruction -- what you just said is not in the record because he's right that it's your burden to show, because it's a presumption that it was relevant, it's your burden to show, sort of, that the instruction is inappropriate because they have

28

everything, or it would be too much, or too harsh a sanction.  So, I'll allow you to supplement that.

MR. O'ROURKE:  Your Honor, may I hand up the documents that I discussed so that you have them?

THE COURT: Yeah, but I mean – do you want them -- The thing is it's quite possible whatever I do will be appealed to Judge Chen.  So, you might want to do it in a way that it's in the record.

MR. O'ROURKE:  Fair enough.

THE COURT:  Then, I know Judge Chen.  If I were just to say something -- if I were to say there should be an adverse inference and not say what it is, he's just going to send you right back to me.

MR. O'ROURKE: Right.

THE COURT:  What is it that you're proposing so I can see in context is it reasonable in terms of what happened and what you have, which is why we're pushing that you – as to what it is you think you don't have, what it would be relevant to.  I assume what we're saying is it would be relevant to their knowledge or their intent.

MR. HUGHES: Right, as well as – It goes to the other factor of actual confusion too to the extent that the focus groups revealed that there was actual confusion, or potential of actual confusion and would go to that sleekcraft matter as well.

29

THE COURT:  But, you deposed her.

MR. HUGHES:  Yes.  But, the issue with the deposition of now the second time a former employee is without documents in front of us relating to what documents were stored on her hard drive and those email archives, she -- basically, she answered she didn't know or remember a significant amount.  So, we were really just hamstrung with respect to that deposition.

THE COURT:  But, you showed her the email that she sent to Mr. --

MR. HUGHES:  That's right.  We have that.  We have that --

THE COURT:  And she was able to discuss what she remembered --

MR. HUGHES:  That's right.

THE COURT:  – as to that -- you want to say something.

MR. WILLSEY:  Your Honor, I took that deposition.

THE COURT:  All right.

MR. WILLSEY:  So, I sat through it.  Sometimes I'm not surprised that people don't remember things that happened two years ago, but that was certainly the case here.  She didn't remember much of anything.  I put documents -- the few documents we had I put in front of her. It didn't refresh her recollection independently.  She could

30

read what was put in front of her, but her knowledge did not go beyond that.

So, the documents -- we're prejudiced by not having documents that existed on her hard drive because those were present sense statements and impressions that she made. She may have communicated to others at the company that they should not pick Creme De Lys because she was so concerned about the potential confusion. We don't know, but I do know that --

THE COURT: But, why would you not -- if she communicated those with other people in the company, why would you not have them?

MR. WILLSEY: Well, I don't know – first of all, I don't know who she was communicating with at the company.

MR. O'ROURKE: Yes, you do Peter. You absolutely know.

MR. WILLSEY: No, I don't. First of all --

THE COURT: Last names. Last names.

MR. WILLSEY: Your Honor, let me clarify something real quickly. This is great Mr. O'Rourke has provided us with some documents, or maybe some additional documents relating to the focus group --

MR. O'ROURKE: They're not additional, no.

MR. WILLSEY: Well, then they've already been produced. That's good for us. The point is that

these -- the issue here with that initial hard drive, no one can tell us -- they can't tell us what email archives were stored there.  They can't tell us what additional documents were on her hard drive.  They have no idea.  And, yet, we're being forced here to imagine oh well, that would have been relating to the focus group, or that would have been relating to this other issue.  She was intricately involved in this whole process, and she testified to storing documents on her hard drive, and testified to having her email archives stored there.

Yet, now we're in the situation to telling – trying to fill in the gaps ourselves for spoliation that occurred by opposing counsel, rather by Diageo.  It is an extremely frustrating situation, as you can imagine, because there's no way for us to fill in those gaps when noone, even the Defendants, cannot tell us what was on that hard drive to begin with.  Why is that?  Because no on even talked to Jennifer Josephson even when she was rehired as an employee.

