1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JACKSON FAMILY WINES, INC., et al.,

Plaintiffs,

v.

DIAGEO NORTH AMERICA, INC., et al.,

Defendants.

Case No. 11-5639 EMC (JSC)

**ORDER GRANTING MOTION FOR SANCTIONS**

In August 2012, eight months after the commencement of this litigation, Defendants deleted the hard drive of marketing department employee Jennifer Josephson.  Defendants did not reveal their destruction of evidence, however, until a December 2013 Court-ordered Rule 30(b)(6) deposition on the preservation of Ms. Josephson's documents.  This involuntary disclosure occurred six months after Defendants discovered a "gap" in their production of Josephson's documents, and five months after they represented to the Court that "every single document" for Ms. Josephson had been produced.  Plaintiffs now move for sanctions due to Defendants' spoliation.  (Dkt. No. 140.) Plaintiffs seek an adverse inference instruction for the trial in this case, which begins next month, as well as monetary sanctions.  Defendants contend that sanctions are inappropriate because 1) they acted in good faith in deleting the hard drive, 2) the deletion has not prejudiced Plaintiffs, and 3)

United States District Court
Northern District of California

1   Plaintiffs' own conduct precludes sanctions.  After carefully considering the parties' submissions,

2   including their post-hearing submissions, and having had the benefit of oral argument on February 6,

3   2014, the Court GRANTS Plaintiffs' motion for sanctions.

4                                    **BACKGROUND**

5           Plaintiffs filed this lawsuit in November 2011 alleging that Defendants' Crème de Lys brand

6   of wine infringes Plaintiffs' La Crema brand of wine.  The lawsuit followed an August 31, 2011 letter

7   from Plaintiffs to Defendants demanding that they stop using the Crème de Lys mark.

8           Ms. Josephson worked for Defendant Diageo North America, Inc. as a director of Consumer

9   Planning from January 2009 to sometime in August 2011.[1]  (*See* Dkt. No. 103-4 at 18:17-20, 19:6-8,

10  27:11-12.)  Defendants assert that Josephson was on "loan" to Defendant Diageo Chateau & Estate

11  Wines ("DC&E"), which is the entity responsible for wine "innovations," such as Crème de Lys.

12  (Dkt. No. 187-4 at 3.)  Defendants have described Josephson's role as "the conduit between Diageo's

13  marketing team and Northstar [Research Partners, LLC], the third-party market research company,"

14  that was conducting focus groups for the selection of Defendants' Crème de Lys brand.  (Dkt. No.

15  103-2 at 6.)  One communication between Josephson and Northstar regarded Josephson's inquiry as to

16  why Northstar's focus group report "didn't include anything about potential confusion with La

17  Crema" (Dkt. No. 140-8),[2] confusion that was voiced by some of the focus group participants (*see*

18  Dkt. No. 187-13).  Other than handling focus group sessions, Josephson "was involved in helping

19  DC&E decide that the wine should be about an exhale moment rather than a moment of indulgence."

20  (Dkt. No. 188-2 at 40:22-41:9.)

21          After Josephson left Diageo in August 2011, her work-provided laptop was sent to IBM,

22  where it was "imaged," pursuant to Defendants' "leaver's process."  (Dkt. No. 139-2 at 11:14-12:3.)

23  IBM then sent a copy of the image back to Defendants on an external hard drive, which Defendants

24  received around February 2012.  (*Id.* at 12:7-14.)  It is undisputed that Defendants never issued a

25  litigation hold on Josephson's documents and never spoke to Josephson about preserving her

26  documents, even after she returned to the company in October 2011.

27  _____

28  [1]  Josephson returned to the company in October 2011 in a non-marketing role.  (*See* Dkt. No. 103-12 at 26:3-24.)
    [2]  This email was produced by Northstar in response to Plaintiffs' subpoena in March 2013.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

On March 23, 2012, Plaintiffs served document requests for the production of all documents concerning the "selection, adoption, and/or use" of the Crème de Lys mark.  (Dkt. No. 140-5.)  In June 2012, Plaintiffs deposed some of Defendants' employees who testified about Josephson's involvement in the selection of the mark.  Defendants recall that Plaintiffs' counsel "marked five documents that included Ms. Josephson, and even read into the record Ms. Josephson's statements from the documents."  (Dkt. No. 72 at 4 (emphasis omitted).)  Defendants, however, had still not produced any of Josephson's documents.