THE COURT:  Is she on your witness list?

MR. WILLSEY:  She's an unavailable witness.  So, yes, we will have deposition testimony shown at trial.

MR. O'ROURKE:  Your Honor, can I briefly comment on that?  With all due respect, counsel has created the impression that Ms. Josephson had a big role on the project, and was a part of the grand innovation team.  She wasn't.

32

As I've explained to the Court, and as they well know because they've taken the director, the brand manager, the brand director, they've taken everyone on the brand side and they know that they had a problem with the name, and that they then have Diageo North America sitting in Connecticut and New York and those are the research people. They said we should do some research.  Her role was specific and it was limited, and it was limited to the two focus groups in Sacramento and Illinois.  Look, what I'm not going to overstate is they are right that I don't know what was on her hard drive that was destroyed.  No one will know that unfortunately.  That's a big problem.  But --

THE COURT:  What are the back up tapes are from -- those are from --

MR. O'ROURKE:  Those are from the company's --

THE COURT:  Emails that would have been backed up. Okay.

MR. O'ROURKE:  The company server sweeps emails at the end of every month, and those are kept, at least on the back up tape.  That's what we did search and we came up with the other 200 documents.

MR. WILLSEY:  From the active mailbox.

MR. O'ROURKE:  But, in any event, when counsel tries to create the impression that there was some bigger

33

story than the focus group that, frankly, is not fair.  I know this is a bad situation.

THE COURT:  I actually didn't interpret that.  I thought it was pretty much limited to the focus group and what she may have communicated regarding her impressions about what happened at the focus group.

MR. O'ROURKE:  Fair enough, but just so the Court understands, she did have notes from that which they got.  The good news is for them and for us is that those notes were shared with Noel Campbell, the brand manager.  We have the notes.  They're in here.  It talks about the connection between La Crema and Creme de Lys.  They have the original draft of the report that didn't mention the connection.  We have the email that says "Hey, you mentioned the label but you don't mention the name.  You should put that in the report."  They have the revised report where it went in.  They have the emails of that being recorded up to upper level management.

So, all I'm suggesting, your Honor, is that notwithstanding that we have this bad scenario it is a limited factual piece of the case and it was very much the subject of extensive discovery by many many witnesses, and there's no reason to believe that there's anything more helpful to them, or harmful to my client, that was – that could be uncovered because that was the uh-oh moment when we

34

saw her documents the first time and we collected them and produced them anyway.  There is also no dispute that they had these documents in our very first production.

MR. SEIGARTEL:  One other point, your Honor, there is also -- there is no document that references another document that hasn't been produced.  There is no email that, for example, says "Well, what about the May 1st report?" and they don't have the May 1st report.  There's nothing referencing something else they don't have.

So, again, as Mr. O'Rourke said, we don't know. Jackson also doesn't know.  But, the most reasonable conclusion taking all of the facts in consideration, is that there is no prejudice and that they really do have everything.  That's the most reasonable conclusion taking everything in account.

MR. WILLSEY:  I'm just surprised.  I saw that in their papers too.  I don't know how that can be their conclusion that we have the whole universe of documents.  We know from -- and you've seen these charts we've provided to you in subsequent -- in prior motions we filed.  We know there were 114 emails that were to or from Josephson that didn't come from Josephson's custodial file.  So then are we to believe that that is the entire universe, that there is nothing else Josephson had where she sent it off to somebody else, maybe not one of those identified custodians?  We will

never know because --

THE COURT:  No.  What they're saying is different. What they're saying is of course there are documents out there that you don't have --

MR. WILLSEY: Right.

THE COURT:  -- that relevant to this particular issue that's been identified that is relevant to her which is those focus groups, her observations and then what was communicated about those observations, right?  That's what they're saying is you have a lot of that evidence.  It's good evidence for you.  And what they're saying is what more could be out there?  But, what is it that you think it would be?