Sometime in August 2012, Defendants deleted the image of Josephson's laptop, six months after receiving the image from IBM, pursuant to Defendants' standard "leaver's process."  (Dkt. No. 139-2 at 12:7-14.)

On January 7, 2013, Defendants identified Josephson as a person with knowledge of Defendants' adoption of the Crème de Lys mark in response to an interrogatory.  (Dkt. No. 139-4 at 9 (Response to Interrogatory No. 7).)[3]  In April 2013, however, Josephson is absent from Defendants' list of document custodians whose documents Defendants had searched, gathered, and reviewed. (Dkt. No. 140-7.)

On June 3, 2013, Plaintiffs deposed Mr. Histed, Northstar's Executive Vice President and Josephson's contact for the focus group studies.  Defendants assert that the day after Histed's deposition "Diageo realized there might be a gap in its document collection."  (Dkt. No. 140 at 5.) Thus, on June 4, 2013, Defendants "started collecting all remaining Josephson documents."  (*Id.*) Defendants subsequently produced only nine documents from Josephson's custodial file, documents which Plaintiffs contend are from Josephson's second laptop given to her when she was rehired in a non-marketing role in October 2011.

Toward the end of fact discovery, which closed on July 5, 2013, the parties brought several discovery disputes to the Court for resolution.  One dispute involved Plaintiffs' request for a Rule 30(b)(6) deposition on Defendants' document collection and preservation efforts based on Plaintiffs' contention that Defendants' document production was somehow incomplete.  Plaintiffs asserted that

---

[3]  Plaintiffs assert that Defendants had failed earlier to identify Josephson in a prior interrogatory response from May 2012.  (*See* Dkt. Nos. 140 at 2, 140-9 at 1.)  Plaintiffs, however, do not include Defendants' May 2012 interrogatory responses as an exhibit to the joint letter.

United States District Court
Northern District of California

1  they "suspect that Defendants' discovery efforts are deficient because Defendants failed to produce

2  highly relevant documents that were subsequently produced by third parties."  (Dkt. No. 67 at 4.)

3  Defendants objected to Plaintiffs' request:

4         Jackson's suggestion that Diageo, in refusing to designate a witness to speak to this
5         improper Topic, is attempting to "conceal" something is simply insulting. Jackson has
          not pointed concretely to a single document Diageo has failed to produce.  Indeed, as
6         the Court would expect, each side's documents were searched and culled
          electronically with search terms the parties negotiated and finalized.  Diageo searched
7         the electronic files of every Diageo employee from whom Jackson demanded
          discovery.  Diageo has acted with complete propriety, and Jackson has absolutely no
8         grounds to doubt this.

9

10  (*Id.* at 8.)

11         Another discovery dispute concerned Plaintiffs' request for leave to depose Josephson after

12  the close of fact discovery and for the production of all of her documents.  In opposing Plaintiffs'

13  request, Defendants insisted that they:

14         simply cannot be more plain than what Diageo counsel has already told Jackson on
           several occasions, namely, that Diageo counsel collected <u>every single document</u> that
15         Diageo had in its custodial files for Ms. Josephson; Diageo counsel then applied
           <u>every single keyword search string</u> that the parties previously negotiated to these
16         Josephson documents; Diageo counsel then reviewed <u>every single document</u> returned
           from the keyword searches; and Diageo produced <u>every single responsive, non-</u>
17         <u>privileged document</u>.  There is simply nothing left to be done in connection with Ms.
           Josephson's documents, as Diageo has complied fully and in good faith with
18         Jackson's requests and Diageo's discovery obligations.

19

20  (Dkt. No. 72 at 5.)

21         At the August 1, 2013 hearing on the parties' various discovery disputes Plaintiffs were more

22  specific about their concern, explaining that it arose from receiving "a hundred emails with

23  Josephson's name on them, [but] we didn't get these [emails] in her custodial files."  (Dkt. No. 79 at

24  8:15-17.)  Defendants again insisted that nothing was amiss: "I really think they have all the

25  Josephson documents, because if you see some of them, some of them are actually troubling from our

26  perspective.  We didn't withhold anything."  (*Id.* at 7:13-15.)  The Court then asked Plaintiffs'

27  counsel if he had previously discussed the issue with Defendants' counsel.  Plaintiffs' counsel said

28  "no."  (*Id.* at 8:24.)  The Court accordingly instructed the parties to meet and confer on the issue:

4

United States District Court
Northern District of California

1    "why don't you just sit down and have the conversation, and he can figure out, and you can explain to

2    him why they didn't have it."  (*Id.* at 8:25-9:3.)  The Court noted that "we want to make sure the

3    documents were preserved.  And we want to know what else is out there that we should be getting."