MR. WILLSEY:  I think it would be likely additional communications with North Star.  I think it would have been additional communication --

THE COURT:  About what?

MR. WILLSEY:  About the focus groups, about --

THE COURT:  And why would North Star not have produced them?

MR. WILLSEY:  Well, North Star is a third party was producing documents in response to the subpoena, and they didn't have a duty to preserve way back in August of 2011.  I'm imagining that at the time at which her -- rather when her hard drive was captured and imaged and they kept

36

it, she actually – when she was deposed, she actually said she recalls that she never – didn't delete old emails, or rather old documents and things like that, only personal things.  I mentioned that that world, that fully preserved world would have had additional information, would have had additional be it drafts, documents, things like that.

THE COURT:  Of what?

MR. WILLSEY:  Relating to her work on this matter, in the selected adoption of the Creme De Lys mark.

THE COURT:  Well, her work on this matter though, you took her deposition, is – you took her – not you -- Jackson --

MR. WILLSEY: Yes.

THE COURT:  – is related to working with the focus groups.

MR. WILLSEY:  That's right.

THE COURT:  Right?

MR. WILLSEY:  That's right.  She actually --

THE COURT:  So, that's her role.  She's one witness.  That's her role.

MR. WILLSEY:  She testified that she helped determine the target consumer.  She would oversee research that would happen and would oversee marketing.  That's --

MR. O'ROURKE: Those were her general responsibilities, your Honor.  Please.

37

THE COURT:  Okay.

MR. WILLSEY:  Yes.  Those were her general responsibilities --

MR. O'ROURKE:  As an affiliate of the company, not on this project.  On this project, she was a researcher who organized and coordinated the focus groups.  That was it.  That's not in dispute.

MR. WILLSEY:  Your Honor, all I know is that time and again her importance has been downplayed and time and again, we've learned that she did have some of the more critical documents in this case and then those were subsequently destroyed.

THE COURT:  But, were the documents that she had, what is the relevance to this case?  What is the evidence of what she did with respect to the adoption of this brand?

MR. WILLSEY:  She was involved with the consumer research studies that took place both in Sacramento and the other location.

THE COURT:  Illinois.

MR. WILLSEY:  Illinois.  And involved with the selection and adoption of the Creme de Lys mark --

MR. O'ROURKE:  Not true.

MR. WILLSEY:  To say that --

THE COURT:  Let him finish.

MR. WILLSEY:  That's inappropriate.  To the extent

38

that they were analyzing Creme de Lys for the purposes of adopting this mark in the consumer – you know, in the marketplace.  They conducted these focus groups.  She was there.  She took notes, and she  had communications about the report and then also, you know, communications internally and with North Star, direct communications with North Star about the focus group sessions.

THE COURT:  And you have her notes?

MR. WILLSEY:  Well, purportedly we do have her complete set of notes.  But, again because her hard drive was destroyed, I frankly don't know that.  I have to rest on the assurances of opposing counsel.

THE COURT:  Well, do they look complete?  Is there anything on them that suggests they are incomplete?

MR. WILLSEY:  They're notes, your Honor.  I mean it just flows.  I don't really know.  Frankly, because we don't have DVDs from this other session, that I have no way to verify that those notes are complete.

MR. O'ROURKE:  Your Honor, can I describe the notes?

THE COURT:  No, but you can submit them if you want.

MR. O'ROURKE:  Okay.

THE COURT:  Because I'll let you supplement.

The focus group in which the women expressed concern

39

about the confusion that was Sacramento?

MR. WILLSEY: It actually was – it appears like it was in both groups.

THE COURT:  Do you have the DVD of the Illinois?

MR. WILLSEY:  Just of the Illinois, yes.

THE COURT:  All right.  This is what I'm going to do.  I think you do have to -- I don't think – I'm telling you Judge Chen will just send it right back to me because there hasn't been any motion practice in this case except in front of me.  So, he doesn't really know the case all that well.