4    (*Id.* at 9:19-21.)

5         In its Order the next day, the Court denied Plaintiffs' request for a Rule 30(b)(6) witness on

6    the topic of document collection and preservation, concluding that such a witness "is not necessary to

7    assuage Plaintiffs' concerns, which are supported merely by Plaintiffs' vague contention that

8    something may be amiss.  As discussed at the hearing, the parties shall confer regarding Plaintiffs'

9    concerns and insure that all documents are identified and produced."  (Dkt. No. 77 at 3.)  In that same

10   Order, the Court granted Plaintiffs' request for relief to depose Josephson after the close of fact

11   discovery.  (*Id.* at 4-5.)

12        On October 30, 2013, Defendants received requested "backup tapes" from IBM that included

13   some of Josephson's documents.  (Dkt. No. 139-2 at 37:20-22.)  Although the record does not reveal

14   when the request for Josephson's backup tapes was made, it was assuredly before October 30.

15   Defendants informed neither Plaintiffs nor the Court of these recovered documents from Josephson's

16   files until Defendants produced them on December 4, 2013.

17        On November 1, 2013, Plaintiffs, after meeting and conferring with Defendants, renewed their

18   request for a Rule 30(b)(6) deposition on Defendants' efforts to retain Josephson's documents.  (Dkt.

19   No. 104.)  Plaintiffs identified several inconsistencies between the few documents they received from

20   Josephson's custodial file and those documents received from other custodians and from Northstar.

21   Defendants objected to the deposition request, insisting that there was "no warrant" for it.  (*Id.* at 5.)

22   Defendants maintained that "Jackson has already received the entire universe of documents and

23   correspondence including Ms. Josephson."  (*Id.* at 6.)

24        The Court granted Plaintiffs' motion, stating that "Defendants fail to explain why the

25   documents found in other custodial files were not found in Josephson's custodial file."  (Dkt. No. 106

26   at 3.)  The Court also concluded that Defendants failed to provide an explanation as to why the

27   Josephson-Hilsted emails—which included the email referencing confusion with La Crema—were

28   produced by Northstar, but not by Defendants.  (*Id.* ("While there may certainly be an innocent

1    explanation for Defendants' failure to produce an email from Josephson that specifically mentions La

2    Crema, Defendants fail to provide one.").)

3         On December 4, 2013, Defendants produced the approximately 200 emails from Josephson's

4    custodial files that were stored on the backup tapes.  It is not clear from the record whether these 200

5    emails are Josephson's entire email correspondence from her first stint working for Diageo.

6    Defendants' Rule 30(b)(6) witness on document preservation, who was deposed on December 13,

7    2013, testified to what was on Josephson's backup tapes: "So it's not only e-mails.  It's also calendar

8    appointments, but—and it's—so if you consider that e-mail.  So it's anything within the e-mail box."

9    (Dkt. No. 139-2 at 39:6-9.)  Plaintiffs assert that these emails came from only Josephson's "active"

10   email files "(*e.g.*, inbox, outbox, etc.);" none of the documents came from the email archives on her

11   first laptop.  (Dkt. No. 140 at 2 n.2.)  Defendants argue that this "is simply not true, as Ms. Josephson

12   sent and received the emails collected from the backup drives at the time she was using the first

13   laptop, and more importantly, at the time that she worked on the April Focus Groups."  (*Id.* at 6 n.8.)

14   At the hearing on the motion, however, Defendants did not challenge Plaintiffs' contention that the

15   backup tapes captured Josephson's emails only if they were in her "active" email files.

16        Plaintiffs deposed Defendants' Rule 30(b)(6) witness on December 13, 2013, where

17   Defendants  revealed for the first time that Josephson's laptop hard drive had been deleted 16 months

18   earlier.