MR. WILLSEY:  Your Honor, the only reason why we didn't is – get instruction from Chen was that you had a judge on the factual predicate, so that was --

THE COURT:  But, he'll want to know anyway.

MR. WILLSEY:  Okay.

THE COURT:  So, you have to submit it in context.  Don't overreach, right?  Because if you're going to go all for nothing, it will be like Media Tech.  That's a very different case.  There, there wasn't any spoilation.  I had never seen a motion seeking -- then, because it is – different matter.  And then, because it is – there is that presumption it is your burden and it was -- I'll let you submit whatever you want, in terms of going to prejudice per additional evidence, and you can respond to it.  We need to

40

do --

What day is your trial?

UNIDENTIFIED SPEAKER:  March 3rd.

THE COURT:  Oh my God.

MR. WILLSEY:  February 18th is the pretrial conference.

THE COURT:  I don't know how we're going to do this then.  Well, you just need to -- what's today Thursday?  By Monday, then you need to file your supplement.  Do you want to see what they file before you file or no?

MR. O'ROURKE:  I mean it would be nice to have a day or two so if we could file our supplement along with our proposed adverse inference instruction on Wednesday.

THE COURT:  All right.

MR. SIEGARTEL:  Your Honor, not to mettle this up and I appreciate all the time you're spending on this.  It's a little hard to talk about prejudice if I don't know what they say.

THE COURT:  Can you -- you should know today, tomorrow what is the adverse inference instruction you are seeking?

UNIDENTIFIED:  Yeah.

UNIDENTIFIED SPEAKER:  We have some examples from case law, and I'm sure there was one that was modified in the Apple v. Samsung case.

41

THE COURT:  I'm sure you don't want that one, right?

UNIDENTIFIED SPEAKER:  It seems to be a little overreaching.  But, there are some other ones.

THE COURT:  No.  No.  Which ones?  Judge Graywall's (phonetic) or Judge Ko's -- Judge Graywalls' got reverse.  So, that's not good.  Judge Ko's didn't say very much, and then nobody wanted it anyway because it was mutual.  So, but why don't you -- in this case, in Apple, of course, there were many custodians, many, that had been destroyed, right.  Here, it's quite -- it's been pinpointed quite precisely to Ms. Josephson.  So, I think whatever instruction you're seeking has to be limited.  It can't create some inference there was some massive destruction of anything.  It was one thing.

UNIDENTIFIED SPEAKER:  Then, can I propose this that by tomorrow we submit a proposed adverse inference instruction, and we'll send that also to opposing counsel.  Then, if we follow the schedule we just talked about on Monday they make a filing and then Wednesday we respond to that.

THE COURT:  Then, it's submitted.  Okay.

UNIDENTIFIED SPEAKER: Appreciate that, your Honor.

UNIDENTIFIED SPEAKER:  Thank you, your Honor

THE COURT:  Thank you

42

MR. HUGHES:  As far as monetary sanctions, with our submission on Wednesday, should we submit a proposed figure along with back up invoices and things?

THE COURT:  Well, this is what I'm wondering.  I don't even know that they -- I mean, you can dispute it that's fine.  Clearly, I think the stuff that occurred after June -- the motion practice that they should -- that your client should pay for that because that should have been disclosed that the hard drive had been destroyed.  You can do that, but we can also just do it after trial.  I mean I can do my order and find that I think monetary sanctions for this stuff is appropriate.

MR. HUGHES:  To be determined post trial.

THE COURT:  To be determined post trial.

UNIDENTIFIED SPEAKER:  Okay.

THE COURT:  Then, I'm hoping these things have way of going away, right?  But, I'll do it if I have to.

ALL: Thank you, your Honor.

THE COURT:  Thank you.

(Proceedings adjourned at 10:47 a.m.)

43

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Friday, February 7, 2014