19        The parties filed their joint letter concerning sanctions on January 23, 2014.

20                                    **LEGAL STANDARD**

21        Courts are vested with inherent powers arising out of "'the control necessar[y] . . . to manage

22   their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Unigard Sec. Ins.*

23   *Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (quoting *Chambers v.*

24   *NASCO, Inc.*, 501 U.S. 32, 43 (1991)).  The Ninth Circuit has explicitly recognized trial courts'

25   "inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or

26   spoliation of relevant evidence," *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993), and that

27   sanctions for spoliation of evidence may be imposed under the court's inherent powers to manage its

28   own affairs, *see Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).  Spoliation "refers to the

United States District Court
Northern District of California

6

1  destruction or material alteration of evidence or to the failure to preserve property for another's use as

2  evidence in pending or reasonably foreseeable litigation." *Apple Inc. v. Samsung Elecs. Co., Ltd.*,

3  888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (internal quotation marks omitted). "Evidence of

4  spoliation may be grounds for sanctions, which may include an adverse inference instruction." *Id.*

5  The Ninth Circuit has not clearly articulated a test for determining the appropriateness of an

6  adverse inference instruction. "Courts in this District, however, have generally followed Second

7  Circuit law." *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2013 WL 6869933, at *3 (N.D. Cal.

8  Dec. 31, 2013) (collecting cases). The Second Circuit's three-part test provides that "a party seeking

9  an adverse inference instruction based on the destruction of evidence must establish[:] (1) that the

10  party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2)

11  that the records were destroyed with a 'culpable state of mind[;]' and (3) that the evidence was

12  'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would

13  support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107

14  (2d Cir. 2002).

### DISCUSSION

**A.    Spoliation**

**1.    Defendants' Duty to Preserve Relevant Evidence**

18  Defendants do not argue that they did not have a duty to preserve Josephson's documents,

19  including the data on her laptop that were erased. Josephson's laptop image was destroyed in August

20  2012—well after this duty arose, which was as early as the August 31, 2011 cease and desist letter

21  and as late as the November 21, 2011 filing of this lawsuit. *See Silvestri v. Gen. Motors Corp.*, 271

22  F.3d 583, 591 (9th Cir. 2001) ("The duty to preserve material evidence arises not only during

23  litigation but also extends to that period before the litigation when a party reasonably should know

24  that the evidence may be relevant to anticipated litigation."). This factor is accordingly satisfied.

**2.    Defendants' Requisite State of Mind**

26  The Ninth Circuit has recognized "the power of the district court to sanction under its inherent

27  powers not only for bad faith, but also for willfulness or fault by the offending party." *Unigard*, 982

28  F.2d at 368 n.2. "A party's destruction of evidence qualifies as willful spoliation if the party has some

United States District Court
Northern District of California

7

1    notice that the documents were *potentially* relevant to the litigation before they were destroyed."

2    *Leon*, 464 F.3d at 959 (internal quotation marks omitted).  "All that the court must find is that [the

3    party] acted with a 'conscious disregard' of its obligations."  *Apple Inc. v. Samsung Elecs. Co., Ltd.*,

4    881 F. Supp. 2d 1132, 1147 (N.D. Cal. 2012), *modified*, 888 F. Supp. 2d 976.

5         Defendants contend they acted in good faith and lack culpability because Josephson's

6    documents were destroyed before Defendants became aware that "certain of her documents might be

7    relevant."  (Dkt. No. 140 at 5.)  The Court is not persuaded.  Given Defendants' own description of

8    Josephson as the "the conduit between Diageo's marketing team and Northstar," (Dkt. No. 103-2 at

9    6), the market research firm that was running focus groups for the selection of the Crème de Lys

10   mark, the Court fails to see how Defendants could not view Josephson's documents as being at least

11   potentially relevant from the moment litigation was reasonably anticipated.  Defendants cite no

12   authority for the proposition that a party is not put on notice of the relevance of documents until the

13   opposing party requests those documents.

14        Despite being on notice that Josephson's documents were potentially relevant, Defendants

15   failed to intervene in their own "leavers" process and ensure that Josephson's documents were

16   preserved.  "[I]t generally is recognized that when a company or organization has a document

17   retention policy, it is obligated to suspend that policy and implement a 'litigation hold' to ensure the

18   preservation of relevant documents after the preservation duty has been triggered."  *Apple Inc.*, 881 F.

19   Supp. 2d at 1147 (internal quotation marks omitted) (concluding that Samsung's failure to ensure

20   emails were preserved, and not destroyed pursuant to the company's biweekly automatic destruction

21   policy, was willful).  It is undisputed that Defendants never issued a litigation hold on Josephson's

22   documents and never spoke to Josephson about preserving her documents, even after she returned to

23   the company in October 2011.  The Court concludes that Defendants' destruction of Josephson's files

24   was willful and in conscious disregard of their duty to preserve her documents.

25        Defendants' argument that they "went to extraordinary lengths" to search for and recover

26   Josephson's documents is not responsive to whether Defendants willfully failed to preserve those

27   documents in the first place.  Further, Defendants' effort to extinguish their culpability is undermined

28   by their abject failure to disclose the destruction of Josephson's files to Plaintiffs and the Court.

1   Defendants admit that they discovered the "gap" in their discovery production on June 3, 2013, yet

2   not until a Court-ordered deposition on December 13, 2013 did Defendants reveal that Josephson's

3   data were deleted.  Worse, Defendants' representations to the Court since June 3, however artfully

4   crafted, have consistently, and vehemently, sought to reassure the Court that the production of

5   Josephson's documents was complete and irreproachable.  As recounted above, Defendants repeatedly

6   represented to this Court in July, August, and November that "every single document" in Josephson's

7   custodial file had been produced, and that Plaintiffs' inquiry into whether Josephson's documents

8   were preserved was without warrant.  It is apparent now that those representations were not true.  At

9   the hearing, Defendants conceded that the representations made to the Court were false, but argued

10  that they were made unknowingly since they were not yet aware that the hard drive was destroyed.  If

11  Defendants were actually not aware that the hard drive had been destroyed when the issue was raised

12  and litigated over several months, Defendants' ignorance was the result of a willful failure to make

13  themselves aware.  Defendants provide no explanation for their failure to discover what happened to

14  Josephson's custodial file once they discovered a "gap" in their production that resulted in only nine

15  of Josephson's documents being produced, and especially after Plaintiffs raised the precise issue with

16  them shortly thereafter.  As became apparent to the Court, there was a clear discrepancy in

17  Defendants' document production; for instance, relevant emails sent from Josephson were produced

18  from the custodial files of the emails' recipient, but those same emails were not produced from

19  Josephson's custodial files.  Given these obvious red flags, Defendants should have investigated the

20  issue of Josephson's custodial file, and any reasonable investigation would have uncovered the

21  erasure of her hard drive.

22          Further, Defendants' contention that they were unaware of the deletion of Josephson's hard

23  drive when they made the false representations is questionable since Defendants admit they received

24  backup tapes of Josephson's hard drive from IBM on October 30, 2013.  Defendants' Rule 30(b)(6)

25  deponent on the issue of production and retention of Josephson's documents, testified that the backups

26  were requested from IBM and delivered in full on October 30, 2013.  That Defendants requested

27  (presumably before October 30) and received Josephson's backup tapes on October 30 indicates that

28  Defendants were aware of the spoliation sometime earlier than October 30, but no later than that date.

United States District Court
Northern District of California

1    Nonetheless, Defendants falsely represented to this Court on *November 1* that there was "no warrant"

2    for Plaintiffs' request for a Rule 30(b)(6) deposition on preservation of Josephson's documents and

3    that "Jackson has already received the entire universe of documents and correspondence including

4    Ms. Josephson." (Dkt. No. 104 at 5-6.)  Defendants further noted that "it is extremely disappointing

5    to Diageo that it is still being forced to combat this preservation issue." (*Id.* at 5.)  Contrary to

6    Defendants' representations on November 1, they knew Josephson's hard drive had not been

7    preserved, and they knew that the "entire universe" of Josephson's documents and correspondence

8    had not been produced.  What is "extremely disappointing" is that Defendants concealed those facts

9    from Plaintiffs and the Court.

10         Defendants' failure to promptly reveal the destruction, as well as their apparent efforts to

11   cover it up, does not reflect well on Defendants.  Although bad faith is not required for an adverse

12   inference sanction, Defendants' conduct since they learned about the destruction qualifies as

13   circumstantial evidence of such bad faith.  Moreover, Defendants' conduct has delayed the remedial

14   process for the destruction of the documents such that this Court—and perhaps then the presiding

15   judge—must consider Plaintiffs' sanctions motion less than a month before trial is set to commence.

16   If Defendants had acted in good faith since they discovered the destruction, this matter would have

17   been resolved months earlier.

18         **3.       The Relevance of the Destroyed Evidence to Plaintiffs**

19         "[B]ecause the relevance of destroyed documents cannot be clearly ascertained because the

20   documents no longer exist, a party can hardly assert any presumption of irrelevance as to the

21   destroyed documents." *Leon*, 464 F.3d at 959 (internal quotation marks and alterations omitted).  It is

22   readily apparent that the destroyed evidence included at least one document relevant to Plaintiffs'

23   case; namely, the email from Josephson to Histed inquiring about the lack of discussion in the focus

24   group report of possible confusion with La Crema, which was an issue raised more than once by the

25   focus group participants.  It is certainly possible that additional relevant documents were destroyed

26   that have not been produced by other custodians.  On the other hand, Plaintiffs have apparently found

27   nothing relevant in the 200 emails that Defendants have recovered on the backup tapes.  In light of

28   Defendants' conduct with respect to Josephson's documents throughout the litigation, the Court

United States District Court
Northern District of California

1   declines to give Defendants the benefit of the doubt.  *See Hamilton v. Signature Flight Support Corp.*,

2   2005 WL 3481423, at *6 (N.D. Cal. Dec. 20, 2005) ("[C]ourts must take care not to hold the

3   prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or

4   unavailable evidence, because doing so would subvert the purposes of the adverse inference, and

5   would allow parties who have destroyed evidence to profit from that destruction." (internal quotation

6   marks and alterations omitted)).  The Court accordingly finds that the destroyed evidence contained

7   relevant documents.

8   **B.      Sanction**

9           **1.      Adverse inference instruction**

10          In considering what spoliation sanction to impose, if any, courts generally consider three

11  factors: "'(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of

12  prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid

13  substantial unfairness to the opposing party.'"  *Nursing Home Pension Fund v. Oracle Corp.*, 254

14  F.R.D. 559, 563 (N.D. Cal. 2008) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d

15  Cir. 1994)).  "Ultimately, the choice of appropriate spoliation sanctions must be determined on a case-

16  by-case basis, and should be commensurate to the spoliating party's motive or degree of fault in

17  destroying the evidence."  *Apple Inc.*, 888 F. Supp. 2d at 992.

18          As already recounted above, the fault for the destruction of Josephson's documents resides

19  with Defendants only.  Given Defendants' knowledge of Josephson's role in the company and the

20  obvious connection she had to Plaintiffs' claims, Defendants' failure to secure her documents

21  constituted willful spoliation.

22          Regarding prejudice, the inquiry "looks to whether the spoiling party's actions impaired the

23  non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the

24  case."  *Leon*, 464 F.3d at 959 (internal quotation marks and alterations omitted).  "In the Ninth

25  Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of

26  the case, and further, that such evidence was adverse to the party that destroyed it."  *Dong Ah Tire &*

27  *Rubber Co., Ltd. v. Glasforms, Inc.*, 2009 WL 1949124, at *10 (N.D. Cal. July 2, 2009); *see Hynix*

28  *Semiconductor, Inc. v. Rambus Inc.*, 591 F. Supp. 2d 1038, 1060 (N.D. Cal. 2006) ("[I]f spoliation is

1    shown, the burden of proof logically shifts to the guilty party to show that no prejudice resulted from

2    the spoliation" because that party "is in a much better position to show what was destroyed and should

3    not be able to benefit from its wrongdoing"), *rev'd on other grounds*, 645 F.3d 1336, 1344–47 (Fed.

4    Cir. 2011); *see also Apple Inc.*, 888 F. Supp. 2d at 993 ("[T]hough neither Apple nor the Court may

5    ever know the contents of any destroyed Samsung emails, the fact that the emails of key Samsung

6    witnesses were among those destroyed permits the reasonable inference that Apple was prejudiced by

7    Samsung's spoliation.").

8         Defendants contend that Plaintiffs have not suffered prejudice because the "much more

9    reasonable conclusion is that Jackson has received <u>every single document</u> concerning the April Focus

10   Groups, which are Ms. Josephson's only connection to this litigation."  (Dkt. No. 140 at 6.)

11   Defendants further assert that Diageo has "collected and reviewed its backup electronic drives in order

12   to ensure that it produced every document it possessed concerning Ms. Josephson and the April Focus

13   Groups."  (*Id.*)  In their supplemental briefing to the Court, Defendants contend that it is logical to

14   infer that all of Josephson's relevant documents have likely been produced by other custodians or

15   Northstar given Josephson's "limited and circumscribed role" in the development of the brand

16   coupled with the "extensive discovery" Plaintiffs have already received about the focus groups, which

17   are Josephson's only connection to this case.

18         While the Court is persuaded that the vast bulk of Josephson's documents were otherwise

19   produced by other custodians and Northstar, Defendants do not, and cannot, represent with complete

20   assurance that every relevant document on Josephson's deleted hard drive has been produced to

21   Plaintiffs.   And although it is difficult, if not impossible, to identify what relevant documents are

22   completely missing, and to what degree those documents would affect the outcome of this case, the

23   Court finds it equally challenging—in light of Defendants' efforts to conceal the spoliation—to

24   conclude that the entire universe of relevant documents has been produced.  It is certainly possible

25   that Josephson created a relevant document that was not produced by another custodian (because the

26   other custodian never received it and/or saved it) or by Northstar (who had no duty to preserve until

27   Plaintiffs' subpoena in March 2013).  Defendants' willful spoliation and their apparent effort to cover-

28   up that spoliation undermines Defendants' contention that the most logical conclusion is that Plaintiffs

United States District Court
Northern District of California

1    have all the documents and any unproduced deleted document is irrelevant.  Given Defendants'

2    conduct, it is equally, if not more, logical to conclude that Plaintiffs do not have every relevant

3    document.  *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 110 (2d Cir. 2002)

4    ("[I]f any of [the spoiling party's] acts that hindered DeGeorge's attempts to obtain the [deleted] e-

5    mails was grossly negligent or taken in bad faith, then it could support an inference that the missing e-

6    mails are harmful to [the spoiling party].") (footnote omitted).  If Defendants had nothing to hide, then

7    why did they willfully conceal the spoliation from the Plaintiffs and the Court?  Because Defendants

8    have not provided an answer to that question, they cannot defeat the presumption of prejudice.

9           Defendants' cited authority does not compel a different result.  *Chin v. Port Authority of New

10   York & New Jersey* held that the district did not abuse its discretion in declining to issue an adverse

11   inference instruction even though the Port Authority had failed to preserve evidence.  685 F.3d 135,

12   162 (2d Cir. 2012).  The Second Circuit emphasized that there are no per se rules in deciding to issue

13   an adverse inference instruction, and thus rejected Chin's argument that such an instruction must issue

14   where the spoiling party was grossly negligent and the destroyed documents were relevant.  *Id.*

15   ("[W]e have repeatedly held that a case-by-case approach to the failure to produce relevant evidence,

16   at the discretion of the district court, is appropriate.") (internal quotation marks omitted).  This case-

17   by-case approach is especially applicable here, where Defendants' actions following the spoliation

18   exacerbated the misconduct and tipped the scales in determining the existence of prejudice.  The other

19   cases Defendants cite all involve instances where the destroyed evidence was actually produced in

20   some other form.  *See Reinsdorf v. Skechers U.S.A., Inc.*, --- F.R.D. ----, 2013 WL 3878685, at *25

21   (C.D. Cal. July 19, 2013) (rejecting request for adverse inference instruction for destruction of a

22   marketing document where the non-spoiling party "actually has a copy of the document"); *Ahcom,

23   Ltd. v. Smeding*, 2011 WL 3443499, at *8-9 (N.D. Cal. Aug. 8, 2011) (considering terminating

24   sanctions and adverse inference instruction together and concluding that such sanctions were

25   inappropriate where destruction of computer that contained defendant's financial information was

26   "highly unlikely" to have materially affected the outcome of the case—namely, the alter ego

27   determination—because plaintiff had "extensive information" as to defendant's finances); *Med. Lab.

28   Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 825 (9th Cir. 2002) (affirming the district

13

1   court's denial of an adverse inference instruction where the inadvertent loss of pap smear slides was

2   remedied by the existence of digital images of the lost slides).

3      Regarding lesser sanctions, while Plaintiffs also seek monetary sanctions, the parties have not

4   otherwise discussed sanctions less severe than an adverse inference.  In light of Defendants' conduct

5   described above, there is no lesser sanction appropriate in this case.[4]

6      Given Defendants' fault for the destruction, the presumption of prejudice, and the absence of

7   lesser sanctions, the Court concludes that an adverse inference instruction is appropriate.  Plaintiffs

8   propose the following instruction:

9
10   > Defendants Diageo North America, Inc. and Diageo Chateau and Estate
   > Wines failed to preserve evidence for Plaintiffs' use in this litigation
   > after their duty to preserve arose.  Defendants destroyed the only copy
11   > of witness Jennifer Josephson's laptop hard drive, which may have
   > contained emails, notes and other documents relating to focus group
12   > sessions concerning the proposed mark CRÈME DE LEES (which
   > eventually became CRÈME DE LYS). Whether this fact is important to
13   > you in reaching a verdict in this case is for you to decide.

14   (Dkt. No. 191-3.)[5]  The Court generally agrees with the instruction, but concludes that the following,

15   slightly modified instruction should be given to the jury:

16
17   > Defendants Diageo North America, Inc. and Diageo Chateau and Estate
   > Wines failed to preserve the only copy of witness Jennifer Josephson's
   > laptop hard drive after their duty to preserve arose.  The hard drive may
18   > have contained emails, notes, and other documents relating to focus
   > group sessions concerning the proposed mark that eventually became
19   > CRÈME DE LYS.  Whether this fact is important to you in reaching a
   > verdict in this case is for you to decide.
20

21   This instruction, which is not particularly harsh, is proportional to Defendants' spoliation and their

22   subsequent conduct attempting to conceal the spoliation.  The instruction simply relays to the jury the

23   Court's factual findings regarding spoliation, and leaves it for the jury to determine the significance of

24   _____

25   [4]  Defendants also argue that the parties' relative equities favor denying sanctions.  Defendants,
   however, provide no authority for the proposition that the Court should look to the non-spoiling
26   party's conduct in determining whether the spoiling party should be sanctioned.  If Defendants have a
   meritorious discovery dispute with Plaintiffs—in this case, there have been many—Defendants should
27   have followed the proper protocol for such disputes and presented it to the Court for resolution if
   necessary.
28   [5]  Defendants have not provided any proposed instruction.

14

United States District Court
Northern District of California

1  those facts in reaching its verdict.  A more harsh sanction would be inappropriate given the

2  voluminous evidence that has been produced.  *See Apple*, 888 F. Supp. 2d at 994-95 (finding similar

3  instruction appropriate where Apple was prejudiced by the spoliation of email accounts, but its

4  "ability to go to trial" was not significantly hampered due to the "voluminous" discovery in the case,

5  which included some of the erased emails produced from the sender or the receiver).  Further, because

6  the instruction is specific to Josephson, the instruction appropriately captures the issues relevant to the

7  spoliation.  In other words, if Josephson is not an important witness for the jury (as Defendants insist),

8  then the instruction would likely have no impact; however, if Josephson is an important witness for

9  the jury, the instruction appropriately advises the jury that Defendants did not fulfill their duty to

10  preserve the documents of this important witness.

11            **2.        Monetary sanctions**

12            Monetary sanctions under the Court's inherent power require a finding that the sanctioned

13  party's behavior constituted or was tantamount to bad faith.[6]  *Leon*, 464 F.3d at 961.  "A party

14  demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court

15  order."  *Id.* (internal quotation marks omitted).  As detailed above, Defendants admit that they knew

16  as of June 4, 2013 that there was a "gap" in their production of Josephson's documents.  And, if they

17  had conducted a proper inquiry, they should have learned of the destruction in June 2013.  Defendants

18  further knew that Josephson's hard drive had been deleted at least by the time Defendants requested

19  Josephson's backup tapes from IBM, which Defendants received on October 30, 2013.  Nonetheless,

20  Defendants consistently maintained in communications with Plaintiffs, in filings with this Court, and

21  at oral arguments from June through November that there was no issue with the production and

22  preservation of Josephson's documents.  Defendants' apparent efforts to conceal the spoliation plainly

23  delayed and disrupted the litigation and therefore a finding of bad faith supporting monetary sanctions

24  is appropriate.

25            The monetary sanctions against Defendants shall include the fees and costs associated with 1)

26  Plaintiffs' efforts, beginning in June 2013, to ensure that Josephson's documents were produced and

27

28  [6]  While monetary sanctions under Federal Rule of Civil Procedure 37 do not require a finding of bad faith, *see Dong Ah*, 2009 WL 1949124, at *4, Plaintiffs have not identified a Court order that Defendants violated.

United States District Court
Northern District of California

1    preserved, and 2) Plaintiffs' request for sanctions due to Defendants' spoliation.  A determination of

2    such costs will be made after the impending trial.

3                                              **CONCLUSION**

4            For the reasons stated above, Plaintiffs' motion for an adverse inference instruction and

5    monetary sanction is GRANTED. Within 30 days of the trial verdict, Plaintiffs shall meet and confer

6    with Defendants regarding the amount of monetary sanctions sought.  If no agreement is reached,

7    Plaintiffs shall file a motion with this Court regarding the appropriate amount of sanctions within 45

8    days of the verdict.  Failure to abide by these deadlines without leave of court will be deemed a

9    waiver of Plaintiffs' motion for monetary sanctions.

10           Any objections to this Order must be filed with the district court judge within 14 days of the

11   filing of this Order.  Fed. R. Civ. P. 72(a); N.D. Cal. Civ. L.R. 72–2.

12

13           **IT IS SO ORDERED.**

14

15   Dated:  February 14, 2014

16                                                    _____
                                                      JACQUELINE SCOTT CORLEY
17                                                    UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28