**Pages 1 - 151**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

JACKSON FAMILY WINES, INC. and )
LC TM HOLDINGS, LLC,          )
                              )
          Plaintiffs,         )
                              )
  VS.                         )      NO. C-11-5639-EMC
                              )
DIAGEO NORTH AMERICA, INC.,   )
and DIAGEO CHATEAU & ESTATE    )
WINES CO.,                    )
                              )
          Defendants.         )
                              )

                    San Francisco, California
                    Tuesday, February 18, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

            COOLEY LLP
            101 California Street
            Fifth Floor
            San Francisco, California  94111-5800
    **BY:  MICHAEL G. RHODES, Esq.**

            777 SIXTH STREET, N.W.
            11th Floor
            Washington, D.C.  20001
    **BY:  PETER J. WILLSEY, Esq.**

        (Appearances continued on next page)

Reported By:      Candace Yount, CSR No. 2737, RMR, CCRR
                  Contract Court Reporter
                  United States District Court
                  Northern District of California

**APPEARANCES (Continued)**:

For Plaintiff (continued):

                COOLEY LLP
                1299 Pennsylvania Avenue NW
                Suite 700
                Washington, D.C.  20004
        BY:     **BRENDAN J. HUGHES, Esq.**


For Defendants:

                PROSKAUER ROSE
                Eleven Times Square
                New York, New York  10036
        BY:     **BRENDAN J. O'ROURKE, Esq.**
                **CELIA V. COHEN, Esq.**
                **DAVID A. MUNKITTRICK, Esq.**
                **ADAM D. SIEGARTEL, Esq.**

**Tuesday - February 18, 2014**                    **2:37 p.m.**

                    **P R O C E E D I N G S**

                         **---000---**

        **THE CLERK:**  Calling Case C-11-5639, Jackson Family Wines versus Diageo.

        Counsel, please come forward and state your appearances for the record.

        **MR. RHODES:**  Good afternoon, Your Honor.  Michael Rhodes of Cooley on behalf of plaintiffs.

        **THE COURT:**  All right.  Thank you, Mr. Rhodes.

        **MR. WILLSEY:**  Good afternoon, Your Honor.  Peter Willsey on behalf of plaintiffs.

        **THE COURT:**  Thank you, Mr. Willsey.

        **MR. HUGHES:**  Good afternoon, Your Honor.  Brendan Hughes on behalf of the plaintiffs.

        **THE COURT:**  Mr. Hughes.

        **MR. O'ROURKE:**  Good afternoon, Your Honor.  Brendan O'Rourke from Proskauer Rose for the defendants.

        **THE COURT:**  All right.  Thank you, Mr. O'Rourke.

        **MR. SIEGARTEL:**  Good afternoon.  Adam Siegartel from Proskauer Rose for the defendants.

        **THE COURT:**  All right.  Thank you, Mr. Siegartel.

        **MR. MUNKITTRICK:**  Good afternoon, Your Honor.  David Munkittrick from Proskauer Rose for defendants.

        **THE COURT:**  All right.  Good afternoon, Mr.

Munkittrick.

MS. COHEN:  Good afternoon, Your Honor.  Celia Cohen on behalf of defendants.

THE COURT:  All right.  Thank you, Ms. Cohen.

MR. RHODES:  And, Your Honor, excuse me.  I just want to introduce you to my client, Mr. Wesselkamper.  He's the General Counsel.

THE COURT:  Great.  Welcome.

MR. O'ROURKE:  Your Honor, as well from Diageo, Elliot Basner of IP and Elliot -- Evan Gourvitz, who's the in-house litigation IP counsel.

THE COURT:  Excellent.  Good afternoon, gentlemen.

I'm glad you're here because I understand that you have a Settlement Conference that I have ordered tomorrow, correct, before Judge Laporte?

MR. O'ROURKE:  (Nodding head.)

MR. RHODES:  Yes, Your Honor.

THE COURT:  All right.  It's my view -- and I know that the parties were -- indicated that they weren't particularly asking for a Settlement Conference but I thought it would be appropriate given the fact that we are really at the precipice at this point and, by the end of this process, you'll get a pretty good sense of how I'm going to rule on various motions and so you'll have a very good opportunity to assess litigation risks, as well as you can assess it at this

point before going to trial.

So I did think it was an opportune time to revisit this issue because of the -- I think the timeliness of -- of the ADR at this juncture.  So, I'm glad that's happening.

Let me just give you one preliminary note.  My law clerk, Kendall Hannon, who's been working with me on this case, indicated that he worked at Kirkland & Ellis about two years ago, two and a half years ago, and investigated a matter that involved, I think, one of the subsidiaries perhaps of Jackson Family Wines, Kendall Jackson, looking at -- nothing to do with this case but I did want to disclose it.

It had to do with a investigation into a challenge to a California and Washington regulation on a dormant commerce clause issue that had to do with the regulation of wholesale -- wholesale/retail issues.  It has nothing to do with this case. He has no knowledge about anything in this case.

And, in fact, my understanding is that the firm was not actually retained to do anything in that case but I did want to disclose that.

**MR. RHODES:**  Your Honor, two points.  One is, I wasn't aware that the dormant commerce clause was still active and, secondly, we have no objection on behalf of plaintiffs.

**THE COURT:**  Okay.  Thanks.

**MR. O'ROURKE:**  No objection, Your Honor.

**THE COURT:**  All right.  All right.  Appreciate it.

Let me just say that in terms of the time for trial, and I appreciate the witness -- very detailed witness list that you gave me, but given the number of days that we have and given time for jury selection, openings and closing, I'm able to accommodate 15 hours each side, which would include your direct examination and cross-examination of any adverse witnesses.

I may put a certain time limit on closings to make sure we get done but in order to get this done in 10 court days, that's really at the limit.

Now, you're pretty close.  You're not that far over.  I had a case where people are estimating 40, 50 hours and I told them "No, you're not going to -- You have 15 and they scramble a little.  So I did want to give warning in terms of the number of hours.  And we do use a clock, chess clock, and I do stick to it very closely.  So any time up that you're examining, whether it's direct or cross, is time against your -- your lot.

**MR. O'ROURKE:**  Your Honor, for clarification, please. You'd said 10 days.  Are you talking -- I thought we talked about eight days.

**THE COURT:**  I . . .

**MR. RHODES:**  I think that's right, Your Honor.  I think you gave us an additional day of March 14 --

**THE COURT:**  Oh.

**MR. RHODES:**  -- at the last conference and you said that was the last day we would have.

**THE COURT:** There was. And there was -- Is there also a day that we're dark?

**MR. RHODES:** I think there was a day that you said you were dark.

**THE COURT:** I think that's right, and I forgot to take that into account.

Well --

**MR. RHODES:** I mean, regardless, Your Honor, 15 hours in my opinion is a lot of time and it's more than ample.

**THE COURT:** Of course, I mean, I have to -- I may have to recalculate --

**MR. RHODES:** Yes.

**THE COURT:** -- now for you.

**MR. RHODES:** I just had a question. So that sounded like that 15-hour -- whatever time you ultimately give us -- I mean, to me, 12, 13 hours is plenty in a trial like this -- that does not include the time that you're going to allocate for opening and closing, or it does?

**THE COURT:** Not at this point.

**MR. RHODES:** Okay.

**THE COURT:** I may now have to do a slight recalibration here and see. Whatever it is, you basically have about a little over four hours of testimony every day.

**MR. RHODES:** Right.

**THE COURT:** That's what it boils down to. In this

criminal trial I have, we're getting about four hours and 10 minutes, sometimes 15 minutes, but sometimes there are other matters come up, things are delayed.  So you can count on about four hours plus --

MR. RHODES:  Does the --

THE COURT:  -- that we normally . . .

MR. RHODES:  Does the Court take a morning break and a lunch break and that's sort of it for the day?

THE COURT:  Yes.  I take a 15-minute morning break and a 30-minute sort of a quick lunch break so people don't get exhaustion --

MR. RHODES:  Right.

THE COURT:  -- to get them through to 2 o'clock.

MR. RHODES:  Fair enough.

THE COURT:  So I have to now recalibrate and relook at the calendar.  But, you know, so maybe -- it may be 12 hours or so, so I'll have to look at it.  I mean, I'll give you the maximum I can.

But picking a jury trial in a civil case is not as time-consuming.  It should be -- We should be able to do that by noon or before that, so I intend that first day just to get going, opening statements and --

MR. RHODES:  Yeah.

THE COURT:  -- evidence so . . .

MR. RHODES:  We met --

THE COURT:  I go a full day the first day.

MR. RHODES:  Yeah.  We met and conferred, and we both kind of said 45 minutes for opening seems about right.  And if you go longer than that, frankly, you tend to lose the jury, anyway.

THE COURT:  Yeah.

MR. RHODES:  And I know --

MR. O'ROURKE:  Your Honor --

MR. RHODES:  -- that's consistent with what the Court what want.

THE COURT:  Yeah.

MR. O'ROURKE:  On our last conference, you mentioned Monday through Wednesday and then Friday for the two weeks starting March 3rd.

Just for planning purposes, because -- particularly since we go second.  You know, witnesses are already trying to, you know, figure out schedules.

Would -- Would you mind, Your Honor, letting us know what days we're actually going to be here?

THE COURT:  Yeah.  We are dark on Thursdays, so every Thursday we don't have.  So it's Monday, Tuesday, Wednesday and Friday.

MR. O'ROURKE:  Right.

THE COURT:  Betty, is there a day in there that we can --

THE CLERK: We can do Tuesday.

THE COURT: Starting from the 3rd.

(Court and clerk confer.)

MR. RHODES: So that would be the 6th and the 13th?

THE CLERK: It's just Thursday we're dark.

THE COURT: Okay.

THE CLERK: Looks like we have every day okay, the 3rd, the 4th, 5th, 7th, 10th.

THE COURT: All right. So we get -- We're going to be able to get eight full days? I mean, eight --

THE CLERK: Eight days.

THE COURT: -- real days.

THE CLERK: Yeah, we'll have eight real days.

THE COURT: That will get us to the 14th.

THE CLERK: Yeah.

MR. O'ROURKE: Thank you.

THE COURT: Okay. So we'll leave it at 13.

MR. O'ROURKE: Okay. Thank you.

THE COURT: And I'm going to get out a final pretrial order that'll have -- reiterate the times and the breaks and the number of hours. But, again, you know, maybe I'll have to recalibrate that and see what we have here.

So let me talk about -- There are a number of -- First of all, before we get to the motions in limine, there are sort of six legal questions that you had posed and I want to give you

my view.

The first question is whether plaintiffs' State law dilution claim is barred by its registration of the mark.  And, of course, it is if it is sustained.  But, here, there -- the plaintiffs seek to -- to cancel the mark, thereby putting it at issue.  So, I mean, there's sort of wrap it up together.  But I think it is the case that if the mark is sustained, then that would bar the dilution action.

But I guess -- So, you know, that -- that is -- that's going to be an issue, obviously.  The success or not of the challenge to the mark is going to have, obviously, enormous influence on the viability of the state dilution claim.

**MR. O'ROURKE:**  Your Honor, for clarity?

**THE COURT:**  Yeah.

**MR. O'ROURKE:**  I think it's pretty clear that the cancelation claim is based only on the infringement claim. That would be the basis for canceling my client's registration, so that if they don't win on the infringement claim, then the dilution claim needs to be dismissed.

**THE COURT:**  All right.  Do you have a different view of the -- the basis of the cancelation?

**MR. WILLSEY:**  No.  I actually thought that Mr. O'Rourke was going to say something slightly different.

My point is that there are different remedies associated with infringement and dilution claims.  So the dilution claim

should stay in.  So if we prevail in canceling the registration on the likelihood of confusion theory, that opens up the door to a finding on dilution which could result in different remedies than just an infringement claim.

        **THE COURT:**  Right.  On the other hand, if you lose on the infringement claim, your -- your dilution claim falls.

        **MR. WILLSEY:**  I will concede that.

        **THE COURT:**  All right.

        **MR. O'ROURKE:**  Your Honor, by the way, just to reserve our rights:

    We think the Ninth Circuit was wrong.  We think the statute's clear on its face; that is, an absolute bar and it's preempted.  But I understand that Your Honor is not in a position to decide that for us.

        **THE COURT:**  Yes, I think that is correct.

        **MR. O'ROURKE:**  Well, we just want to reserve that legal argument.

        **THE COURT:**  I understand.  I understand.  Anything can be revisited in the Ninth Circuit, so . . .

    All right.  Then there's the question about likelihood of confusion in active market conditions and how specific the evidence must be and . . .

    In this case, I think the Ninth Circuit has also stated that while the focus is, obviously, on consumer confusion, nonconsumer confusion may be relevant to the likelihood of

confusion inquiry.

And given as examples, where potential customers are involved, nonconsumers whose confusion could create an inference that consumers are likely to be confused, and nonconsumers whose confusion could influence consumers.

And so . . .  As we -- As we get into the motions in limine and the evidence, my view is that circumstantial evidence -- Although that may be the ultimate question, there is circumstantial evidence that may come in that's different from any direct evidence lack of confusion.  But we can talk about that as I get into the motions in limine and the objections.

That is my view that, yes, the focus is on actual confusion of consumers under political (sic) market conditions but that does preclude the admission of circumstantial evidence in that regard.

**MR. O'ROURKE:**  Your Honor?

**THE COURT:**  Yeah.

**MR. O'ROURKE:**  May I briefly?

**THE COURT:**  Sure.

**MR. O'ROURKE:**  Thank you.

I agree with you, Your Honor, with one caveat:  That the confusion, though, needs to be based on confusion based on the appearance of the marks as they appear on the product.  That's very clear.

If that confusion happens at the retail level through a store owner, I understand that the Ninth Circuit would allow you to permit the jury to consider that depending upon the quality of that evidence and whether it's otherwise objectionable.

But it is about the marks, not about something someone might have said three steps down the line having nothing to do with the appearance of the marks or the packaging.

**MR. WILLSEY:** Your Honor?

**THE COURT:** Yeah.

**MR. WILLSEY:** Do you want to hear argument on this now or in the context of the motion?

**THE COURT:** Well, we're going to talk about it in connection with the defendants' Motion in Limine Number 2, for instance --

**MR. WILLSEY:** That's right.

**THE COURT:** -- or Wagner and Gilbert.

But I am of the view that, yes, legally is -- the critical issue is whether there's confusion with respect to the marks and not some other factors.

The question is what kind of evidence and how close -- closely related that evidence need to be in order for it to be admissible in front of the jury. And I think that's what In Limine Number 2 concerns.

**MR. WILLSEY:** Yes, Your Honor.

THE COURT:  So we'll have a chance to talk about that.

Regarding the knowledge of the senior mark.  Again, the Ninth Circuit has made clear that when an infringer normally adopts a mark that is identical or similar -- to use its words -- to another mark, the Court can presume intent to deceive the public, mere knowledge of the mark is not enough.  You've got to do something about it.

I think the debate may be -- Obviously, it's identical but it's not much of a debate what -- what the Ninth Circuit said.

The question is:  What does "similar" mean and how similar must it be?  I don't know if there are any greater descriptive words than -- than what the Ninth Circuit has employed, for instance, in the Hokto Kinoko Company vs. Concord Farms case.

But it is -- it is -- I think each side agrees that mere knowledge is not enough.  You've got to -- You've got to do something with respect to the mark and adopting something that's identical or similar to that mark in order to raise that presumption.

The question about whether plaintiff needs to prove the fact of damages through active damages.  Although the law could be clearer, I believe that the law weighted authority is that active injury does need to be demonstrated as a predicate to recover actual damages.

On the other hand, I -- I don't think the law is such that the plaintiff needs to show specific instances of loss of

sales.  Again, there can be circumstantial evidence from which a jury can infer active confusion and, thus, actual damages.

I think if actual confusion is found by the jury, a jury can infer from that actual damages without actually finding or pointing to any specific concrete loss of sales.

But -- And that may inform the jury instructions which I will tell you I'm -- What I'm going to do on jury instructions, we may have to have a separate jury instruction conference. I'm not prepared to delve into that today.  What I can do is issue a set of proposed instructions based on your comments for your client and, if possible, a further conference on that.

With respect to whether a jury can award damages for a reason other than as a proxy for calculating plaintiffs' actual damages, I think the law is clear in the Ninth Circuit that if it is not as a proxy for actual damages and having to prove the fact of damage but is done as a disgorgement, that is an equitable remedy, not a legal remedy, that's for the Court to determine.

And I think the Ninth Circuit held that it's really like an accounting of profits which is an equitable remedy, not a legal remedy, in the Reebok versus Marmite case.

So I do find that, for that purpose, that is the basis -- that is an equitable basis for recovering of profits, not a legal remedy.

And then whether or not a showing of bad faith is required

for an award of such profits.  Here, the Ninth Circuit has instructions that suggest that willfulness is not always a requirement.  And yet we have a Ninth Circuit case, the Adray case that says the plaintiff -- suggests the plaintiff can recover upon a showing that the infringement was willful.

So I -- I'm -- I -- It appears to me that the -- the comments to the instruction I'm not sure is consistent with the law.

I guess I'll take your comment on that.  But if there is a conflict, I think I'm obliged to apply the current Ninth Circuit precedent rather than any comments from the Jury Instruction Committee.

**MR. RHODES:**  Do you want to hear argument on that now?

**THE COURT:**  Well, yeah.  I'll take your comments on this.

(Pause in proceedings.)

**MR. WILLSEY:**  I'm sorry, Your Honor.  What was the case that you just mentioned?  Ambray (phonetic)?

**THE COURT:**  Yes.  Adray?  Adray vs. Adry-Mart.

**MR. WILLSEY:**  Your Honor, if you'll just give us a second to pull a copy of the case.

(Pause in proceedings.)

**THE COURT:**  The comment -- The comment acknowledges Adray, but then . . .

Well, I'll let you comment on the comment.

**MR. HUGHES:**  Your Honor, actually, may we come back to this?

**THE COURT:**  Sure.

**MR. HUGHES:**  Thank you.

**THE COURT:**  Well, let's talk about the actual motions in limine, taking the defendants' motions first.

Defendants' first motion seeks to amend the introduction of evidence regarding the focus group that have been conducted regarding La Crema wine.

And I think my tentative view on that is that although there are authorities that caution about the -- the unreliable nature of focus groups because, you know, their susceptibility to being led and the issues not being properly teed up and, et cetera, et cetera.

I do think, number one, that in this case the focus group evidence is relevant and probative to defendants' intent in adopting the mark since there is a chronology here and it preceded the actual business decision that was taken.

And I also do think that, given that its focus was on a particular market that is sort of a targeted market, potential targeted market for both wines, that -- that it does have some appropriate value.  Obviously, it's subject to some impeachment and cross-examination.

And so, you know, one could -- It's really more of a 403 carving predicate than anything else.  But it seems to me that,

in this case, that would be a proper subject of cross-examination rather than total exclusion.  So that's my tentative view, and I'll hear your thoughts.

          **MR. O'ROURKE:**  Given your tentative ruling, perhaps it makes sense for me to go first, Your Honor.

          **THE COURT:**  I think so.

          **MR. O'ROURKE:**  I just want to see if I could understand the Court's ruling first.

     Are you saying that it's -- it's admissible as evidence of Diageo's intent in adopting the mark?  Because our motion is directed to both that issue and the issue of whether it comes in as evidence of actual confusion.

     And on the issue of actual confusion, it is -- it is not competent evidence of actual confusion for all of the reasons listed in our motion, including that the name at issue in this case, the label at issue -- the name in this case is different from what was tested, the label is different from what's tested.  Significant changes were made to the -- the things shown to the focus group participants.  They were led in a discussion for 90 minutes.

     In the focus groups, Your Honor, as you know, the La Crema brand was at the focus groups.  They were specifically asked about La Crema.  The products were compared.  They were put in a competitive array.  They were asked about it at the beginning of the focus group.  They were asked about it at the end of the

focus group.  And it was an artificially in-your-face discussion.

And -- And Mr. Histed, who conducted the focus groups, and who has the most experience of any of the witnesses in the case that talk about this, said this is in no way a reflection of what happens in the marketplace whatsoever.  When people walk into a store, they walk into a store and they make their decisions, you know, within a few minutes at most.

From a -- From an evidentiary standpoint, Your Honor, the statements are -- In addition to the fact that it ends up not being relevant because the wrong thing was tested and it was tested under artificial nonmarketplace conditions.

How could it not be hearsay if offered for the truth that these women were confused?  These are out-of-court statements, unsworn, by people who are not in this courtroom, regarding samples of mocked-up boards that don't exist in the marketplace.

So it's -- it's -- You know, when the Court looks for exceptions to hearsay, if there's not one that's specific, the Court, with due respect, should be concerned about the reliability of the evidence.  And it has not been tested.

The -- The Respondents at the focus groups have not been called to testify.  No one's been asked.  We don't even know exactly who they are.

So --

THE COURT:  Well, let -- Let me unpack that for a moment.

MR. O'ROURKE:  Sure.

THE COURT:  First, with respect to going to defendants' intent, that -- that is a less close question to me; that -- that if this was done prior -- I understand there's been change in the spelling of the word.  There's been a change in design of the label, et cetera, et cetera, but the sequence of things, at least makes it relevant to -- probative to the question of intent.  We can certainly come back to that.  I'm sure there will be.  But it is -- it has some probative value.

And that one to me seems quite clear -- If that were the only purpose, then I guess we'd have to give a limiting instruction to the jury so that -- For instance, they'd be instructed that this does not go to the question of actual confusion or likelihood of confusion.

The second one is a closer question, because there is a lot of case law that specifically talks about the potential underlying reliability of focus groups for many of the reasons you cite.

Now, you cite both unreliability and hearsay.  Those are two separate concepts --

MR. O'ROURKE:  Yeah.

THE COURT:  -- because, inherently, any kind of a survey or any -- any kind of comments by consumers which

evidence confusion or actual confusion is, in a sense, hearsay. It's -- It's often, unless the -- Well, it's a statement made out of court.

The question is whether it's hearsay and goes, really, to the state of mind of the consumer to show the fact of confusion. Then I don't think there's a hearsay problem.

I think the -- the bigger problem here is whether or not this is so unlike -- so different than after-market conditions and perhaps tainted by the focus group process, it was led with leading questions and things were put out in terms of comparison, where it loses so much probative value, its prejudicial value outweighs the probative value. I think that's the question. And I think that's what some of the courts have excluded focus group kind of evidence. I think that's the gist of -- of that.

On the other hand, one could argue that you have to look at the facts of each case and that, in this particular case, there were changes. A change in the name may not have been -- maybe have seen some materials to the -- to the participants in the -- in the group and that the gist of their comments would have applied irrespective of change in the label or change in the name.

Therefore, it has some probative value. But I guess I'd like to hear why -- why should this focus group be deemed admissible where other courts have said that there are too many

problems with focus groups.

**MR. WILLSEY:**  Sure, Your Honor.  A few things.

First, I mean, it's clear from the deposition testimony of Mr. Jeff Histed, the guy who conducted the focus group sessions, that the focus groups were intended to, quote, provide insights to the chardonnay drinkers, female chardonnay drinkers in particular, and through those insights provide, I guess, direction on how to compete in the marketplace.

They were looking for the exact type of consumers that they were going to target with this new product.

As for the difference between Crème De Lys, spelled L-Y-S, and Crème De Lees, spelled L-E-E-S, that difference is immaterial in this context because, number one, the dominant portion of the marks is "Crème" and, number two, Diageo recognized that the marks were materially -- materially different and they didn't conduct any further consumer research on Crème De Lys, L-Y-S.

Under the *Riordan* case, it's clear that, within the Ninth Circuit, nonconsumer confusion can be relevant.  This is not prejudicial.  They will have every opportunity at trial to introduce testimony from Mr. Histed that explains the nature of the focus group sessions.  They will have at least one live witness, I believe, who actually attended the focus group sessions.

Notably, it's not hearsay.  This clearly falls -- I mean,

there's two reasons.  Number one, it's not even hearsay because it's not being offered for the truth of the matter asserted.

There -- These products aren't the same.  They don't come from the same source.  Everyone knows that.  That's the truth.  This reflects a mistaken belief about that.

Number two, though, even if you consider it hearsay, this clearly falls under the state of mind exception, Federal Rule of Evidence 803(3), and the courts have consistently recognized that this -- at a minimum, if you consider it hearsay, it falls within that specific exception.

I want to address just two other things quickly.

They have made a point about the fact that these focus group participants were in a room for 90 minutes.  And there's testimony in this case from Jen Josephson saying that she thinks an average consumer takes three minutes in a store.

I think it's logical for the Court -- for a juror to conclude that confusion is going to be more likely in these very quick purchasing decisions as opposed to a setting where people have 90 minutes to think about something.

And, finally, I'll note that nowhere in the focus groups, at least that I've seen, did Mr. Histed say, "So, consumers" -- did he lead off the question by saying, "Consumers, do you think these two are confusing?"

He -- He directed their attention to La Crema.  And, spontaneously, focus group participants brought up comments or

made comments about the possibility of confusion between the products.

MR. O'ROURKE:  May I, Your Honor?

THE COURT:  Yup.

MR. O'ROURKE:  With regard to the state of mind, supposed hearsay exception, on these issues, the plaintiffs rely on the *CytoSport* case.

In the *CytoSport* case, Your Honor, they were all instances of confusion that actually happened in the marketplace and were overheard.

So I'll give you this much, Your Honor:  We can agree that some courts permit testimony to come in, for example, if someone was working at a store and a consumer came in -- And let's makeup a hypothetical.  They saw a sneaker called Mikee. And they said, "Oh, wow.  Look, Nike is now selling Mikee."  If that statement was observed by the store clerk, there are cases that say the store clerk can come in and talk about that consumer's present sense.

This is not what's happening here.  This was -- This was not in the marketplace.  It was not the products involved.  It was a highly structured, highly involved process.  Whereas Mr. Histed said, "We were drawing every conceivable piece of information out of these respondents that we could."  It's artificial.  It doesn't replicate the marketplace.

And so these were not present sense perceptions.  They

were influenced by what all of the other respondents were saying.  They were -- They were influenced by the introduction of La Crema artificially into the thought process.

THE COURT:  Well, it's their present sense.  You're just saying it's a tainted present sense.

I don't see how it goes to hearsay.  It's not hearsay anymore --

MR. O'ROURKE:  It's --

THE COURT:  It's as much hearsay or less hearsay as the store clerk's testimony --

MR. O'ROURKE:  To prove that they were confused, Your Honor?

THE COURT:  That goes to probative value, not to -- to -- Because, in each case, it's either a present sense testimony on the part of the declarant or is -- goes to state of mind.

Your point, as I understand it, goes to the reliability of it, that it should not be admitted because it's not probative since it's not -- has nothing -- is so far removed from actual market conditions and that there's a 403 problem --

MR. RHODES:  Yes.

THE COURT:  -- not a hearsay problem.

I mean, I understand you say there's a hearsay problem but I don't -- I don't see a hearsay problem.

I think the closer question is whether there's -- there's

enough probative value here that it should be admitted notwithstanding 403.

MR. WILLSEY:  Your Honor, I mean, all of the points I think that have been made, not only in the briefs but here today, they go to the weight of this evidence, not the admissibility.

The jury is fully capable to consider the construct of the focus group session and to take that into consideration.

But, clearly, under the case law, these are people who were targeted as the exact kind of people who were going to be, hopefully, buying Crème De Lys.  And when they were confronted with images of La Crema, they came up with comments on their own as to a potential for confusion.

There -- There was no poll conducted here asking them specifically, "Do you think these two would be confusing?"

I would grant you that if the moderator walked around and said, "Okay.  Do you think these two are confusing?  Do you think these two are confusing?", it might be impermissibly tainted.

But that's not what happened here.  These comments were spontaneous.  They were in reaction to being shown a bottle of La Crema or a picture of a bottle of La Crema.

MR. O'ROURKE:  I'm not sure that would be Mr. Willsey's position if that's what actually was asked, I suspect.

But when it comes down to reliability, the last piece of the nail in the coffin, from our perspective, Your Honor, is, there was another name tested.  It was called Buttercream.

And there were at least two respondents in the focus groups who confused Buttercream with La Crema.  It just shows how unreliable that forced focus on those brands were.

There -- It's inconceivable that any consumer would -- would confuse Buttercream with La Crema and yet people were confusing those in the focus groups, just to show you how unreliable the process was, Your Honor, for the purposes of proving actual confusion.

**THE COURT:**  All right.  I'll give you one chance as to that point.

**MR. WILLSEY:**  Your Honor, I don't want to get into a different issue, which I think we'll address at length later on today.

But we're a little bit hamstrung, by the way, in what we're examining in this -- on this issue because we're looking at DVDs from one focus group session.  The DVDs, if they were made in the California session, have never come to light.  No one knows whether they exist or what happened to them.

There's been an issue in this case where a key witness who oversaw the focus groups, who attended both of them.  Her laptop hard drive was destroyed.  We don't know what was on there.

So when Mr. O'Rourke points to instances of confusion, we -- you know, pertaining to Buttercream and Crème De Lys, we're -- we're hamstrung here because we don't know whether documents from Jen Josephson would have shed light on that or could have had instances -- or reflected instances of other people being confused.

**THE COURT:** All right.  I'm going to deny defendants' motion.

I do find that there is enough probative value here given the specific nature of some of the comments that were made, particularly those that tend to be more spontaneous than led, that I'm not going to exclude these on grounds of 403.

I find that they are relevant and have probative value as to likelihood of confusion as well as to defendants' purpose and motive and, for the reasons I've stated, they are not hearsay.

Now, at some point -- I don't know exactly how it's going to play out at trial.  At some point, it becomes cumulative or stuff starts to come in that is on the edge, which it appears to me -- So this is without prejudice to a specific piece of testimony subject to the 403 problem.

But, in the main, I'm not going to order blanket exclusion at this point.

With respect to defendants' Motion Number 2, the evidence of actual -- alleged evidence of actual confusion.

So now we do reach this question about what happens certainly in the real-world marketplace.

And so we take, for instance, Moore's testimony, who's the owner of a wine shop, who says that someone -- unidentified but he thinks it might have been a buyer -- told him that there was a connection and that the wine tasted a bit like La Crema.

You know, for the reason we just stated, it's probably not -- bars hearsay.  On the other hand, I have some questions about -- There's not much here.  We don't know whether this alleged connection was based on the mark or based on something else that was heard.

Although it's not technically hearsay, it is hearsay in the common use of that language.  I mean, the person who made that statement, we don't know who it is and don't know much more about why the person made that connection.

So it is the quality of evidence that concerns me on that one.

**MR. WILLSEY:**  Yeah.  On this, Your Honor, again, as with the last motion, I think this really goes to the weight of the evidence, not its admissibility.

You clearly had two individuals who mistakenly believed there was some association between La Crema and Crème De Lys.

What's significant here is that although they could not testify that it was the names that created that confusion, they couldn't say that they wouldn't have otherwise been confused.

And these are experts in the wine industry.  I mean, they're employees in the wine business.  And if anyone would be well positioned to know that two products aren't, in fact, associated with each other, it would be these two.

But Moore and Waggoner both believed it at some point in time.  And what's worse is that their mistaken impression led to the generation of an advertisement.  It was -- This is the subject of their closely related Motion in Limine Number 3, which clearly said to consumers at large that Crème De Lys was brought to you by the makers of La Crema, and that advertisement went out to over 10,000 customers.

So, Your Honor, we -- They can introduce testimony that seems to indicate that these gentlemen weren't exactly sure why they drew this connection, or they had an idea but they couldn't remember who told them.  But the fact is, they were confused.  That confusion had significant ramifications as it led to an advertisement that went out to 10,000 consumers, and that's something the jury ought to consider.

**MR. O'ROURKE:**  Your Honor?

**THE COURT:**  Yes.

**MR. O'ROURKE:**  The quality of the evidence is so low that, with regard to these two witnesses, that it would be really dangerous to let the jury hear from them.

With respect to Mr. Moore, with all due respect to Mr. Willsey, he said that they were -- that they were confused.

They were -- They specifically testified, each of them, Mr. Moore and Mr. Waggoner, that they were not confused as a result of the name or the packaging.

And in Mr. Moore's case, Mr. Willsey's colleague -- because I was at that deposition -- asked Mr. Moore whether, when he asked him about why was the person who told you about this, was it because of the names, he said, and I'll quote (reading):

"No, I didn't find there was.  I never thought there was -- it was reasonable to find any similarity."

They specifically asked whether it was reasonable to conclude, based on his understanding, whether the confusion that was supposedly told to him by some person, he can't even remember who it was, was based on the name, and he said no.

And then when he asked whether he thought the names and the labels were confusingly similar, he said, no, he didn't think anything was, and neither did Mr. Waggoner.

Now, there's another piece to show you why Mr. Waggoner's testimony is completely --

**THE COURT:**  Why do I do about the -- the advertising that Third Quarter sent out?

**MR. O'ROURKE:**  You know, I don't -- I don't think it's probative with any issue that's relevant to the jury.  The issue is whether the marks are confusingly similar.

And -- And here's the problem --

THE COURT: Well, but if you have an ad that goes out from a wine club with a fair amount of circulation that says, "From the wine maker who brought us La Crema comes Crème De Lys," you know, doesn't that -- isn't that a relevant piece of evidence that -- from which a jury might assess whether or not there's a likelihood of confusion out in the real-world market. This is the real-world market. Once it sends out, that's the actual market.

MR. O'ROURKE: But it's -- But the evidence is not evidence of actual confusion between the marks. And what we don't know, for example -- And, obviously, I'm not saying that this is what happened.

But when -- when you have a trial, particularly in front of a jury -- if it was before Your Honor, I'd feel a little more comfortable having you take all this evidence for what it was worth. But when you have a jury, it's very, very scary for a defendant.

And what happens is, you have the possibility that someone from Jackson Family Wines went into that store and told their buyer, "This is the same juice." It was a mistake.

We have no idea why these people thought that there was a connection between La Crema and Crème De Lys but it was never about the name; it was only about the fact that they might have had the same wine maker.

**MR. WILLSEY:** Your Honor, but they can bring that into evidence in front of the jury. They can play testimony from these witnesses.

There is other testimony that is more helpful for us. Mr. Waggoner at some point testified that he thought it was cute that these might be a play on one another, the La Crema and Crème De Lys marks.

And the fact is, it led to something that I don't think anyone with straight face can argue is not relevant to the issue of a likelihood of confusion. And that's that this ad, which was clearly confusing and inaccurate on its face, went out to a large segment of the public.

**MR. O'ROURKE:** There --

**THE COURT:** Did you say that this ad, though, creates confusion because of the mark?

**MR. WILLSEY:** I would say --

**THE COURT:** It creates confusion.

**MR. WILLSEY:** I would argue that it -- it causes confusion because of the mark. The marks are -- The fact that the marks are as similar as they are -- And I know we can argue about that until the cows come home.

But if the marks were not as similar as they are, it would be less likely that people would buy that statement. But when you see La Crema and Crème De Lys coming to you from the same wine maker, it naturally to me would sink in.

**MR. O'ROURKE:** Your Honor, Mr. Waggoner gave testimony in a couple of ways.

Jackson Family Wines found out about him and got a declaration from him. Didn't tell us about it. And it wasn't until about two weeks before the end of discovery that they served us with a declaration and then there was a deposition.

And we went and we -- we interviewed him, too. It was very late in the game, but we interviewed him, too, and we got him to sign a declaration. And you know what he said? In his declaration, which he affirmed at his deposition, in June 2013, he said that somebody -- he doesn't know who it was -- somebody told him that was a connection between La Crema and Crème De Lys.

And he said that that occurred six to eight years ago. That would have been between 2005 and 2007. And guess when my client's product was introduced into the market. August of 2010.

**MR. WILLSEY:** And, Your Honor --

**MR. O'ROURKE:** So the supposed confusion that may have happened from some guy, he doesn't even remember who it was, couldn't have happened.

**MR. WILLSEY:** Your Honor, that's exactly the type of thing that is fair game for the jury to consider in determining how much weight they are going to afford this testimony.

**THE COURT:** Well, except there's got to be -- I've got

to perform some gate-keeping function here.

MR. WILLSEY:  Well --

THE COURT:  Something that is so tenuous --

MR. WILLSEY:  I would --

THE COURT:  -- so tenuous that it risks confusion, then I've got a duty under 403 to say, well, at some point, this is -- this is just not enough.

MR. WILLSEY:  But, Your Honor, I note in the brief that they filed in this, there is not a single citation to a case, within the Ninth Circuit or elsewhere, in which this evidence -- this type of evidence was excluded from court.

The *GM* case upon which they rely comes from the Sixth Circuit and it stands for the proposition that they have put forth, which is that confusion has to be a result of the name.

However, what's notable is, in that case, the *General Motors* case, the Sixth Circuit considered the evidence.  They just didn't give it much weight.

I can't find any case law that would support the rather Draconian remedy of keeping this from a jury when they have every right and every ability to question the weight of this evidence and to submit testimony from Waggoner and Moore.

But that testimony from Waggoner and Moore is essential to lay a foundation for an advertisement which is clearly problematic and directly bears on the issue of likelihood of confusion.

THE COURT:  When was the -- Waggoner testifies that he went to Albertson's and the worker told him -- the worker thought this was a second-label bottle.

Was that within this time frame?

MR. O'ROURKE:  It was -- No.  He tes -- He gave a declaration that said when that occurred was "six to eight years ago," and that was six to eight years prior to June 2013.

And when asked about whether that statement in his declaration was true, he affirmed in his deposition, sworn testimony, that that is correct.

THE COURT:  All right.  Let me ask:  What -- With respect to Waggoner specifically, what evidence is there of something current that gives it plausibility?  Is there anything more current than an alleged 2005-2007 encounter?

MR. WILLSEY:  No -- Your Honor, well, when he was at Third Quarter during this time frame and the wine had already come out, that's when the advertisement in -- in question went out from Third Quarter.

THE COURT:  Well, actually coming through Moore (sic).

MR. WILLSEY:  Yeah.  But let me check his deposition testimony.  I'll look at it now.

But I believe in his deposition, he testified as to this visit to Albertson's happening within the relevant time frame.

MR. O'ROURKE:  No, he did not.

MR. WILLSEY:  And I think you're talking about the

declaration that he signed for you guys.

MR. O'ROURKE:  That was the only evidence on the timing of when the supposed conversation took place in Albertson's.

He said in his declaration that "It was six to eight years ago."  And when my -- my colleague Jenny Jones asked him about whether that statement was true, he said "Yes."

MR. WILLSEY:  Your Honor --

THE COURT:  Well, see, here's where it comes out.

I do find that it is -- The only question is not whether this is sufficient to -- in and of itself, to establish causation and confusion, and causation for that confusion is related to the mark.

On the other hand, we're only talking about admissibility of evidence, and I find that there is sufficient basis to admit this evidence with respect to Moore and to Gilbert's testimony, who also testified to something that seems to be current and seems to be confusion.

MR. O'ROURKE:  Your Honor, we haven't even talked about Gilbert yet.  It's a totally different piece of evidence with its own set of problems, with due respect.

THE COURT:  Well, let me hear you on why -- why that doesn't apply.  Because he appears to say that the person said -- Or when he said, "When I searched it, the first thing that was incriminating:  Is this a type of -- Is this a type of

La Crema?"

        **MR. O'ROURKE:**  Here's what happened, Your Honor.

     Mr. Gilbert supposedly is the father of an employee of Jackson Family Wines.  This employee from Jackson Family Wines' father, according to the story, went to a wedding with his wife, or some woman named Victoria.  I forget her name.

     So she liked -- She saw Crème De Lys at the wedding and she liked it.  And so what he did was, he went and he thought he would want to buy it.

     So he went -- He was trying to figure out where he could buy it, so he guessed that he could buy it at Costco.  So he went off to Costco and did a search supposedly for Crème De Lys, and supposedly the father of a Jackson employee did a search for Crème De Lys on the Costco website and, according to an e-mail -- which is triple hearsay -- said that La Crema came back in the search.  So he sent his daughter an e-mail that said, "Hey, this is what happened."

     So is Mr. Gilbert going to be in this courtroom to talk about that?  No.  Is Mr. Gilbert's daughter going to be in the courtroom to talk about that e-mail?  No.

     In turn, Ms. Gilbert forwarded that e-mail to Jeff Ngo, who is the Brand Director for La Crema.  And Mr. Ngo somehow is going to be a competent witness to talk about a person going to a wedding and was the father of an employee of Jackson Family Wines?

It's -- It's -- It's so far afield of what's competent evidence, that one is -- that one is scary.  And there's every reason to be worried about the truthfulness of that evidence.

And by the way, Your Honor, I'll go one better.  I went on the website for Costco.  I did a search for Crème De Lys and La Crema does not come up.  It does not come up.

**THE COURT:**  Why is that any different, other than --
Putting aside the relationship and the reliability which you can -- you can cross-examine on, why is that any different from a consumer asking that same question and sending an e-mail saying, "What's the deal here?"

**MR. O'ROURKE:**  Your Honor, seriously, we have the father of an employee of his client who has an e-mail from -- I -- I haven't -- I haven't -- I haven't -- I haven't been given her name in pretrial discovery.  I've not taken her deposition, much less his deposition.

They obviously know who Mr. Gilbert is and can contact him.  And they're putting it in not through Mr. Gilbert, not through his daughter who works for his client, but supposedly through Mr. Ngo, who said, "Forward me the e-mail."  There's been no competent evidence on this topic.

**THE COURT:**  Okay.  What's your response?

**MR. WILLSEY:**  Your Honor, they deposed Jeff Ngo about it.

This issue came up.  You knew about it.  You could have

pursued about it -- pursued it in discovery.

There's case law consistent in this circuit that reflects that statements by not -- employees of a party or family members of a party's employee are admissible.  Their state of mind -- They fall within the state of mind exception.  They're clearly relevant to a likelihood of confusion.

Again, they can attack this for all they want for all the reasons that Mr. O'Rourke just said.  But they -- they had an opportunity to question Jeff Ngo about this particular e-mail.

And I believe you did.

**MR. O'ROURKE:**  He didn't know anything.  He knew that he -- he got an e-mail forwarded to him.  That was the extent of his knowledge.

**THE COURT:**  Did they have an opportunity to -- if they wanted to, to depose Mr. Gilbert?

**MR. O'ROURKE:**  No, it came up after discovery.

**MR. RHODES:**  They never asked.

**MR. O'ROURKE:**  It came up after discovery, Your Honor.  It came up after discovery.

They knew of this e-mail since the spring and we got this after discovery.

**MR. WILLSEY:**  Wait a minute.

But the . . .  There are a lot of things in this case that took place after discovery because we had a witness who was out on maternity leave.  We had a witness they refused to produce

on the topic of distribution and we had to go to the Court and get an order from Judge Corley. There was plenty that happened.

THE COURT: Well, I don't see any briefing here that the reason why this should be excluded is because the actual declarant of Mr. Gilbert is not available, wasn't made available, wasn't disclosed until it was too late to depose him. I didn't see that.

MR. O'ROURKE: The e-mail was in March. That's the date of the e-mail. It was produced only in June, about two weeks before the end of discovery.

But, Your Honor, do I have to go chase every ghost for -- Do I have to chase down and take depositions for evidence --

THE COURT: It's up to you.

MR. O'ROURKE: -- that's not competent?

If --

THE COURT: That's up to you.

MR. O'ROURKE: But it -- But, Your Honor, how could the Court allow a jury in this case to hear Mr. Ngo, the Brand --

THE COURT: See, you could make that same attack on any consumer who appears to provide some evidence of confusion. The person doesn't know what he's talking about. We don't know exactly what he saw, what he was thinking, exactly why. They had some invested interest in this. And that's up to you.

**MR. O'ROURKE:**  Your Honor --

**THE COURT:**  That's up to you whether you want to chase it down.

**MR. O'ROURKE:**  Well --

**THE COURT:**  That doesn't mean it's not admissible.

**MR. O'ROURKE:**  Your Honor --

**THE COURT:**  It's not hearsay.

**MR. O'ROURKE:**  Your Honor, the -- the e-mail that Mr. Ngo now wants to talk about at trial was produced to us in January of 2014.  The discovery cutoff in this case was July -- Jan -- July 5th, 2013.

**THE COURT:**  Okay.  Well, that's what I hadn't heard. I hadn't heard anything about late -- late production.

**MR. WILLSEY:**  Your Honor, that was -- that's because it was not a subject of their brief.  It wasn't even brought up.  We didn't have a chance to counter this in our opposition brief.

And the -- The fact is, the deposition of Jeff Ngo took place in discovery.  This issue was discussed.  They questioned him about this incident.  They never followed up on it.

**THE COURT:**  This incident regarding Mr. Gilbert?

**MR. WILLSEY:**  Mr. Gilbert's, by a father of an employee at Jackson Family Wine.  That's who Mr. Gilbert was.

**THE COURT:**  So this -- this incident was described, maybe not the name of Mr. Gilbert but the incident.

**MR. WILLSEY:**  I -- I'll have to check the transcript. I think his name was even mentioned.

Does anybody here know?  Does anybody have the transcript?

I believe it is, but, Your Honor, I would love to check it to make sure.

**THE COURT:**  Well, all right.  I haven't seen any -- any briefing that suggests that's the gist of this, that this is late discovery; therefore, there's a problem in terms of being able to impeach or at least question Mr. Gilbert.  And absent that, that's -- that's not an issue I'm going to consider at this point.

So what did you find on the Waggoner thing?  Did you find anything, about when he had this conversation with somebody who thought it was a second-label wine?

**MR. WILLSEY:**  Your Honor, I can -- I don't -- Unfortunately, I don't think we have the full transcript of Waggoner's deposition.  I can retrieve that and get back to you as soon as possible but --

**THE COURT:**  Well -- All right.  We've got to move on. This is only the second one.

I'm going to admit the Moore testimony.  I'm going to admit the Ngo testimony.  I'm not going to admit the Waggoner testimony because at least of the representation that's been made about the -- the -- that raises serious questions about the basis of his testimony.

**MR. WILLSEY:**  Your Honor, could I have leave at trial, or between now and trial, if I can find testimony that's --

**THE COURT:**  No.  I'm going to cut things off.  We could go on forever.  I'm not going to do it.

**MR. WILLSEY:**  Okay.

**THE COURT:**  I made my decision.

With respect to these various exhibits of documentary evidence, I'll get out a ruling on all this.  I will say that, for instance, the advertisement -- And I will say, yes, on its face and perhaps with respect to, again, some of the testimony that Moore and -- might give, may not explicitly draw the connection to the mark and, therefore, there's an issue about whether or not any confusion that's engender is caused by the mark.

On the other hand, there is sufficient circumstantial evidence of enough similarity that -- and the jury could infer that the similarity of the marks were indeed the cause or engendered by, for instance, this ad that went out.

**MR. O'ROURKE:**  Your Honor, you should know that you will be the first court of which I'm aware that has allowed in evidence of actual confusion that did not relate to the marks, and when there's no proof that it related to the marks, but . . .

**THE COURT:**  Well, I'm saying there's circumstantial proof there that led to the marks --

**MR. O'ROURKE:**  Okay.

**THE COURT:**  -- and that's -- that's the basis.

I found there was not sufficient evidence from which one can infer it was related to the mark in the absence of direct evidence, and not even a decent circumstantial evidence I would view, certainly.  But I do find there's circumstantial evidence here.

Similarly, there's a -- there's a question.  There are various other pieces of documentary evidence, but to me they pretty much are analyzed under the same rubric.

And, again, the question is whether or not there's a -- a causal relationship that is demonstrated.  And I find similarly for most of these, perhaps all of these, that there is sufficient circumstantial evidence similarity of mark that suggests that any confusion is likely -- or there's a very good probability that any confusion is attributable to the mark.

And, again, these are just gatehold (sic) questions -- threshold questions for admissibility to the jury.  It does not preclude cross-examination and argument to the contrary.

And I will get out a written ruling on each one of these so you see exactly where I'm at.

With respect to Motion in Limine Number 4, here, we do have an allegation that the plaintiffs were very late in providing a con -- a -- an extensive conclusion about whether or not the plaintiffs were going to seek actual damages.  It

appears that there wasn't a clear communication until January 8th; is that right?

MR. WILLSEY:  No.  Your Honor, the first clear communication of that, respectfully, was in the Complaint, in the prayer for relief, when we specifically said we're going after actual damages.

What defendants cannot show is that any step along the way did we indicate or infer to them that we weren't going after actual damages.

MR. SIEGARTEL:  Your Honor --

THE COURT:  Yeah.

MR. SIEGARTEL:  -- at no -- at no point since the Complaint have plaintiffs made any showing at all that there's been any actual damages.

It's not in their 2680 disclosures.  They served six different 2680 disclosures.  They never identified a single witness who was going to speak to actual damages.

In addition to that, their fact witnesses, during deposition, Mr. Ngo, Mr. Comstock, gave very self-serving allegations about their allegedly being harmed, but when asked what the extent of the harm was, they said, "It's not for me to talk about.  You have to talk to our expert."

Jackson's expert in turn has never opined at all that Jackson has lost any damages -- has there been any damages as a result of this -- as a result of Crème De Lys.

The entire case, Jackson's witnesses have just passed the buck to somebody else.  Nobody has ever given any evidence at all that there's any actual damages.

If you look at Jackson's P&L statement, it's very clear that since Crème De Lys was introduced, La Crema sales have skyrocketed; their profits have skyrocketed.

There is absolutely no evidence at all that any actual damages.  Leading up to January of this year when it's true, Jackson for the first time said they intend to use -- they intend to seek a disgorgement of profits as a proxy for their lost damages.  There is absolutely no basis at all for that.

Jackson emphasizes the totality of circumstances.  In their brief, that's the case law they talk about.  It's very clear that there's a standard here.

Jackson has a responsibility to have an obligation to come forward with some type of evidence.  They've never done it.  They should not be permitted to claim a disgorgement of profits as a proxy for their lost sales, because there's absolutely no evidence there's been any lost sales.

And that -- that's where it stands.  Your Honor has it exactly right and it was produced very late.  This -- You know, this evidence was produced very late, and there's absolutely no basis at all for Jackson to be permitted to claim any actual harm at trial.

**MR. WILLSEY:**  Your Honor --

PROCEEDINGS

**THE COURT:**  Was there a Rule 26(a)(1)(iii) disclosure of actual damages?

**MR. WILLSEY:**  There were -- No.  There were several 26(a) disclosures on the issue of distribution which, as I will explain --

**THE COURT:**  Distribution of what?

**MR. WILLSEY:**  On the distribution of the products, which, as I will explain, is critical to our ability to determine whether there was actual damages.

So, the story of this goes back quite a bit.

You know, they did not take a dep -- In order to assess actual damages, one very relevant fact is where the products are being sold.  We need to know what stores their Crème De Lys product is being sold in.  We need to know what distributors they used, and so forth, and then you would presumably compare that to where our products are to get a sense of whether the presence of Crème De Lys causes us some actual harm.

Well, they didn't take a 30(b)(6) deposition of any of our witnesses on the topic of distribution of the product.  It wasn't included in their Notice.

We attempted to.  We served them a 30(b)(6) Deposition Notice on June 14th.  And in that Notice, we identified distribution of Crème De Lys as a topic.

They surprisingly objected and refused to present a witness on that topic.  We had to go to Judge Corley.  We

did -- filed a joint letter on July 12th, 2013, seeking leave to be able to take a deposition on a witness who could tell us where their product was.

Judge Corley granted that motion on August 2nd.  Because of scheduling difficulties -- and I'm not pointing the finger at anyone -- the deposition of their designee on the topic of distribution did not take place until October 3rd, 2013.  It was a gentleman named Paul Kalagher.

I took that deposition.  Mr. Kalagher, in my view, could not answer many questions that I thought he should be able to answer after reasonable preparation.

So, we went back to Judge Corley and we asked Judge Corley to order that they produce another witness, who was more prepared, who could tell us where their product was being distributed, how much was distributed, the time periods, et cetera et cetera.

Judge Corley declined to grant us a second deposition, but what she said -- And she specifically held that Mr. Kalagher couldn't answer questions that he should have been able to answer.  And she ordered them to finally produce documents that Mr. Kalagher purportedly had relied -- had reviewed before his deposition.

They finally produced that information December 9th of last year.  And we didn't hear anything for 10 days, and then December 19th, right before the holidays, they made a request

to us saying, "Could you produce a similar spreadsheet with distribution data?"

Now, they had never during discovery filed a motion to compel about this. They had never taken a deposition of a 30(b)(6) witness on our part for purposes of distribution.

We told them, "It's right before the holidays. Our client is closed for two weeks. We'll consider it."

On January 9th, we got back to them and said, "We will produce distribution information," and we produced that on January 21st.

The timing of this for -- And, by the way, that's not -- those aren't documents that existed at Jackson Family Wines. They had to create this, and they agreed to do so because we had finally gotten distribution information from the defendants. This is what enables us now to look and see whether we can make a showing that, in some markets, there has been some actual damage.

One of our witnesses, Mr. Comstock, who's a financial executive at Jackson Family Wines, should be able to review that data and show whether sales trends have been worse in markets where the products overlap -- what we call shared accounts -- and where they don't.

Unfortunately, there's another issue here, which is that the information -- and I don't have a qualm with this -- that's been provided by both sides on distribution data has been

designated highly confidential, so the people at the companies can't see detailed data. So the parties are left in a position where, you know . . .

We would propose that we be able to scrub the data and give it to them in an anonymized fashion so that someone could look at this and show that, look, the -- the sales trends in markets where the products both appear have been worse for us than in markets where La Crema appears but Crème De Lys does not.

Now, all this -- We've jumped ahead.

You know, it's clear in the *Vallavista* court that we don't have to show lost sales in order to recover actual damages. Other types of evidence can fill the gap. So, in addition to the testimony of Jeff Ngo and Ty Comstock, which they've already got in deposition, we can submit proof of actual confusion, and not only these instances that we claim are actual conclusions, the Third Quarter, the Gilbert information. We also have two consumer surveys to show that.

We can also show evidence pertaining to their intent. And if they have a bad faith intent under the *Sleekcraft* case, you can infer that a defendant actually succeeded in damaging the plaintiff.

So even putting aside this distribution data history, which I just ran through at great length, there's sufficient basis here for us to recover actual damages. We don't have to

show lost sales.

But that being said, I think we finally may have distribution data that would enable us to make a showing that there has been actual damage.  The problem is, as of now, the data we gave to you is highly confidential and the data you gave to us is highly confidential and we've got to figure a way to do that.

But the -- the timing of that disclosure is not our fault. They're the one who --

THE COURT:  Well, let me ask.

MR. SIEGARTEL:  Your Honor, may I respond?

THE COURT:  Are you -- Are you seeking -- Will you be seeking at trial lost -- claim for lost sales?

MR. WILLSEY:  Your Honor, in our view, it's too difficult in a situation like this to quantify an exact number of lost sales.

What we want to be able to show is that there's been some degree of harm.  Once that's established, you can rely on defendants' -- you can award defendants profits as a proxy. It's a form of compensatory damages.

THE COURT:  No, I understand that.

MR. SIEGARTEL:  May I -- May I respond to that?

THE COURT:  Yeah.

MR. SIEGARTEL:  Okay, because Mr. Willsey just mentioned a bunch of different things.

First off, the idea that they needed our distribution documents in order to put forth any type of actual damages calculations, absolutely not true.  His entire story about the distribution documents, it's a total red herring.

Okay.  From the very start, in their Complaint, they were alleging a trade channel cross over.

If there is a fact witness, or their expert, who wanted to put forth a best effort to show actual damages, they could have done it.  It's absolutely not true that they needed our distribution documents.

Another thing is, Mr. Willsey said that it was only in December of 2013 that we first asked for distribution documents?  That's absolutely not true.

In our very first document request in this case, we sought trade channel information.  They said they were going to produce it; they never did.  So it's absolutely not true that they needed to wait for our distribution documents.

Going back to the 26(a) disclosures, subpart (3) is a computation of damages.  They've never given it to us.  So that's also not true.

The *Vallavista* case that Mr. Willsey mentioned is --
There's separate sections about damages and profit disgorgement.  Jackson is pointing to the damages part of the decision, but it's very clear in that decision there's a separate section when it comes to disgorgement of profits.

In that decision, the Court actually held that, for disgorgement of profits, you need to show willfulness.  So to the extent that that case is on point, it's absolutely contrary to Jackson's position.

But, again, going back to this argument they needed the distribution documents, it's absolutely not true.  It doesn't hold water.

Their damage expert never said in his reports that he needed the distribution stuff -- the information to make a calculation.  He said in his deposition -- It's very clear.

Mr. Gutzler is their expert.  He said, "I could have done a damages analysis.  I could have done a profits analysis.  I decided to do a profits analysis."  He said it over and over.

And here's what it comes down to, Your Honor:  We're not trying to stop them from seeking a disgorgement of profits.  But they need to do it under the unjust enrichment theory.

There's three different theories for seeking a disgorgement:  There's unjust enrichment; there is deterrence; and then there's the proxy argument that they're trying to do.

If they want to do the unjust enrichment, they can give it a shot, but with respect to --

**THE COURT:**  You knew they were seeking that under -- at least under the unjust enrichment theory.

**MR. SIEGARTEL:**  Yes, we --

**THE COURT:**  There's no secret.

**MR. SIEGARTEL:**  That's -- That is not a secret.

**THE COURT:**  My --

**MR. SIEGARTEL:**  What is a secret --

**THE COURT:**  -- question is -- which is why I asked counsel -- if they're not going to seek and try to recover from the jury actual lost sales but only use that to establish the fact of -- of injury and damages and then seek the proxy method, how are you prejudiced by this late commitment -- your assertion of a late commitment and affirmation that they would be seeking to establish actual damages when -- when what they're going to be seeking is something you knew they were going to be seeking all along, just under a different rubric and under a different finder of fact?

You don't want the jury to determine that.  I understand that.  But how are you prejudiced from an evidentiary point of view?

**MR. SIEGARTEL:**  Because unjust enrichment versus actual injury are completely different issues with completely different evidence, completely different facts.

They never put forth any facts at all that demonstrated actual injury.  So, as far as we were concerned, they weren't ever going to try to claim actual injury.  Again, it was never in the 26(a) disclosures; it was never in their Expert Report. They could have done such things.

Unjust enrichment comes forth much more naturally from the

way discovery proceeded in this --

THE COURT:  But their --

MR. SIEGARTEL:  -- in this case.

THE COURT:  -- proof of the proxy, whether it's the proxy method or the unjust enrichment, is going to be the same. There's going to be debate about what the lost -- what the profits were, the cost analysis --

MR. SIEGARTEL:  Sure.

THE COURT:  -- and all sorts.

So that -- you're not prejudiced --

MR. SIEGARTEL:  There --

THE COURT:  -- because that's been at --

MR. SIEGARTEL:  There is --

THE COURT:  -- issue --

MR. SIEGARTEL:  There is -- There actual is one more point.

But -- And this goes to what the case law says, going back to the three theories of disgorgement.

The case law is clear that, for unjust enrichment or for deterrence, you need to show willfulness.

The reason why Jackson is starting to love this proxy theory is because there's this sliver of case law that holds you don't need to show willfulness for the proxy theory. That's why Jackson all of a sudden is latching on to this proxy theory, because -- Although we don't think that sort of case

law is the right case law.

Again, *Vallavista* and other cases hold willfulness is needed for all three of the disgorgement theories.  That's why Jackson's latching on to this proxy theory, because, under their reading of the cases, you don't need to show willfulness whereas you do need to show it for unjust enrichment.

**THE COURT:**  All right.  And you'll be able to both make the legal argument that you have to have willfulness even under the proxy theory and, if not, you certainly have lots of grounds to try to rebut any claim of willfulness.

I mean, it's -- The question I have is, yeah, maybe this should have been clarified earlier but, at this juncture, it seems like all of the stuff that you have, that you need, that you're going to -- you're intending to put on are going to be the same evidence, anyway.

**MR. SIEGARTEL:**  That's --

**THE COURT:**  To rebut willfulness, to counter any claim of -- of -- the magnitude of any profits obtained, et cetera et cetera, so --

**MR. SIEGARTEL:**  Your Honor, because they were -- they were not sincerely alleging actual harm at any point in the case, we proceeded with discovery differently.

For them to say now at the very end of the case on January 15th -- And, by the way, if you look at their witness list, what it says for Mr. Gutzler is, by the way, Mr. Gutzler,

he's still considering whether he's going to come forth with the damages analysis.  Like, they won't let it go.  And we've been prejudiced in our ability to have discovery on that point.

THE COURT:  Well, on which point?

MR. SIEGARTEL:  On whether or not they've actually been harmed.

And, again, their P&L absolutely contradicts whether they actually -- they've actually been harmed.  Their profits are skyrocketing.  Their sales are skyrocketing.  But that's a factual point.

But, again, to the extent the way discovery proceeded in this matter, we would be prejudiced now if we have to start combatting their allegation that they have been actually harmed and there's absolutely no basis.

THE COURT:  All right.  Let me ask:  What is -- What are the basis -- What's your case for actual harm?  What are you going to put on?

MR. WILLSEY:  Your Honor, this raises an issue I wanted to bring at the outset of the hearing.

In order for me to explain this, I'm going to have to talk about -- or I may have to talk about details of highly confidential information.  We have party representatives in the courtroom.

I'm more than happy to talk about it.

THE COURT:  I don't need you to get into specifics.

I --

MR. WILLSEY:  Okay.

THE COURT:  I need you to explain to me --

MR. WILLSEY:  Okay.  I can make a --

THE COURT:  -- what -- what is your proffer?

MR. WILLSEY:  I can make a proffer to you that I have looked at account data and distribution data, and this is specifically the information that they produced to us in December and that we then generated in response to that and produced to them in January.

And that when you look at shared accounts on some levels, on -- for example, on our top 10 markets, in our top 20 markets, you will see that the growth rate -- the success rate -- of La Crema is worse than it is in markets that we don't share with Crème De Lys.  That's exactly what we can show.

Now, I will be very transparent here.  We think it is -- It would be extraordinarily difficult and possibly impossible to quantify exactly how much financial harm we've -- we've -- we've suffered.

THE COURT:  So you're not going to try to quantify.  You're just going to show the fact of some --

MR. WILLSEY:  And then we move to things that have been subject of discovery for years:  Willfulness --

THE COURT:  So that's the basis of your actual

damages -- actual harm claim.

**MR. WILLSEY:**  That's correct.

**THE COURT:**  All right.  So, what's your response to how are we going to -- When are they going to -- How are they supposed to, with two weeks left or whatever we have before trial . . .

Isn't that unfair to them?

Now, you're going to say, well, they didn't produce until late, et cetera et cetera.  But, I mean, at this late juncture, since you didn't clarify that that's what you were going to seek, why -- how are they going to defend themselves?  Are you going to take a last-minute -- If you were in their shoes, what would you do?

**MR. WILLSEY:**  If I were in their shoes, I would look at account data.  I would see if, based on what we produced in January, there was something else they think they need.  I'd ask us -- We'd be very cooperative in giving them any additional level of detail that they might need subject to running by my client.

They can have a witness -- They can have their -- their damages witness look at this.  And it's a very simple theory.  Because we're not -- Because we're not trying to quantify lost sales, it's just an assessment of how shared accounts perform.

**THE COURT:**  But it still takes some expert analysis to make --

MR. SIEGARTEL:  Your Honor, just --

THE COURT:  -- some analysis --

MR. SIEGARTEL:  If we --

THE COURT:  -- to make that determination --

MR. SIEGARTEL:  Your Honor --

THE COURT:  Hold on.

MR. SIEGARTEL:  Okay.  Sorry.

THE COURT:  I still take -- I take it you're going to present expert testimony on this point?

MR. WILLSEY:  No, Your Honor.

THE COURT:  You're not?

MR. WILLSEY:  Our intention right now is to just have Mr. Comstock, assuming that he can look at the data he needs to.  Because right now, I made a proffer based on what I have reviewed.

I think we still have to work out an issue with confidentiality designations, because we can't show certain information to Mr. Comstock.  But this would not be part of our damages expert testimony.

And, by the way, on the damages expert issue, every report from our damages expert mention the fact that he would need distribution data and information in order to make any analysis of actual damages.  And that's what we never got, and they wouldn't even provide a guy to testify as a 30(b)(6) witness on the distribution data.

**THE COURT:** So how are you going to put this on without . . .

You have this data and you have certain trend lines and the things you're going to show, the damp or -- or suppressed rove and shared markets, et cetera et cetera. Is that just going to be evident from some chart? I mean, how are you going to present this without some kind of expert evidence?

**MR. WILLSEY:** I -- I -- I think, Your Honor, it could be evidenced just by a very simple adding up of numbers, and the sales trend over a given period of time, and Market X where the products appear together, and Market Y where La -- La Crema is and Crème De Lys is not.

It's not a particularly complicated exercise, and it's one that they should be able to do very quickly as well.

And, again, we -- we could not have done this until they gave us detailed distribution information.

**THE COURT:** And how are you going to respond? Just sort of see what comes out at trial and without any prior depositions? Just through the art -- good old-fashioned hard cross-examination?

**MR. WILLSEY:** They can do it that way.

They can look at the numbers and consult with their expert witness and try to slice them a different way and say, "Well, if you look at it from this perspective, sales trends aren't worse."

**THE COURT:** Are you just going to disclose -- preview any of this testimony prior to trial?

**MR. WILLSEY:** (Conferring with counsel.)

Yeah, we can do that. We'd be more than happy to do that.

**MR. SIEGARTEL:** Your Honor, may I -- may I respond --

**THE COURT:** Yeah.

**MR. SIEGARTEL:** -- just briefly?

Their spreadsheet is 50,000 lines of data; all right? Our spreadsheet is equally long.

The idea that this is simple and that it could be synthesized into something rudimentary is absolutely not true; it's absolutely implausible. These are massive data sets.

And -- And Your Honor is -- is -- is rightly pointing out the enormous logistical issues with presenting this. We're 10 days before trial. I mean, come on.

And the idea that Jackson couldn't do their distribution spreadsheet before getting ours is absolutely not true. Again, we asked for it at the very beginning of discovery. They never gave it to us.

**MR. WILLSEY:** Wait a minute.

**MR. SIEGARTEL:** We --

**THE COURT:** No. Hold on. No. Let him finish.

**MR. WILLSEY:** Okay. Sure.

**MR. SIEGARTEL:** And, by the way, even at this point, Jackson's spreadsheet still doesn't have the detail that Diageo

provided to Jackson.

For example, Diageo has given to Jackson a list of every single store where Crème De Lys was ever sold. Jackson has not given us analogous information. It's not at all similar. There's no way to do an apples to apples comparison so whatever apples to apples comparison they're going to try to do would -- would be faulty. Inherently, it would be faulty.

Again, we're 10 days before trial. The ship has passed. It's done. This case was filed a few years ago. The ship has sailed on this, respectfully.

Again, they want to seek disgorgement on particular theories, unjust enrichment? They may. But to seek actual damages, it's absolutely -- it's -- it's just absurd. I mean, it's preposterous.

At this point, he's talking about 50,000-line spreadsheets. And the parties have to have additional meet and confers. And then their experts have to get involved. Maybe some fact witnesses are going to get involved.

That's -- That's what I have to say.

**MR. WILLSEY:** And -- And, Your Honor, this is a problem of their making.

**THE COURT:** No. It's a problem of everybody's making.

**MR. WILLSEY:** Well, okay.

**THE COURT:** And you knew this -- You knew discovery deadlines.

If they weren't producing things, you've got to move quickly.

MR. WILLSEY: Your Honor, but --

THE COURT: You've got to move --

MR. WILLSEY: We --

THE COURT: -- to compel immediately and press upon the discovery judge what the deadlines are and not, you know --

MR. WILLSEY: Your Honor --

THE COURT: All I know is, you can't sit here now two weeks before trial and say, "We finally got the spreadsheets last week or the week before. We gave our spreadsheets. And it's going to be a simple matter to prove" -- You know, if this were a simple case where there's a huge dropoff in sales or something, now you're looking at trend lines from which you have to confer and extrapolate.

Anybody that's been through this knows there are many reasoned response. All the questions, all sorts of stuff that come in. And, normally, you could have three experts on each side on this very point, an economist and everybody else.

To say that you're going to have a specific witness give testimony and then the other side's going to be able to respond? And this case has been pending since when? You knew this -- You claimed damages. This case has been pending since November 21st, 2011?

MR. WILLSEY: Right. And, Your Honor --

**THE COURT:** And you haven't moved earlier for -- for distribution data?

**MR. WILLSEY:** Well -- Well, we didn't know what data existed. We needed -- And I think it's quite reasonable. And I don't think --

**THE COURT:** Why'd it take you three years?

**MR. WILLSEY:** No, but -- To take a 30(b)(6).

This case was suspended for quite a long time due to settlement efforts that took place over a year ago that were unsuccessful.

But what you won't hear is an explanation as to why, when we proposed the very reasonable step of deposing a corporate designee on the topic of the distribution of Crème De Lys, they flat-out refused. And Judge Corley I don't think could understand why they did that.

But that pushed things so far beyond the discovery period -- As I said, you know, we filed that motion, and I can get you the dates. Because they were flat-out refusing to put anybody in a chair and answer questions about the distribution of their product, we had to go through this motion to compel process. We finally got an order from Judge Corley in August. The deposition -- The deponent was finally made available on October 30.

And I can show you e-mail after e-mail where I was asking opposing counsel, "Can we get this guy deposed?" And it took

that long to get a date for them to make him available.

And when I -- When he sat there, he couldn't answer questions.  I asked him, "Where is your product?"  And he had no recall of specific accounts.  He couldn't testify to our satisfaction so we had to go back to Corley.  And it was only then, under Court Order, that defendants decided to produce this distribution data.

I mean, we went at it the way I think a rational actor would in this situation, and trying to get them to produce a witness who could testify about the basic distribution of their product before we start going after documents we don't even know exist.

**MR. SIEGARTEL:**  20 seconds, Your Honor?

This case was filed --

**THE COURT:**  Why isn't this a problem of your own making?

**MR. SIEGARTEL:**  Pardon me?

**THE COURT:**  Why isn't this a problem of your own making?

**MR. SIEGARTEL:**  Of Diageo's making?

**THE COURT:**  Yes.

**MR. SIEGARTEL:**  Oh.  Absolutely --

**MR. O'ROURKE:**  Your Honor, one second if I could.  I apologize for interrupting.

If they needed both sets of distribution information to do

this analysis, theirs is a -- is 50,000 lines of data that was produced to us in January 2014, which was prompted by my e-mail saying, "Guys, could you please tell us what your theory of damages is."

So if we have some culpability here, the plaintiff, who's now claiming this, gave us this 50,000 lines of data which is the subject of another motion, Your Honor.  It came late.

If they needed that to do the analysis, why haven't we gotten that all along ourselves?  It was only recently produced and it's massive, Your Honor.  We can't make sense of it.

**MR. SIEGARTEL:**  Your Honor, to go back to the timing of why this is not Diageo's own doing.

As Your Honor said, this case was filed November 2011.

The 30(b)(6) distribution notice that they served was in mid-June 2013, a year and a half after this case was filed, two weeks before fact discovered closed.  No, three.  I don't want to misrepresent.  Three weeks before fact discovery closed is when they finally sought their 30(b)(6) designee about distribution.

The witness was deposed.  Mr. Willsey claims that he didn't answer sufficiently.  They made a motion.  Magistrate Corley denied the motion.  She held, he testified sufficiently again.

So, to the extent this is absolutely not an issue of Diageo's own doing, this is not a problem of Diageo's own

doing.  We produced the documents.  They didn't produce.  They never made this an issue in the case.

We're the defendant.  We don't have the burden of proof on this.  It's abso -- Jackson had -- This is absolutely a problem of Jackson's own doing.

There's no -- There's no basis at all for producing 50,000 lines of data in January of 2014.  That was covered by our very, very first document request in the case.

**THE COURT:**  When was your first document request?

**MR. SIEGARTEL:**  Well, let's see.  I guess that would have been May of 2012, April of 2012, about six months after the case was filed.

**THE COURT:**  And what did you ask for that would cover the spreadsheet?

**MR. SIEGARTEL:**  We asked for all -- We asked for documents sufficient to show every trade channel where La Crema has been sold, including bars, restaurants, liquor stores.  It was absolutely promised by that request.

**MR. WILLSEY:**  And that document did not exist.  Again, we generated that report based on internal data after they finally produced what Judge Corley ordered them to.  It didn't exist.

We did produce internal marketing documents that talk about the sales channels.  In fact, in response to Interrogatory Number 16, I believe it was, we identified with

specificity 21 distributors that we share and the states in which those distributors are located.

We were responding to discovery.  It's -- What -- What they're talking about didn't exist throughout this case.  They had every opportunity to ask for it; they didn't.

And one thing I take issue is, in -- in the chronology that Mr. Siegartel just gave you, he says on June 14th they noticed this deposition, 30(b)(6) Notice, and included distribution topic.  The next thing on his chronology is, on October 30, 2013, he -- the deponent was made available for deposition.

What he leaves out is the fact that they refused, without any rational basis, to make a witness available on that topic and forced us to go through a meet-and-confer process with Judge Corley before getting there.

**MR. SIEGARTEL:**  Your Honor, a couple things.

One is Mr. Willsey's statement that the documents didn't exist.  We've never heard that before.  I'm not even sure where that's coming from, because that was never told to us at any point when the parties were discussing this.

As for the timing, again, Jackson has the burden of proof.  Your Honor had it exactly right.  They had obligations.  If they want to meet and confer -- If they want to make their motions, that's their problem.  They're not bashful about making motions to compel, such things like that.  They could

have done this sooner.  They didn't and that's where this ends.

**THE COURT:**  Okay.  I'm granting the motion.

We're not going to turn this -- We're not going to have a trial based on last-minute production that really warrants expert testimony.

I don't possibly see how somebody can just look at spreadsheets where there are not obvious trend lines and purport to give testimony without giving the other side the chance to respond, a chance to analyze, a chance to prepare, especially when there was no 26(a)(1)(A)(iii) disclosure.

And although it appears that the defendant has dragged its feet to a certain extent, I find that the plaintiffs have not been sufficiently diligent so as to obviate the -- the problem here.

So it's not coming in.  And, therefore, defendants' Motion in Limine Number 5, I'm not sure what you're asking for.

**MR. WILLSEY:**  Your Honor, what they're asking for in Motion 5 is somewhat incredible.

They want to exclude -- let's see -- "all evidence and argument that the wines are sold in the same channels or in the same stores."

**THE COURT:**  Yeah.  I mean, I didn't know what that meant.  If it meant what it says it meant, it's easy to deny.

**MR. WILLSEY:**  That's what they're asking for.

**MS. COHEN:**  Your Honor, really, the issue is a

comparison of these two spreadsheets that we've been talking about.

Jackson's spreadsheet, which they produced to us, does not have store-level information that would allow us to identify particular retail locations that carry both products.

So what we're seeking to exclude is evidence or argument of particular retail locations that carry both products or quantifying the number of retail locations that carry both products.

THE COURT:  Are you going to quantify in some way?

MR. WILLSEY:  No.  Right now, I think it might be difficult to do that.

But I should point out:  In response to Request for Admissions a year ago, a long time ago, maybe nine months ago, they admitted that some retail stores that sell La Crema wine also sell Crème De Lys wines.  They admitted that some distributors sell at least one wine produced by one of the plaintiffs and at least one wine produced by the defendants. They admitted that in response for Request for Admissions.

And what they're asking now is to exclude argument and testimony that the wines are sold in the same channels of trade or in the same stores.

That's -- It's -- It's amazingly --

THE COURT:  Well --

MR. WILLSEY:  -- broad --

**THE COURT:**  -- I -- I understand the argument to be a little bit more precise than that.

I mean, if that's the argument as a blanket argument, that answer is no; I'm going to deny.

To the extent they're saying that they have not been provided with sufficient information because the level of detail of your spreadsheet does not allow them to look at a store level in which they can assess the -- the extent of overlap or to rebut any claim you might have, that might be problematic.

**MR. WILLSEY:**  But -- But that is not a problem, Your Honor, because the spreadsheet that we already gave them -- And this -- this is quite different.

I will grant you that -- that dissecting and analyzing the specific data and distribution sheets is not an easy exercise.

But what is easy is to look at the names of the accounts, which is included in the document that they produced to us in December and the document we produced to them in January.  It's a simple matter of saying, look at the names of the accounts. These hundred show up on both spreadsheets.

And in like of the fact that -- You know, previously, you know, we have made witnesses available.  We have identified names of distributors in Response to Interrogatories.  For them to bring this now, I can't quite comprehend it.

But, again, even if you tailor their motion to just target

the names of specific accounts, they finally gave us that information in December.  We gave them responsive information that is just as detailed in that regard and identified specific accounts, and that's not a complicated indevor (phonetic) -- endeavor.  They can look at the names of the accounts and match them up very quickly and that doesn't even require expert testimony.

          **MS. COHEN:**  Your Honor, if I may, I brought excerpts from both parties' spreadsheets that I think will help clarify the issue.  If I may pass that up.

          **THE COURT:**  Yup.

          **MS. COHEN:**  So the first page is what Diageo produced. You'll see that it provides street addresses, particular locations.

     The second page is what Jackson produced, and it's only state-level data.

     On the first page, which is what Diageo-produced, we have, for example, numerous Brown Jug Liquor store locations in Alaska.

     There's one Brown Jug Liquor store in Alaska listed for La Crema.  We have no way of knowing if it's the same Brown Jug that's listed on Diageo's spreadsheet.

     Jackson, however, knows each of their accounts.  You'll see there's what I assume is an account number after each of the names on their spreadsheet.  So they can know on a

store-level specificity why there's overlap.  We can't.

**THE COURT:**  All right.  So why can't it be produced with the same degree of specificity of the store-level chart.

**MR. WILLSEY:**  Your Honor, I believe that we did produce the name of each and every account that we have.  I can double-check that.

But what -- what's more important here is that we're not talking now about some analysis of damages and profits, figures and things like that.  I mean, it's just -- The issue here is, did the parties share the same channels of trade?

**THE COURT:**  Well --

**MR. WILLSEY:**  Yes, we --

**THE COURT:**  -- again, I know we don't have to quantify because of the ruling I just issued.  But we may have -- The degree of the overlap is one of the factors that the jury will have to consider.

So if there's one Brown Jug Liquor store in -- in Anchorage versus all 12 of them or 10 of them.

The same with Golden Hill Liquor, is it all of them?

I mean, it may be a difference of several-fold and that might be a factor.  So the quantity does matter, maybe not in terms of damages assessment, at least not with respect to the -- to the jury assessment of the proxy theory, but . . .

What's the problem?  Why not just produce similarly to the same level of detail they produced?

**MR. WILLSEY:**  Your Honor, it was difficult to generate this data, in part, because . . .

We were dealing -- We were trying to match what they produced to us and, granted, which did not produce as much as they did in our spreadsheets, but it was difficult to work with people at the company because the information was designated as highly confidential, as it should be.  I have no -- no qualms with that at all.

**THE COURT:**  So it could be produced under a Protective Order.

**MR. WILLSEY:**  Yeah.  So -- I mean, we could -- we could take a look at the spreadsheet and give them more granular data or in however form they think it would be most useful.

That's not something that, with trial starting March 3rd, is a problem for them because, again, this is not -- It's a matter of, you know, counting up the number of accounts that sell La Crema and counting up the number that sell Crème De Lys and saying, "You overlap in X percent."  I -- I can't fathom that that would require expert testimony.

And, again, I think this is a quite a different issue than the damages issue that you just ruled upon.

**THE COURT:**  All right.  Well, I'm not convinced that there's a logical problem producing a greater degree of granularity or spec -- specificity that would be at the same

level of -- of the chart that was provided by defendant.

So, I'm going to order that, as a condition of my denying this motion, that -- that plaintiff produce such a chart.

Today's already what?  Tuesday?  And we've got trial starting in . . . two weeks?

**MR. WILLSEY:**  Your Honor, can I confer briefly with my client to see how fast we can get it?

**THE COURT:**  Yes.

(Pause in proceedings.)

**MR. WILLSEY:**  Yeah.  Your Honor, we can get that. It's difficult, and I'll explain why, is that some of the information that they're asking for is actually information that distributors have as opposed to us, but we can get it to the other side a week from today.

**THE COURT:**  All right.

**MS. COHEN:**  That's fine, Your Honor.  We agree with that.

**THE COURT:**  Okay.  So that'll be February 25th.

All right.  Thank you.  Let's get to plaintiffs' motions.

Plaintiff seeks to preclude the defendant from offering evidence of plaintiffs' trademark application for the broader class, and that is withdraw on the theory, I understand it, that -- the defendants' theory is that this is relevant to likelihood of confusion because it shows that the detail searches database had concluded that there were no conflicting

marks -- marks, including the Crème De Lys.

All right.  Is that the --

**MR. WILLSEY:**  Yeah.

**MR. O'ROURKE:**  Your Honor, to be precise the motion didn't even cover that.  They mo -- They -- They just filed a motion and I was just trying to not hide anything from the Court.

They filed a motion saying, "Your Honor, don't let them come in here and say we got a descriptiveness refusal on La Crema for the wine portion of our application."

And we said, "You know what?  We've read the application.  That's a fair concern of theirs."  So we are not going to proffer it for evidence that their mark is descriptive.

But we were just really noting -- Parenthetically, it's not really part of the motion.  I think this was an easy one.  We just wanted to say it does come in and it comes in for the proposition that our client's registration was not cited against their mark, point one.

Point two.  You'll see that we're going to introduce evidence of third-party uses of alcoholic products that include derivations of the word "cream."

They've taken the position that nonwine alcohol that has "cream" on it are not relevant, yet they filed an application for La Crema that cover a description of goods that goes beyond wine.  It was for alcoholic beverages except beers.

PROCEEDINGS

And you'll also see in the case, Your Honor, that they have sent cease and desist letters in connection with cream-formative marks for nonwine products.

So I would just -- wanted to just, you know, be -- It was in -- in an abundance of caution to let the Court know we don't want -- we will not use it as evidence of descriptiveness, but it has these other limited purposes.

**MR. WILLSEY:** And, Your Honor, I don't think it's relevant. And if it even is arguably relevant, the probative value is extremely low for the two points that they made clear that they want to use this for.

Number one, it's not evidence -- It's not probative of whether these marks are confusingly similar, because patent and trademark Office -- Office actions in this circuit are regarded as inconclusive because they're made at the, quote, lowest administrative level. They should not be relied on by a Court, as stated in the *Carter-Wallace* decision.

That's quite different than the Second Circuit which affords them a little bit more weight.

But in this circuit, they are regarded as what they are, which are decisions that are made at the lowest administrative level.

I can tell you I -- I prosecute a lot of trademark applications. And what happens is exam -- applications go to people who are one or two or three years out of law school and

they make an initial ruling.  They do a search.

That -- That -- That isn't worth much in this case.

THE COURT:  Well --

MR. WILLSEY:  Number two --

THE COURT:  -- "not much" means not worth anything.

MR. WILLSEY:  Well, number two, it lacks finality.
It's a non-final Office action.

It's not a final determination that there's no likelihood
of confusion or there is a likelihood of confusion a between
Crème De Lys and La Crema.  It is nothing more than a non-final
Office action that Jackson Family Wines did not respond to.

If it has any probative value -- which I don't think it
does -- it's extremely low.  It doesn't reflect -- They don't
need this to produce evidence about our enforcement strategy.
They've deposed witnesses.  They know what our enforcement
strategy is.  There's demand letters out there.  They can put
those into evidence.  A lot of them are on their trial exhibit
list.  They don't need this application for that purpose
whatsoever.

And if -- If it's relevant, it has an extremely low
probative value.  It is highly prejudicial.  It is easy to be
confused by a jury as -- They very -- merry -- They very may
well conflate the existence of the nestful (sic) registration
we have that no one disputes for the mark "La Crema" with the
fact that there's this other one that went abandoned.

Number two, there's a very real likelihood that an average juror walking in here might think that this non-final low-level administrative action somehow represents a government determination when, in fact, it doesn't.

And the fact is -- And one last point.  To -- To show one of the points that they're -- they're using here, which is that, you know, at some point, the PTO did not cite one mark against the other, they don't need this abandoned application because they can point to their own application for Crème De Lys, which they undoubtedly will, which is on their exhibit list, but they can say, "We filed it.  We didn't get an objection from the Patent & Trademark Office citing La Crema," and there you go.  And that actually went through to registration.

But -- So there -- there's actually no need for the abandoned La Crema application to come in, given that they have those facts.

**MR. SIEGARTEL:**  Your Honor, very -- Oh, I'm sorry.

(Pause in proceedings.)

**MR. O'ROURKE:**  Your Honor, they have a registration for La Crema for wine.  They filed the second application to expand the scope of the rights that they would have by having a more expansive description of the goods.  The description of goods was "alcoholic beverages except beer."

So, I think it's important for the jury to know that, on

the one hand, they're seeking government approval for that level of protection.

On the other hand, they're going to come into Court and tell the jury that use of Crème-formative marks on alcoholic products other than wine are not relevant to the decision of the jury as to whether their rights are sufficiently broad enough to stop Crème De Lys in view of all these other third-party uses.

They're trying --

THE COURT:  What?  So your argument essentially is like an estoppel motion, that they made a certain representation and took one position before the PTO and, therefore, shouldn't be able to take their position here?

MR. O'ROURKE:  You know, I -- I think it's a good theory.  I don't know if -- if it goes as far as estoppel.  But it is certainly relevant as to their intent on what's important for them from a policing standpoint.  It's clearly relevant to that issue.

THE COURT:  Well, their intent is not necessarily relevant.  The question is, is there a likelihood of confusion in these other markets outside of the wine industry where the term "cream" or "Crème" or some variant of that is used.

MR. O'ROURKE:  Yeah.  My -- My point is, Your Honor, that they're -- In the litigation, they're trying to take the position that any use of those formative marks for nonwine

alcoholic products shouldn't be relevant to the jury.  But, on the other hand, they're seeking to get that level of protection through a registration process.

MR. WILLSEY:  Your Honor, there was deposition testimony by one of our witnesses during this case, and she is a trial witness, and she explains exactly why they filed that application.  And it had nothing to do with an enforcement strategy; it was to take advantage of something called the Madrid Protocol System, which provides a mechanism to obtain foreign trademark registration protection easier than you would have if you had filed directly with --

THE COURT:  All right.  I'm going to grant the motion on grounds of Rule 403.  There's too many sideshows and side issues and they have very little, if any, probative value.  And to explain the case of probative value or not gets us into a mini trial that's going to sidetrack the jury and possibly -- probably confuse the jury, so we're not going to have that evidence.

In Limine Number 2.  This is the investigative report of Mr. Yarborough.

Let me -- Let me first clarify:  Is -- Is there going to be an attempt to actually introduce the report --

MR. SIEGARTEL:  No.

THE COURT:  -- or just the testimony?

MR. SIEGARTEL:  Just the testimony --

**THE COURT:**  Just the --

**MR. SIEGARTEL:**  -- not the report.

**THE COURT:**  All right.  And . . .

Well, to the extent he's testified as to the stuff that he's bought that has the names "cream" or "Crème," "Crema" that goes to the strength or not of the weakness of the mark seems to me that that's relevant if we stay within the category of products that are, I would say, within the wine group.

To the extent that he tries to testify about some of the phonecalls he's made, to me that's -- that's hearsay.  That's rank hearsay.  I don't see how that comes in.

He can testify as to what he saw, what he bought, what he acquired.  "Here's what's on the market based on when I went out to XYZ stores."  He can testify to that.

I don't see how he testifies to what so and so told me or the representative of this company.  That's hearsay.

**MR. SIEGARTEL:**  That's -- That's right.

Mr. Yarborough is only going to testify about things within his firsthand knowledge:  The investigation he ran; the products he purchased; the Internet research that he did.

He's not going to be testifying about what somebody at a winery might have told him because we agree that is hearsay.  We're going to limit his testimony just to everything he has from his firsthand knowledge.

**THE COURT:**  And I'm going to limit it further to wines

and not things that actually have cream in it or Irish -- you know, Bailey's Irish Cream or anything else.  I mean, that -- that is getting, I -- I -- I think, too far afield.

MR. SIEGARTEL:  Can I -- Can I speak to that, Your Honor?

THE COURT:  Yeah.

MR. SIEGARTEL:  Okay.  Here's Diageo's theory in the case:

When a consumer goes to a liquor store, they are saturated with "Crème" terms.  Sometimes it's the name of the product.  Sometimes it's in a descriptive sense.  Sometimes it's a wine product.  Sometimes it's a liqueur.  Sometimes it's something with cream.

But the case law is clear -- The Crowded Field Doctrine is very clear that when a mark is widely used, the plaintiffs' marking weaker, consumers are well accustomed to distinguishing.

And if I could -- if I could pass up, Your Honor, just one example -- well, two examples.  If I may.  May I pass these up?

THE COURT:  Yeah.

MR. SIEGARTEL:  These are two nonwine products that Mr. Yarborough purchased.  One of the names is called Crema Fina.  It's absolutely within the province of the jury, as a question of fact, if they're going to credit Crema Fina or not.

Another one of those products is La Crema.  It's -- It's

their mark.  It's plaintiffs' mark.  It's -- This is not technically a distilled wine, but it's absolutely a product that a jury member could credit -- maybe not credit but, regardless, that's the jury's province.

The case law on this is very, very clear.  We have case law in our brief:  The *JL Beverage* case, the *E. Remy* case.  The *JL Beverage* case made it really clear.  You don't just look to vodka.  You also look to wine and beer.

And, by the way, Jackson is enforcing their mark against people who sell beer.  It doesn't make any sense -- Well, that's not the right way of saying it.

If Jackson thought that only wine products mattered, they wouldn't be enforcing their mark against the manufacturer of a beer product.  We have that in the evidence.  Again, they had their trademark application going beyond wine.

So, again, Your Honor, to reconsider.  Both the case law and the facts of this case make clear that non-still wine products are relevant because the consumer is being inundated with "Crème" terms in all sorts of ways.

And the case law, again, makes clear that when that's the case, the --

**THE COURT:**  So you would include products that actually have dairy cream in it so that it's descriptive?

**MR. SIEGARTEL:**  It's not that we're including a product that has dairy cream.  We're including a product that,

for one reason or another, has a "Crème" term in the name.

The ingredients in the product are not what's important here.

**THE COURT:**  Well, did you draw any line?

**MR. SIEGARTEL:**  Well, Mr. Yarborough -- We're drawing a line as to what Mr. Yarborough's investigation was.  He restricted his investigation to Crème terms, so that's where we're drawing the line.

All of these products, again, it's the province of the jury to credit or not credit these products as they see fit.  Again, case law concludes these are related products.  The case law does not restrict it just to a still wine in this instance.

So, where do we draw the line?  We draw the line at Crème terms because that's what the consumers are seeing in the marketplace, all over the place, and, by the way, for -- for alcoholic beverages.

So, Your Honor, there's also a case, the -- the -- I'm sorry -- the *Spin Master* case, which makes very clear that other descriptive uses in the marketplace are relevant.

That's our entire point.  The fact that you have "Crème" being used in a descriptive sense in the marketplace in connection with alcoholic beverages absolutely undercuts Jackson's point that their mark is not descriptive because the -- the consumer is seeing it in descriptive ways all over the place.

So, again, to only restrict it to still wines is not the right -- respectfully, is -- is not the right way to approach the issue.

And we're going to restrict it, again, only to what Mr. Yarborough did himself.  And he's going to speak about his investigation; he's going to so to speak about what he purchased.

If Jackson then wants to cross him, they can cross him and they can say, "Is this a distilled wine?"  And he will say "No."  But, again, that's -- that's perfectly a subject for cross-examination and that's --

THE COURT:  All right.

MR. SIEGARTEL:  -- our position.

THE COURT:  A few minutes ago, you argued that I open the door, let the jury decide.

MR. SIEGARTEL:  And here --

THE COURT:  And -- And why -- why -- why not?  Why not let the jury decide whether this stuff --

MR. SIEGARTEL:  Well, there's got to be --

THE COURT:  -- the wine category's relevant or not?

MR. SIEGARTEL:  The -- The -- You have to draw a line somewhere as to what is even within the reasonable sphere of this case.  I mean -- And they did draw a line --

THE COURT:  And some courts have drawn lines, right, broader.  It talks about all alcoholic products.

**MR. WILLSEY:** Well, it depends on -- on the case and the facts at hand and what the parties actually manufacture. The *Start* case classified the relevant class of goods as wines, and that's a fairly recent decision from -- from this Court.

The -- The fact is, they did draw a line of de -- demarcation where they -- when they told Mr. Yarborough to go out and look for things, you know.

Where are you going to draw the -- Does it include any product that contain cream? Dairy products? I mean, you have to have some degree of reason when you're trying to identify what the products are that are relevant to this case.

**MR. SIEGARTEL:** Your Honor, he --

**MR. WILLSEY:** And, here --

**THE COURT:** Hold on. Let him finish.

**MR. SIEGARTEL:** I'm sorry. I'm sorry.

**MR. WILLSEY:** And, here, there is ample evidence that he went out and apparently purchased wine products.

Sure. Talk about those.

That's all they need. They don't need to -- And it's highly confusing to all of a sudden start throwing before the jury evidence of a Molly's Irish Cream product, which actually has dairy cream in it and is a liqueur and does not compete in any way, shape or form with a wine product. I mean, there's no evidence to suggest that those types of products compete.

**MR. SIEGARTEL:** May -- May I respond --

THE COURT:  All right.

MR. SIEGARTEL:  -- Your Honor?

THE COURT:  Yeah.

MR. SIEGARTEL:  Again, Jackson is enforcing its mark against a beer product.

For Jackson to come into this Court and say that nonwine products are --

THE COURT:  No.  You're making an estoppel argument.

MR. SIEGARTEL:  Well, I'm making an argument that, in the marketplace, other products other than still wine are relevant to the marketplace and how a consumer perceives the Crème term.

If Your Honor sees it as estoppel, I'm not against that. I'm just making -- I'm just pointing to their contradiction, exactly the position about enforcing against a beer product, but then saying beer does not compete with wine.  It -- It doesn't make -- That doesn't --

MR. WILLSEY:  Can I --

MR. SIEGARTEL:  -- make any sense.

MR. WILLSEY:  Can I address that?

THE COURT:  Well, especially if there's an affiliation argument here.

MR. WILLSEY:  Can I address the enforcement against beer issue?

THE COURT:  Yeah.

**MR. WILLSEY:**  I mean, as -- as -- You know, people familiar with trademark law know there are a lot of factors that go into a decision of whether you're going to enforce. One is the similarity of the marks; the other is the relatedness of the product.  And those two relate to each other.

The instance he's talking about is a company that was putting out a beer called La Crema.  It was an exact identical copy of our mark.  It's the only time that we have gone after someone outside the -- into the -- into the beer -- beer field. That's it.  The mark was identical.

**THE COURT:**  So what about this -- What about this exhibit here that says Lacrima?

Oh, it's spelled with an "I."  Sorry.

**MR. WILLSEY:**  Yeah.  Which is a kind of grape from a region in Italy.  It's a descriptive term used on those types of wine products.  There's several because Lacrima is a particular grape or region, I believe, in Italy.

**MR. WESSELKAMPER:**  Yeah, it's a grape variety.

**MR. WILLSEY:**  Grape variety.

**MR. SIEGARTEL:**  Again, Your Honor --

**THE COURT:**  Why doesn't that inform, though, the strength or the weakness of the mark?

**MR. WILLSEY:**  Well, that's a different issue, though, than these cream-based liqueur products.  I mean, that is a

wine product.

We're prepared to explain to the jury what the significance of that is.  As I said, I think it's very little because it's descriptive.

THE COURT:  All right.  If there are other products that are not cream-based but not wine, what's your view of those in terms of inclusion in Yarborough's report?

MR. WILLSEY:  If they're not wine products, they shouldn't be before the jury.  So the one you're looking at, Lacrima, spelled with an I, actually, we're readily prepared to deal with that being put in front of the jury.  We can explain it.

Where things get prejudicial and confusing is when you start putting in the products that have dairy cream and liquor are not competitive in any sense of the imagination.  That's where the prejudice lies.

But for the -- the wine products, provided that he's not -- And there was a bit of uncertainty when this motion was brought.  I -- I believe Yarborough's report is on their trial exhibit list, so we were concerned they were going to try to introduce that into evidence.  And that contains a lot of hearsay and hearsay.

THE COURT:  Why don't you address that?  The report's not coming in.

MR. WILLSEY:  And -- And -- And I -- I accept and

thank the other side for agreeing that he won't testify about conversations he had with third people.

So, really, the last remaining issue here has to be -- has to do with the scope of the products that Mr. Yarborough investigated.

Again, to the extent he went out and bought wine products that have names with what they call Crème terms, we're prepared to deal with that. I don't think it's confusing for the jury and it -- it, frankly, makes sense.

What doesn't make sense is in -- injecting evidence of -- again, I keep using this one example -- dairy cream-based liqueur products before the jury. I think it's confusing.

**MR. SIEGARTEL:** Your Honor, what matters here is the marketplace.

The consumer goes into a liquor store. They see Crème terms all over the place. And what the case law says is that, in those circumstances, consumers become well-accustomed to looking closely at the marks because they're being inundated with those marks.

That's what the *Spin Master* case held. That's why the *Spin Master* case held a descriptive term --

**THE COURT:** If you're looking to buy Bailey's Irish Cream, you're not looking for a glass of chard -- you're not looking for a bottle of chardonnay. It's completely different animal.

**MR. SIEGARTEL:**  You know, actually, Diageo uses the same mark for both vodka and wine.  Smirnoff uses the same mark for beer and spirits.  It's not the case of marks only used for wine but not for another product.

**THE COURT:**  So the question, what's the likelihood the consumer is going to be engaged -- subject to some confusion?

**MR. SIEGARTEL:**  Your Honor, that's subject for cross.

Again, Mr. Yarborough's going to be up there.  If they want to say to Mr. Yarborough, "That's a dairy-based beverage, isn't it," that's not going to --

**THE COURT:**  Okay.  I'm going to limit it.

First of all, the report's not coming in.

Second of all, he's not going to testify about hearsay statements he received.

Third of all, he's not going to be able to testify about cream-based liqueurs or anything where -- where cream or Crema -- Some variant of that is really a descriptive term of something that -- that I think is very far afield.

If there's some other categories -- I haven't looked at his list lately -- that doesn't contain cream but, nonetheless, has a similar name, either because it's not a still wine, per se, I won't exclude that.

But anything that has a cream in it is -- is not --

**MR. SIEGARTEL:**  May I ask one quick clarification question?

THE COURT:  Yeah.

MR. SIEGARTEL:  So Crema Fina, the product that you have up there, is a dairy-based beverage.

Is it Your Honor's holding that that is a product that Mr. Yarborough -- It has "Crema."  It has the word "Crema."  Is it Your Honor's holding that we cannot have Mr. Yarborough --

THE COURT:  Right.

MR. SIEGARTEL:  -- testify to that?

THE COURT:  Yup.  If it has cream in it, it doesn't come in.

MR. SIEGARTEL:  (Nodding head.)

THE COURT:  Third -- Plaintiffs' third motion.  This is the --

MR. WILLSEY:  Dr. Jay.

THE COURT:  Dr. Jay's survey.

First of all, the comments about distribution of wines is not something within her area of expertise and I -- it's not appropriate for her to give that testimony.

MR. O'ROURKE:  Your Honor, can I -- can I address that, please?

THE COURT:  Yeah.

MR. O'ROURKE:  Dr. Jay has been criticized by their rebuttal expert, Dr. Jacoby, for not using the right type of survey.

She used what's known as the *Ever-Ready* methodology, which

is considered by many to be the gold standard of confusion surveys.

They criticized her for not using that methodology because Dr. Jacoby concluded that these products, Crème De Lys and La Crema, are regularly seen together on store shelves side-by-side.  That's the principal criticism of Dr. Jay's survey.

Dr. Jay, as part of her background and research, went and looked at what was happening in stores.

Dr. Jacoby took his client's word for it that that's how the -- the products were distributed.  He didn't go to any stores.

It is absolutely important for the -- the jury to know that Dr. Jay, in -- in determining that the *Ever-Ready* type study, which is a study where you show the defendants' product to respondents, was in a situation where they're not always side-by-side in stores.  In fact, it's more uncommon than it is common.

And so for her to do background and research to inform her views on what type of a methodology she would use is -- is absolutely part of her background research on coming up with the strategy for an *Ever-Ready* methodology in the first place.

THE COURT:  So, it's the basis for her expert opinion?

MR. O'ROURKE:  No.  It's part of the background consideration that went into her decision to -- to -- to

determine that it was appropriate to employ an *Ever-Ready* study as opposed to what plaintiffs' experts did, which is referred to in the case law as a Modified Squirt methodology, where you shove the La Crema bottle under all of the respondents' noses before you ask any questions about my client's product.

**MR. WILLSEY:**  Your Honor?

**THE COURT:**  Yeah.

**MR. WILLSEY:**  The problem here is Mr. Jay (sic) obviously -- or Dr. Jay is going to be testifying as an expert.

If she is allowed to start testifying about visits to wine stores -- which, by the way, were not identified in the body of her report.  She said -- There was a conclusory sentence saying, "The products don't appear together" or something like that.  But she didn't talk about any of this investigative effort, and the first I found out about it is when I was taking her deposition.

The problem is, if she starts testifying about that, the jury is going to look at her and say, "Oh, this is an expert witness telling me that these products don't appear on retail shelves based on her visit to between 12 and 15 retail stores.

She's -- She's freely admitted she's not qualified as an expert on wine distribution.  She shouldn't be allowed to offer that testimony.

What's equally as important is, it's unnecessary.  She made her determination as to which protocol to use.  She used

the *Ever-Ready* survey protocol.

Our experts used, as Mr. Rourke (sic) said, is -- O'Rourke said, is what's called a Modified Squirt protocol.

Now, whether one protocol is better than the -- than the other, in part, might depend on whether these products show up in the same channels of trade.  That's a fact issue.  It doesn't need to be covered by the experts.

You can talk about, you know, do the -- are the products sold in the same retail stores?  Well, they've admitted that in response to a Request for Admission.

That will allow the jury or the Court to determine which protocol might make sense.  But there's absolutely no basis for her to be testifying on something --

**THE COURT:**  Well, what if -- what if she's criticized under cross-examination for employing the *Ever-Ready* protocol?  Doesn't she have a -- a right to be able to explain why?

**MR. WILLSEY:**  She can explain why, but without saying, "I went to 12 to 15 wine stores and I never saw these stores (sic) on shelves next to each other."

**THE COURT:**  Well --

**MR. WILLSEY:**  Because when she says that, that comes across as expert testimony when she clearly is not qualified as --

**THE COURT:**  Maybe; maybe not.  I mean, is -- She's just testifying to what she saw, which then led her -- At least

she will probably testify to -- to conduct one kind of study and not the other.

She can be cross-examined on what she saw, I mean, and -- and the jury can be instructed that her comments about what she saw in the stores is -- is not the subject of her expert testimony and she's not to be given any special weight.

MR. WILLSEY:  Well, whether -- whether the products appear on retail shelves together or not doesn't depend on her testimony.  We have photographs of the products showing up right next to each other.

They will produce some evidence going to the fact that these don't appear next to each other.  They've tried to exclude --

THE COURT:  I assume you can cross-examine her on that.  If all she -- If all she did was go to a dozen stores and base her whole opinion on that, I'm sure you're going to come back with something more systematic.

MR. WILLSEY:  I'll grant you that could be helpful to us.

But the fact is, what we're worried about is that a juror sitting there is going to look at Dr. Deborah Jay testifying to the fact that these products don't appear on retail shelves together based on her 12 to 15 visits to retail stores and read into that a lot more than they said.

She's a survey expert and -- and we haven't filed a

Daubert motion objecting to her as a survey expert; they haven't challenged our survey experts.  That's fine, but their testimony should be limited to the surveys they conducted.

MR. O'ROURKE:  And -- And, Your Honor, the background research they did before conducting the survey.  The -- It's routine for survey experts to go and look at the marketplace.  They look at the Internet.  They look at all kinds of things.  And the jury is entitled to know what her background research on this was.  It's not -- It's not -- It's not that big a deal.

MR. WILLSEY:  But while --

THE COURT:  All right.  I -- I am going to not exclude her testimony in this regard because she will be subject to cross-examination.

If asked, I will give a limiting instruction to the Grand -- to the jury that her comments about her lay survey is not the subject of her expertise and should not be treated as expert testimony.

MR. RHODES:  And, Your Honor, we request that instruction.

THE COURT:  All right.  Remind me.  I will give it.

With respect to her -- her sort of responding to the Johnson and Poray (phonetic) --

Is that how you pronounce it?

MR. O'ROURKE:  Poret.

THE COURT:  Poret?

**MR. WILLSEY:**  Right.

**THE COURT:**  -- reports, that -- that goes beyond the scope.  She can -- She can defend her selection without implicating directly or trying to affirmatively respond to those reports.

**MR. O'ROURKE:**  Your Honor, just to be clear on that -- And I get your ruling.

To be clear on that:  As part of the defense of the *Ever-Ready* methodology is also her -- without specific regard to Johnson and Poret -- her -- her also explaining that Dr. Jacoby's opinion that Squirt -- Modified Squirt would have been the right methodology, she -- she has to talk about that as well.

**THE COURT:**  Yeah.  I mean, she can respond to Jacoby.

**MR. O'ROURKE:**  Yeah.

**MR. WILLSEY:**  I have no argument with that.

**THE COURT:**  Yeah.

**MR. WILLSEY:**  I have no argument with that.

But the one thing I want to clarify, thought, is I believe on the exhibit list is a copy of Deborah Jay's Expert Report, which includes this three-page plus a very lengthy footnote attack on Poret --

**THE COURT:**  Well, again --

**MR. O'ROURKE:**  I don't think the --

**THE COURT:**  -- the reports are hearsay.

**MR. O'ROURKE:** The reports aren't coming in.

**THE COURT:** Okay.

**MR. WILLSEY:** It was on the exhibit list; weren't they?

**MR. O'ROURKE:** I know, but they're hearsay. They are.

**THE COURT:** All right. Good. Agree on something. Making progress.

**MR. WILLSEY:** Yeah.

**THE COURT:** With respect to Plaintiffs' In-House Counsel early contacts with Dr. Jay, it seems to me that there's a 403 problem that the jury may read too much into that.

There was no -- As I understand it, there was no substantive discussion about her methodology. And there are lots of reasons why one might contact a number of experts and -- and where, of course, that might take. And I think that -- to allow that to come in creates a potential serious 403 problem. So I'm -- I'm not going to allow testimony about Miss Schvimmer's contact -- prior contact.

Now, the indirect fixed costs. I guess this is still relevant because there still is a disgorgement claim here, even if -- if it's not going to be an actual damage claim before the jury.

And in that regard, I think the burden is on the defendant to show that any particular item of fixed costs that it

attempts to deduct actually contributed to the infringing product, and any doubt as to the computation is resolved in favor of the plaintiff if the party is wrong or found to have been wrong.

And, here, I don't find any satisfactory evidence that's specific enough to show how advertisement and promotion costs that contributed to Crème De Lys in any concrete way, or any -- how any of the overhead furthers the product, so I -- I have an evidentiary problem.

**MR. SIEGARTEL:** Sure.

Your Honor, Miss Hammer spoke to that. In her deposition, she spoke about specifically how do the different allocated A&P costs directly benefit Crème De Lys. She testifies to it.

She also testified that she got that information from Mr. Mulhall, who is the -- the controller, who is going to be a witness at this -- in this litigation who's going to discuss it further.

This -- As to the overhead, they didn't even ask Miss Hammer about it at her deposition. She had a special deposition in early December specifically about these indirect costs.

They didn't ask her any questions about her -- the overhead. If they had asked questions about the overhead, she would have explained it. Mr. Mulhall is also going to explain it at trial.

All of Jackson's cases -- All -- None -- None of them are in limine cases. There's absolutely no basis for excluding it from the jury. It's a jury question.

Diageo -- You're absolutely right, Your Honor. Diageo is going to have to make an evidentiary presentation that these costs benefited Crème De Lys or assisted Crème De Lys. We get that. But we -- We've done it or we started -- We -- We've done that. Miss Hammer testified to it. She's --

THE COURT: Do you --

MR. SIEGARTEL: -- an expert --

THE COURT: -- have an example -- a good example of something specific that she was able to cite?

MR. SIEGARTEL: Yeah. Ab -- Absolutely, Your Honor.

THE COURT: Well, why don't you give me an example.

MR. SIEGARTEL: Okay. One example would be -- Oh, sure.

When it came to the sampling program, or when it came to what Diageo calls The Wine Bar. It's an online site. She spoke about how that benefited Crème De Lys.

Here's an even better one, Your Honor. Crème De Lys was an innovation product. It was a new product that came out in 2010. One of the indirect A&P costs is specifically for innovation products.

So, without question, that would have --

THE COURT: She --

**MR. SIEGARTEL:**  -- benefited --

**THE COURT:**  -- didn't testify specifically that it covered --

**MR. SIEGARTEL:**  No, she did.  In her deposition, she did.

She spoke about the fact that she spoke to Mr. Mulhall.  Mr. Mulhall directly conveyed to her personally the information for how the innovation program benefited Crème De Lys.  Same for ad agencies, the employee wine bar.

Her deposition is filled -- filled, Your Honor, with information how there's a direct benefit to Crème De Lys from the -- from these lineups.  There -- There's . . .

**THE COURT:**  I'd like you to cite me something specific.  I mean, one -- one example was when we talked about the brand PR agencies.  She says (reading):

"Yeah, the employees I spoke to -- spoke with told me that PR agencies work with all their brands."

Well . . .

**MR. SIEGARTEL:**  Well, that -- that's actually -- I'm sorry.

Your Honor, just to back up for a step.

Diageo has both direct costs and indirect costs for Crème De Lys.  The direct costs in Diageo's electronic ledger go right to Crème De Lys, the wine in the bottle, the costs of the bottle.  Those are direct costs, Your Honor, in addition to

the direct costs.

There are indirect costs in Diageo's system which benefit all their products.  Inherently, an indirect cost benefits all the products.

For example, Diageo has a website.  There are 10 different wines on that website.  The cost of that website goes into these -- the indirect part of the ledger because it benefits all of those wines.

That's what we're getting at here.  There are certain indirect costs which are not allocated to any specific wine in Diageo's system but you can't --

THE COURT:  But you can't just rely on -- on an ipsi dixit assertion that -- that all overhead inherently benefits.

MR. SIEGARTEL:  No.

THE COURT:  You've got to show something --

MR. SIEGARTEL:  Yeah.

THE COURT:  -- to show that the -- that the website did, in fact, feature --

MR. SIEGARTEL:  The --

THE COURT:  -- this product --

MR. SIEGARTEL:  Yeah.

THE COURT:  -- and, in fact, something came out of it.

MR. SIEGARTEL:  That's right.  And that's exactly what Mr. Mulhall is going to testify to.  And that's exactly what some of the other Diageo witnesses might testify to.

But certainly Mr. Mulhall.  He is our witness for this issue.  He is Diageo's controller.  He's going to testify as to that.

And then, as for Miss Hammer, she's the expert and she has said she relied upon it because she would normally rely upon it.  It's -- It's the way Diageo runs their business that they have these indirect costs.

And, by the way, Mr. Gutzler, the damages expert for Jackson, isn't challenging that.  Jackson's not challenging that these indirect costs are potentially deductible if their evidentiary presentation is made, and we're going to make that at trial.

And that's what the cases make clear over and over again. All the cases that are cited say it's a question for the jury whether or not the defendant has presented sufficient evidence that the indirect costs benefited the product.  And that's exactly what we're going to do.

And, again, Miss Hammer spoke to that at her deposition, both with respect -- She spoke about it with respect to the A&P.  If they'd asked her about the overhead, she would have spoke about the overhead, but they didn't.

And that's -- So, again -- But I just want to be clear that the reason why it says it didn't benefit any specific product, it's more accurate to say it benefited all of the products.  It's just in the --

THE COURT:  But it has to be shown --

MR. SIEGARTEL:  Right.  That's correct.

THE COURT:  -- other than a conclusory statement.

MR. SIEGARTEL:  Oh, that's right.

Well, okay, a couple things.  One is, the case law holds that documents taken from the electronic ledger are not conclusory, are sufficient for that purpose, that you can take the numbers from the electronic ledger.

We're going to have both the documentation and the oral testimony.  We already have the documentation.  That's what I -- I believe what Your -- Your Honor's looking at.  And then Mr. Mulhall is going to expound upon that.  He is going to explain why did each of these costs --

THE COURT:  Well, that's what I haven't seen.  The degree of specificity is going to take in order to make your point --

MR. SIEGARTEL:  Well --

THE COURT:  -- to carry your burden.

MR. SIEGARTEL:  -- a couple things.

When Mr. Mulhall was deposed, he testified to that.  He testified to the fact these numbers come from the general ledger.

The indirect expenses, though, the production that you're looking at wasn't produced until after Mr. Mulhall's deposition.

So, again, if he had been deposed, he would have amplified it, and he's going to amplify it more at trial.  There is a million dollars at issue here, $200,000 of allocated A&P, $800,000 of overhead, and Mr. Mulhall's going to explain why it benefited Crème De Lys.

And, Your Honor, just to be clear:  Diageo's point is not that the entire overhead gets deducted.  It's just a particular portion of that overhead, based upon percentage of shipments, that gets allocated to Crème De Lys.

Diageo's not trying to say that all of its indirect costs and all its overhead goes to Crème De Lys.  That's not the object or the position at all.

So, again, in -- in discovery, we did everything we could do.  We -- Mr. Mulhall got deposed.  He testified to it to the extent that he got asked about it.

Miss Hammer, again, I -- I can give you more examples. We -- We have them in our papers, where she -- she described over and over again what Mr. Mulhall told her about why there was a benefit from the sampling program, from the wine bar, from the advertising agencies.  And --

**THE COURT:**  So tell me about the sampling program.

**MR. SIEGARTEL:**  Okay.  So, the sampling program is that Diageo gives out samples to employees, and they give out samples to retail locations, and that costs money.

But that sampling program, because it covers many

different wine products, doesn't get directly attributed to Crème De Lys in the electronic ledger.  You get --

THE COURT:  Is there evidence that the sampling included Crème De Lys?

MR. SIEGARTEL:  There -- There is.  Miss Hammer testified to it and Mr. Mulhall will testify to it further.

THE COURT:  Okay.

MR. SIEGARTEL:  He's going -- I'm sorry.

THE COURT:  All right.

MR. HUGHES:  Your Honor, you're focusing right on the -- on the right issue here, and that is that there's no empirical evidence or data that supports any of the opinions that Miss -- Miss Hammer has made with respect to deductions of indirect costs.

Instead, what's happening here is that opposing counsel's now saying that essentially Mr. Mulhall will save the day with his testimony.

What we should be clear about, just to back up procedurally here, is that I conducted the deposition of Miss Hammer initially, and also, I conducted the deposition of Mr. Mulhall.

When I first conducted the deposition of Miss Hammer, though, it became apparent that after my deposition of Mr. Mulhall, in between that period of time and my deposition of Miss Hammer, Mr. Mulhall had a WebEx communication with

Miss Hammer. She got out these -- these special spreadsheets that had indirect costs and all that.

And so when I questioned her in the deposition about why she conducted these things, she couldn't quite answer and said, "Well, I deducted these because they were showed to me on this data that, you know, was displayed during the WebEx."

I subsequently had to move and seek relief from Magistrate Judge Corley to take a second deposition of Magistrate -- or take a second deposition of Miss Hammer about these special spreadsheets that she received identifying indirect costs.

During that second deposition of Miss Hammer, she then revealed that her memory was a little bit faded in the sense that she could not come up with any real substantive reasons to support her deduction of some of these indirect costs.

As you saw in the testimony that we cited, there were numerous A&P costs that were -- that she had no support for. She couldn't remember whether -- whether or not they were related at all, whether they contributed at all to sales of Crème De Lys.

And, furthermore, in the deposition, the 30(b)(6) deposition of Mr. Mulhall, there was no testimony there where he itemized indirect costs and how specifically they contributed to Crème De Lys.

Thus, we're left in a situation where opposing counsel is saying at trial, Mr. Mulhall will save the day. Mr. Mulhall

will be able to say that this indirect cost, and that indirect cost, and this overhead should be deducted.  But none of that has been provided to us at that time.  And, furthermore, there's absolutely nothing empirical that says that.

I'm just now getting the unsupported statements about what Mr. Mulhall will testify to at trial.  I have nothing here to support that.

THE COURT:  Well, is there anecdotal -- What about the sampling program?  Is that -- Is it accurate that -- that Crème De Lys was included in this sampling program?

MR. HUGHES:  I believe when she was asked about the sampling, I don't -- I don't know whether exactly she recalled that specific one, I -- to be honest.  We went through a number of the A&P costs.  If I'm incorrect, then opposing counsel, I'm sure, will correct me.

But the bottom line, as I know, for instance, was things like -- Let's see.  There -- There were specific examples in our -- our motion.  I think it was Page 2 -- Let's see.  Maybe two of our motion where we had all these bullet points in which she -- she -- Miss Hammer testified not having knowledge about certain itemizations, certain things that were being deducted from the indirect costs, and, you know, would say things like . . . that she -- she thought it was part of the program but agreed that it was possibly that it was not part of the program.

So she was really confused as to what was in and what was not, and she was completely basing this on testimony that Mr. Mulhall was -- you know -- or, rather, a communication that Mr. Mulhall had with her over the telephone.

I mean -- Again, this kind of -- this goes back to this whole issue of expert testimony.  Miss Hammer will be stand -- will be on the stand as the damages expert testifying, based on her expert opinion, that these indirect costs should be deducted, that these over -- that this overhead should be deducted.

But Miss Hammer has nothing to base that on other than, apparently, the testimony of Mr. Mulhall at trial.  I have no data or anything else to support the fact that these specific programs actually contributed to the sales of -- of --

**THE COURT:**  So are you asking, then, for the Court to issue a blanket ban, then, on -- on any testimony regarding indirects fix -- indirect fixed costs, or what are you asking for?

**MR. HUGHES:**  Well, I mean, the goal is that I am asking that -- that anything that, you know, frankly -- I mean, in our motion, we sought that -- you know, to preclude defendants from using opinion evidence or argument that any indirect advertising promotion and indirect overhead costs should be deducted from Crème De Lys' sales.

And the second issue, of course, is that we did not want

her to state or suggest that plaintiffs must prove the portion of Crème De Lys revenue that's attributable to consumer confusion.

But with respect to the first point, the indirect -- the deduction of indirect costs and overhead, I mean, Your Honor, the issue is that if she does not have support other than this un -- other than this -- these communications that she had with Mr. Mulhall, if she does not have empirical data to support these deductions, then it should not come in.

It is going to be unreliable and -- and nothing that I can verify and, therefore, this is not -- And, furthermore, nothing has been produced to us, as far as any sort of empirical support or even testimony in a lot of these cases with Mr. Mulhall as to whether or not any of these indirect A&P actually contributed to the sales of Crème De Lys.

**MR. SIEGARTEL:**  May I respond, Your Honor?  Okay.

Mr. Mulhall is the fact witness and Miss Hammer is the expert.  It's absolutely standard that Miss Hammer would have spoken to Mr. Mulhall to get the factual basis:  How did these costs benefit Crème De Lys?

Mr. Mulhall is the person -- He's the -- He's the person at Diageo with that knowledge.  He conveyed it to Miss Hammer.

With respect to whether or not Miss Hammer may rely upon it, Federal Rule 703 is the governing standard.  And it says Miss Hammer may base her opinion on facts and data that the

expert has been made aware of or personally observed.  She got it from Mr. Mulhall.

With respect to that they don't have from Mr. Mulhall, I just want to give the time to Your Honor to make sure it's clear.

On October 30th, we gave the indirect information to Jackson.  They deposed Miss Hammer on December 3rd, two and a half months ago.  In her deposition, she made very clear that she got the information from Mr. Mulhall.

They never came back and asked for his deposition.  They never said, "Well, that -- that's the issue."  Frankly, on their part, it's willful blindness.

They could have asked for his deposition.  They never did. For them to now come here on mid -- in mid-February and say, "We never deposed Mr. Mulhall," they could have deposed him. And, again, when they deposed him last --

**MR. HUGHES:**  Deposed him again.

**MR. SIEGARTEL:**  Excuse me.

When they deposed him in August, this information had not come out.  That's why he hadn't testified about it yet.

**THE COURT:**  "This information."  What information?

**MR. SIEGARTEL:**  Indirect -- Excuse me.  The $1 million of indirect expenses.  That was produced after Mr. Mulhall's deposition.  It was produced in -- on October 30th.

Miss Hammer got deposed on December 3rd, two and a half

months ago.  And, again, at her deposition, to the extent that she recalled the information, she conveyed it in her deposition.

Again, for example, innovation brands, which is one of the allocated A&Ps.  And, again, she didn't get asked about the overhead.  It's $800,000 of overhead, Your Honor.  They didn't ask her about it.  They could have asked her about it.  She would have given the information.  They didn't do it.  They chose not to.

So for them to now come to Court and say we shouldn't even get to present that to the jury, just -- it's -- it's -- that's not the true --

**THE COURT:**  Were any of these 30(b)(6) depositions?

**MR. HUGHES:**  Yes, Your Honor.

The first deposition we took was of Mr. Mulhall.  It was a 30(b)(6) deposition.

It was after that deposition and after the deposition -- the first deposition of Miss Hammer that they produced this indirect spreadsheets, or whatever, that apparently Miss Hammer relied upon.

So then we had to move and -- and seek to compel a second deposition of Miss Hammer, and -- and that's when we asked additional questions about the indirect costs.  And we did touch base on some overhead issues but, yes, the indirect A&P was primarily the focus.

Now, the interesting thing here is that -- if I'm listening to opposing counsel correctly, I'm apparently now -- It's okay for me to be prejudiced because I didn't seek a second deposition of Mr. Mulhall after he produced this critical spreadsheet after his initial 30(b)(6).

This is a kind of a pattern here. I don't understand why I would have to move to compel to get a 30 -- second 30(b)(6) damages deposition. The first one should have been sufficient.

**MR. SIEGARTEL:** Your Honor --

**THE COURT:** Well, yeah. I -- I don't know. Normally, you get the in -- the documentary information in the 30(b)(6) deposition.

**MR. HUGHES:** That's right.

**MR. SIEGARTEL:** But he was also a fact witness, Your Honor, not just a 30(b)(6).

**THE COURT:** And, so, essentially, you're asking me to grant, effectively, a motion for partial summary adjudication on this issue for lack of -- of -- of sufficiently -- specific evidence that was testified to at -- at the second deposition of Miss Hammer.

**MR. HUGHES:** That's right.

I mean, your Honor, though, if you're not inclined to grant that, then I would say that for anything that she was not -- any indirect costs that she in her previous depositions was not able to support with testimony -- For instance, any of

the times in which she said, "I'm not sure," I'm not certain as to whether or not this should be deducted," then by no means should she be able to testify that those deductions should be made.

THE COURT:  Has she -- Has she providing (sic) an Expert Report -- Has she provided a report?

MR. HUGHES:  She did, yes, Your Honor.

THE COURT:  And . . .

MR. HUGHES:  She simply deducts an allocation of indirect A&P.

MR. SIEGARTEL:  And what she said in her report was that, in her expert opinion, she was comfortable relying upon every single cost based upon her communications with Diageo. She has said that in her expert opinion.

THE COURT:  When was her opinion rendered, her expert?

MR. SIEGARTEL:  It was in late August of 2013.  And she was deposed in late September of 2013.

And in her Expert Report, she even said it in a footnote. "I got this information from Mr. Mulhall."  There's never been any hiding of the ball in any respect about the basis for her expert opinion.

And, again, at her most recent deposition, they didn't even ask about the overhead.  So for them to come here and say "Well, we don't have information on overhead," they didn't ask her.

And, again, with respect to the indirect A&P, which is all those line items --

THE COURT:  All right.  I'm going to deny the motion. I'm not going to effectively grant summary judgment on this question, given the sequence of things and heard.  And to the extent that she testifies differently, she can be cross-examined on that.

I'll simply state what I've already stated in terms of the standard:  That there is not a sufficient causal connection that may be subject to a motion for . . .

MR. HUGHES:  Your Honor, there was one other issue with this motion.

We had essentially said that in the -- within the testimony -- within the report of Miss Hammer, and even her testimony, she seems to have suggested that plaintiffs have a burden to prove the portion of defendants' Crème De Lys gross revenues that are attributable to the future.

Obviously, that's -- that's --

THE COURT:  Wait.  Wait.  Say that again.

MR. HUGHES:  So -- Yes, Your Honor.

There were -- I'll pull up the exact statements that she made, but -- I believe this is actually a moot point, given the fact that opposing counsel may be onboard and not offering up this testimony.

But there was essentially some statements that she made

that suggested that she thought it was our burden -- plaintiffs' burden -- to prove the portion of defendants' sales that are attributable to trademark confusion, and that was a misstatement of the law.  We pointed to a specific portion of her -- of her report and her testimony.

Subsequently, in defendants' response, they agree that they don't intend for her to make that misstatement about the law.

However, I would say that, you know, in her report itself, if you look at -- Let's see here.  I'm going to pull it up.

She said something like . . .  All right.  She questioned in her report whether or not -- or the fact that Mr. Gutzler, our damages expert, had not shown which portion of the revenue was essentially attributable to the confusion.

It's the statements like that, though, in her report -- and I understand that the report will not be part of -- you know, a trial exhibit.  But we just want to make sure that, to the extent that she is going to make any such statements, she can't make a misstatement about the law as to what -- you know, who has the burden of proving any deductions from the -- the profits that they have --

THE COURT:  I assume she's not going to so testify.

MR. SIEGARTEL:  No, no, she's not.  We -- We understand what the Court has ordered.

THE COURT:  All right.

**MR. SIEGARTEL:**  We got it.

**THE COURT:**  Okay.  So, there you go.

**MR. HUGHES:**  Thank you.

**THE COURT:**  Let me just ask a couple of factual questions.  And I will get out rulings on the bellwether exhibits.

The -- Just so I understand:  The -- The Tax and Trade Bureau, when they take certain action, as it relates to Exhibit Number 200, for instance, I take it they do not conduct an inquiry of likelihood of confusion; do they?

**MR. WILLSEY:**  You're correct, Your Honor, they do not.

**THE COURT:**  So I don't see how, for instance, such a document as Exhibit Number 200 is relevant to likelihood of confusion.

**MR. WILLSEY:**  Your Honor, that's our position.

It's the -- It's equivalent to me going out and incorporating -- incorporating an entity with the State Corporation Commission records and calling myself Starbuckss with two Ss on the end, which I could get because it just doesn't match up to an existing corporate name.

That's exactly what this -- What this process concerns is a review of claims that are made on labels to make sure they're consistent with Federal laws.

**THE COURT:**  Right.

**MR. WILLSEY:**  It has nothing to do with trademarks.

**MR. MUNKITTRICK:**  Your Honor, one, they do do a search of conflicting marks in this process.

**THE COURT:**  They do what?

**MR. MUNKITTRICK:**  Conflicting marks.

**THE COURT:**  Conflicting marks, but not likelihood of confusion.

**MR. MUNKITTRICK:**  That's fair.

The second point on this:  Jackson alleges that Diageo acted in bad faith with regard to the name Crème De Lys.

These exhibits go towards Diageo's story of good faith throughout this entire process.  It is part of the legal hoops and confirmations that it has to go through to use this name, and it shows that it did so, that it was proved and used the label with all permissions that were required.

**THE COURT:**  All right.  What about that?

**MR. WILLSEY:**  This is significantly potentially confusing.

It's an official government document which you put in front of someone, and a juror could look at this and say, "Oh, the government somehow has blessed this name," which has no bearing on the trademark issues in this case.

They have their trademark registration for Crème De Lys, which they most assuredly are going to rely upon in this process.

This -- This is just a -- a very confusing document that

has no probative value whatsoever.  I mean, the fact that they got a cola of approval doesn't mean that they had good faith.

        THE COURT:  All right.  Let me ask one more question and see . . .

     The spreadsheets that we talk about, to the extent that they are -- have some relevance.

     I take it that given the way things have evolved, that you are treating whatever the eventual spreadsheet -- you're going to revise yours -- is -- is misled -- is, you're not going to object on the grounds of hearsay because this is the way it's developed.  It's almost like an answer to an interrogatory.

     Is that correct?

        MR. RHODES:  Yes, Your Honor.

        MR. WILLSEY:  That's correct.

        MR. MUNKITTRICK:  That's correct.

        THE COURT:  And then the -- Exhibit Number 109, which is the La Crema IRI -- IRI data -- I don't have -- I don't know if I understand what the -- how this was prepared and what the circumstances were in order to evaluate any question about foundation for business.  It's -- It's submitted as a business record or -- or --

        MR. WILLSEY:  Yeah.

        THE COURT:  -- what?

        MR. WILLSEY:  It's a -- Your Honor, it's a publicly available data source that just reflects sales of various

products, and that's where this came from.

MR. MUNKITTRICK:  In addition -- An additional issue with this document, Your Honor, was that it was produced on January 27th, 2014.  It's another example of going beyond discovery deadlines.

There's no reason that Jackson could not have produced this during discovery and allowed Diageo to do any followup document investigation, production and ask witnesses about this document as they would have if it was produced timely.

THE COURT:  What's -- What's the relevance of this document?

MR. RHODES:  It was -- It was originally contemplated to be used as part of the fact of damage analysis.

What I would entreat the Court to do is to keep the Court's reservation on this and then I -- we'll see whether we even proffer it during the trial.

THE COURT:  All right.  Well, let me ask this question --

MR. RHODES:  Because it would require some authentication and foundation.

THE COURT:  Yeah.  Yeah.

Well, let me ask, now that I've ruled on the fact of damages question, which still leaves the door open for the equitable relief --

MR. WILLSEY:  Yes.

**THE COURT:**  -- disgorgement.

I'm not -- I am not intending to bifurcate this trial. It's --

**MR. RHODES:**  No.

**THE COURT:**  And -- And so there's still issues about -- evidence issues I'm just going to have to evaluate because now the only question now is under -- under disgorgement, there is -- it's -- it's an equitable claim.  I haven't made that decision.

**MR. RHODES:**  Yeah.  You would -- You would basically take whatever the jury ends up doing as the guardian of the evidence during the process of the trial.  And depending on the outcome, we would then have a postverdict phase involving Your Honor with respect to the appropriateness of any equitable relief.

But, as -- as has been noted, there's a variety of different evidentiary scenarios where you could make the case for -- for disgorgement without showing lost profits on our end based on the totality of the evidence that's going to come forward.

**THE COURT:**  All right.  So we still obviate -- We can -- We are able to obviate a lot of this stuff probably.

**MR. RHODES:**  Potentially.  That's why I was suggesting the Court --

**THE COURT:**  All right.

**MR. RHODES:**  -- to maybe just take this one under -- under reservation until somebody actually sponsors it and under what circumstances --

**THE COURT:**  Right.

**MR. RHODES:**  -- in which case the objection could be made at that time.

**THE COURT:**  Right.

**MR. O'ROURKE:**  Your Honor, it sounds like the jury may make a finding, but it's up to Your Honor to make the award.

**MR. RHODES:**  We don't -- We don't disagree with that.

**MR. O'ROURKE:**  Yeah.

**THE COURT:**  All right.  Well, obviously, I'll have to look at the instructions and the verdict form carefully.

Let me just briefly -- The hour is late and the court reporter --

**MR. RHODES:**  Your Honor, I have a tiny bit of good news for you.

**THE COURT:**  Yeah?

**MR. RHODES:**  I know it's rare but --

**THE COURT:**  Oh, you settled the case.  Excellent.

(Laughter)

**MR. RHODES:**  I said a tiny -- I did say a tiny bit.  I didn't want to foreclose the Court's enjoyment from us for the better part of two weeks.

The Statement of the Case that gets read during voir dire,

the parties have proposed joint forms.  I hate that.  I met with my colleague and we scribbled out an agreement.  I used his.

I can just hand it to the Court.  I made two very minor changes.

THE COURT:  That's fine.

MR. RHODES:  Thank you.

THE COURT:  I'll incorporate that.

I don't want to spend a lot of time.  We just received the -- Judge Corley's order.

But I just have a factual question before we do anything further with that, and that is, I know a lot was written about failure to timely disclose, et cetera, et cetera, by counsel, but what I'm interested in is in terms of the actual destruction of the evidence itself.

Is there a dispute as to how that came about and whether there is culpability on -- on a part of the client or anybody else on a willfulness level?

MR. RHODES:  Who would you like to speak first, Your Honor?

THE COURT:  Well . . .

MR. RHODES:  Well, I will tell you what we don't know; right?

And this raises a secondary question which I wanted to raise with the Court, which is:  Assuming that the Court adopts

the rec -- report and recommendation; assuming further that the Court instructs the jury as recommended by the Magistrate.

There is a body of stipulated fact embraced in that opinion which needs to be put before the jury.

I recognize the incendiary nature of this process, so what I would propose to do is to send my colleague a very short stipulation of fact, which would go something like this, which is:

That the individual in question, Miss Josephson, resigned or -- or quit in August of 2011;

That in February of 2012, IBM did a complete image of her work laptop;

That in August 2012, it was lost or discarded.

I don't have the foggiest idea what the circumstances were.  We don't know, so I -- I can't answer the Court's question.

And that when that was lost or discarded, Diageo was under a duty to preserve that evidence.

I think if you just stipulate to those facts, either in the instruction itself -- But the jury has to have some context to under why --

**THE COURT:**  Yeah.

**MR. RHODES:**  -- they're getting that instruction.

Like I said, I'm happy to send Mr. O'Rourke -- We've had some succeed getting things resolved on some scheduling and

logistical issues.  I'm happy to send him a proposal.

I -- I do think it should be relatively neutral in terms of those basic facts.  I don't want to get into the -- the whole whys and wherefores, but I assume that he may think he's going to appeal that ruling, and we need the -- All I'm suggesting is, there needs to be some factual predicate for the jury to understand why they're getting that instruction.

THE COURT:  Yes.

MR. O'ROURKE:  Your Honor, I appreciate that you're raising it.  We're not inclined to appeal it subject to we do not want this trial to turn into a trial about that issue because that is really prejudicial to us.

The Judge made -- Magistrate Corley, who knows this case very well -- and she's done a great job in this case -- she found that we violated our duty to preserve and, as a result, she recommended that we pay them for the money that they had to spend getting into that.

And, in addition, she recommended that Your Honor read an instruction to the jury, and Magistrate Corley believes that the instruction that she's recommending does the trick.

You know, as I said, we're not inclined to appeal.  It's late in the game.  The Court has plenty of work to do; we have plenty of work to do.  It happened.

The -- The -- The instruction seems to me to be, you know -- On the losing side of this, it seems to be balanced and

neutral and that would be the best way to handle it.

But I -- I -- I was going to raise myself, Your Honor, a concern about having this talked about and questions being asked at trial about this issue, which is really not proper and would be a sideshow and very prejudicial.

**THE COURT:**  I agree, and that's why I think the most neutral kind of stipulation, bare bone facts so they understand the context of this is something I think would be good.

**MR. RHODES:**  But your --

**MR. O'ROURKE:**  We can take a shot at that, Your Honor.

**MR. RHODES:**  I'm sorry.  I didn't mean to be --

**MR. O'ROURKE:**  I'm sorry.

**MR. RHODES:**  To be very clear, Your Honor, because I have to take great issue with what was just said.

Let me just refer you to Page 11, Lines 18 through 21, of Magistrate Corley's report.  She says (reading):

> **. . .** The fault for the destruction of Josephson's
> documents resides with defendants only.  Given defendants'
> knowledge of Josephson's role in the company and the
> obvious connection she had to plaintiffs' claims,
> defendants' failure to secure her documents constituted
> willful spoliation."

I absolutely intend to talk about this at trial in my opening, in my closing, and on cross-examination of the witnesses, because we are entitled to explore why seven was

kept, what might have been on the laptop because she played a central role.

In the words of their briefing, this is the person who acted -- and I'm quoting -- "as the conduit between Diageo and the focus group people at Northstar, Mr. Histed, in selecting the very name that's at issue."

So, I want to make it very clear:  I'm -- I'm willing to be very fair and balanced on whatever the jury's instructed on the underlying facts, but I have every right to explore this because this -- they're going to be instructed on it.  And we have every right to argue and see if the jury can be convinced that the spoliation was, in fact, prejudicial.

That's what she says in the final sentence of her proposed instruction, which is the instruction I think that was similar to what Judge Grewal gave in the other case, which is:  Does the jury find it means anything?  We have a right to argue that.

**MR. O'ROURKE:**  Your Honor, they --

**THE COURT:**  Well, hold on.

**MR. O'ROURKE:**  Sorry.

**THE COURT:**  When you say you have -- you want to be able to present this, are you saying that you want to be able to present evidence and delve into the question of how --

**MR. RHODES:**  No.

**THE COURT:**  -- what happened and --

**MR. RHODES:**  No.

**THE COURT:**  I'm not sure I understand --

**MR. RHODES:**  I'm --

**THE COURT:**  -- what it is --

**MR. RHODES:**  I'm entitled to suggest to the jury, through circumstantiality, that there was evidence on that laptop that might have gone to the heart of the question of why they selected the name.

Take a step back, Your Honor.  There were two focus groups done, one in Chicago and one in Sacramento.  Each day had three different groups of the target women.  The expressed of the focus group, by their own documents, was to target La Crema as, quote, a competitive benchmark.

We don't have anything from Sacramento.  We know what they said in Chicago.  I am going to argue that, in the selection of the name, defendants' intent is directly relevant.

I'm going to further argue -- And I don't want to mislead the Court about this.

I would posit that I'm entitled to argue to the jury that the fact that they destroyed this evidence and, according to her, willfully so, evidence that could have been critical to that issue is something the jury could -- should consider against them.

**MR. O'ROURKE:**  Your Honor, may I respond, please?

**THE COURT:**  Yeah.

**MR. O'ROURKE:** First of all, I will tell you, because I was at the motion before Magistrate Corley, it was a very close question for her on whether there ended up at the end of the day being prejudiced, because we went through, chapter and verse, all of the documentation that the other side did get.

It was very clear -- It was very clear, Your Honor, that Ms. Josephson had a very limited role. And when you -- When you see her deposition transcript that's testimony in this case, you'll understand she was the conduit. But what she did is, she did the focus group research. She helped them find the focus group moderator. She facilitated getting the moderator to do a report. She reported back to her client, Noelle Campbell, who was the Brand Manager.

And so what we have is, after -- after the focus group, we have detailed notes, 27 pages of Ms. Josephson's notes that she sent to Noelle Campbell and to Sylvie Schwarze, her boss, and to Mr. Histed, who did the report. She did a summary of it.

She got from Ms. Campbell a -- a set of slides where she mentioned this issue that confusion was mentioned, and you should mention that in there.

She got from Mr. Histed his draft report. She commented on it. It ended up getting revised based on her comments.

So, then -- And I -- And I -- I know we have the culpability here on the ultimate issue that her hard drive was not kept.

But Magistrate Corley is the one who knows this.  As -- As a -- As a matter of jurisprudence, she's the one closest to this on what she is recommending to you that this gets solved.

They keep saying that she might have had these critical documents about why they -- She had no role in the selection of the mark.  She facilitated the focus group and they have extensive evidence of that.

And so, at the end of the day, notwithstanding Magistrate Corley's findings, she recommended a balanced and neutral instruction, and I would suggest that we not appeal and that the Court take her advice and we give that instruction.

When -- When counsel said earlier that he's entitled to examine witnesses at the trial, there's not a witness on either party's trial list that has any knowledge about what went down with regard to that hard drive.

**THE COURT:**  Well, that's my question.  How do we -- I don't understand the point.  I mean, I understand why you'd want to do this in terms of strategy, but what does it mean?

I mean, we're going to -- Are you asking the jury to make a determination of just how bad faith, how deliberate this destruction was, and whether it was done specifically to hide evidence, or whether it was just a recklessness that gave rise to a finding of willfulness or -- and, if so, who's going to testify?  I mean, I don't understand.

**MR. RHODES:**  I'm -- I'm entitled to argue the facts

that are presented.  This is what I'm suggesting.

**THE COURT:**  What are the facts?

**MR. RHODES:**  Well, the fact is that -- By the way, two things that counsel said are not correct.

Page 13, Line 8, she does find prejudice.

Page 2, Line 12 to 13, she describes their characterization of Miss Josephson's role.  This is what she said (reading):

> "Defendants have described Josephson's role as
> 'the conduit between Diageo's marketing team and
> Northstar . . . the third-party market research
> company."

So my -- What I'm suggesting to you is --

**MR. O'ROURKE:**  That's right.

**MR. RHODES:**  -- I'm en -- Hang on, please.

I'm entitled to explore the foundation of the focus group, put that evidence before the Court.

Then, in closing, if the instruction is given, I'm allowed to argue they destroyed evidence from Ms. Josephson who was central to the name-picking process, and you are entitled as the jury to decide for yourself whether that's material.  You are entitled to decide from the totality of the evidence that you've received whether or not that factor is material to your analysis of defendants' intent.  And you are entitled to decide whether or not it has any role in the materiality of the issues

that you confront.

That's all I'm entitled to do.

**THE COURT:**  All right.  I mean, that's fine.  If you just take whatever facts emerged at trial and are relevant --

**MR. RHODES:**  Yes.

**THE COURT:**  -- at trial, and the jury would be instructed pursuant to if we were to -- I were to adopt the recommendation of Judge Corley, the final passage is whether this fact is important to you in reaching a verdict is for you to decide.

**MR. RHODES:**  Yes.

**THE COURT:**  Each side can argue why it's important or why it's not important.  You can argue exactly why it wasn't that material, because all this other stuff wasn't that a big deal.  And he can argue --

**MR. RHODES:**  I wanted to be clear with the Court because counsel said that neither side was going to say anything.  And I didn't want to mislead you to say -- to think that I was going to not talk about this at trial.

**THE COURT:**  All right.  Yeah.

**MR. O'ROURKE:**  I appreciate that and I'm glad it's being flushed out because we had a concern.

But just so we're not getting sandbagged here -- and I don't think you're trying to do that.  I want just to make sure it doesn't happen.

For example, Miss Campbell is a key witness.  She is the one who -- who -- who, you know, was inde -- was responsible for taking this from a concept into the marketplace.

She has no knowledge of the destruction of documents.  It would be highly prejudicial for counsel or his partner Mr. Willsey to ask Ms. Campbell an aggressive question like, "So isn't it true that your company destroyed documents on Miss Josephson's hard drive?"

She is -- That -- And he knows she doesn't have any evidence.

**THE COURT:**  That's what I'm not going to allow.

**MR. RHODES:**  I'm not going to do that, Your Honor.  Let me --

**THE COURT:**  Testimony -- We're not going to turn this into a mini trial.

**MR. RHODES:**  I understand.  I understand.  And I understand, you know, what -- what we're allowed to do.

But I have to have some facts in the record that give meaning and framing to the instruction.  That's what I'm driving at.

**THE COURT:**  Well, you'll get that from the stipulation --

**MR. O'ROURKE:**  Yes.

**THE COURT:**  -- along the lines he suggested, as well as things come out and you talk about the focus groups and this

sort of thing and --

**MR. RHODES:**  And the fact that none of that evidence exists.  That is a relevant fact.

**MR. O'ROURKE:**  Your Honor, that's inherent in the instruction, point one.

And point two, Magistrate Corley thought about this very carefully, obviously, when you read the decision.  And she put facts into the stipulation.  She didn't just say you can decide this one way or the other.  She gave the facts.  She said (reading):

"Defendants Diageo North America and Diageo Chateau and Estate Wines failed to preserve . . . the only copy of witness Jennifer Josephson's laptop hard drive . . . after their duty to preserve arose.  The hard drive may have contained e-mails, notes and other documents relating to focus group sessions concerning the proposed mark . . . that eventually became Crème De Lys.  Whether this fact is important to you in reaching a verdict in this case is for you to decide."

The facts are within the instruction.

**MR. RHODES:**  Well --

**THE COURT:**  And supplemented by foundational facts that you all were going to stipulate to.

**MR. RHODES:**  Yes.

MR. O'ROURKE:  I need to see that.

MR. RHODES:  He's not said that he would.  I said that I would propose it.

THE COURT:  And I told you to stipulate to and -- and I've also made it clear that we're not going to elicit additional testimony to develop and turn this into a mini trial.

Stuff may come out in the course of this trial that may be relevant to the determination and each of you can argue each side as to this instruction.

MR. RHODES:  But -- But I don't want to mislead the Court.  I plan to talk about what evidence does not exist.

And if the Court gives that instruction, then I believe I'm entitled to mention to the jury in opening statement that that happened, what was ever in the four corners of that instruction.

THE COURT:  As long as it is based on evidence that's going to come out at trial, anyway, and not on a specific point, you can argue whatever inference you can because that's what the instruction suggests that they're going to have to do.

MR. RHODES:  Okay.  I didn't want -- I just wanted to make sure everybody knew that I was going to plan to do that and I didn't want you to --

THE COURT:  That's fine.

MR. RHODES:  -- feel like I was misleading you.

THE COURT:  That's fair; all right?

MR. O'ROURKE:  Your Honor, one last --

THE COURT:  Yeah.

MR. O'ROURKE:  Do we have time for one last housekeeping issue?

THE COURT:  Yes.

MR. O'ROURKE:  We wanted -- We've been working hard to make sure that none of the witnesses get called twice.  We read your rules carefully and obviously as, you know, people who have tried a few cases, we agree with you.

So we just want to make sure that the Court is comfortable with the following.  I believe I have this right and if I have it wrong, you'll correct me.

We -- We're planning on agreeing, if the Court is okay with this, for the plaintiff to rest its case, if you will, but subject to examining our witnesses that we're going to put on on our case as part of their case so that we don't have to call in our witnesses where they might want to get a nugget or two or three from them.  They're going to wait to do that on our case.

And -- And we were prepared to stipulate that their case isn't technically closed until all of our witnesses have -- have testified.

THE COURT:  Okay.

MR. O'ROURKE:  Is the Court comfortable with that?

**MR. RHODES:** To -- To be specific, there's a witness, Noelle Campbell. She's on maternity leave, and the last thing anyone should be doing with her is to make her appear multiple times.

We were going to call her in our case in chief. And what counsel and I discussed was, I may play some of her deposition testimony in my case in chief.

He wants to call her and take her story first. I said I'd let him do that. So when she first appears live, it will be during his case.

My case will be deemed open until that testimony's concluded. And then when I get up to cross-examine her, I won't be limited by the four-corners-of-the-scope principal --

**THE COURT:** Right.

**MR. RHODES:** -- on direct. We would do that in order to accommodate the witness.

**THE COURT:** Right. So cross can exceed direct because it's going to be really part of your case in chief.

**MR. RHODES:** Yes.

**MR. O'ROURKE:** Yeah. And I -- I believe actually it's with regard to more than just Ms. Campbell. I have an agreed -- I have an agreement with Mr. Willsey on that. You gave me a list.

**MR. RHODES:** With respect to anybody --

**MR. WILLSEY:** Yes, that -- that's correct.

**MR. RHODES:** Yeah. With respect to anybody who's got a scheduling issue, we all agree that they should just appear once and be done with it.

**MR. O'ROURKE:** It -- It's -- Just to be clear, then, and I'm sorry if I'm taking too much time on this: We have an agreement, subject to the Court's approval, that the Diageo witnesses that we are going to call in our case, they haven't rested until they've had an opportunity to examine them during our case.

**THE COURT:** Right.

**MR. O'ROURKE:** And as a re -- And in exchange for that, they've agreed not to call our Diageo employee witnesses as part of their case.

**MR. WILLSEY:** Your Honor, I'll speak up because I'm the one who reached this agreement.

**THE COURT:** Yeah.

**MR. WILLSEY:** Yes, that is accurate.

**THE COURT:** All right. That's fine.

So, you know, you just alert me in advance that -- that the particular witness will be called, partly as -- in cross, but also as part of the case in chief, deferred case in chief. I'll remember that at the time.

**MR. O'ROURKE:** Okay.

**THE COURT:** That'll be fine.

Of course, that affects any motion for directed verdict.

MR. RHODES:  Yes.

THE COURT:  I assume that you'll stipulate that that can be deferred until the case really is complete -- the case in chief is complete.

MR. RHODES:  Yes.

THE COURT:  So the timing of that may be a little unusual but --

MR. O'ROURKE:  It would be after we rest I would take -- or after -- Yeah.

MR. RHODES:  Yeah.

MR. O'ROURKE:  We'll -- We'll -- We'll talk about that.

MR. RHODES:  The resting will be late in the game.

THE COURT:  All right.

MR. RHODES:  Does -- Would the Court entertain a couple of very logistical questions about --

THE COURT:  Yeah.

MR. RHODES:  -- how you conduct your court?

THE COURT:  Yeah.

MR. RHODES:  Opening, where do you want us and where do you not want us?

THE COURT:  Well, I prefer that you stay by the podium --

MR. RHODES:  Yes.

THE COURT:  -- or close to the podium, partly -- in

large part because the court reporter has a hard time hearing people when they're walking around and . . .  So we've had logistical problems.  So I prefer people -- You can turn the podium.  That's what some people do.  They move it on the table or to address -- So you don't have to keep turning your head, we can -- we can logistically turn the podium.

             MR. RHODES:  Okay.

             THE COURT:  And you can mount it -- I think people have actually mounted it on the table there.

             MR. RHODES:  And the second question is with respect to exhibits.  I mean, I'm assuming that we're going to try to work everything out in advance.

        Publishing exhibits to the -- to the witness?  How do you -- What is your -- mechanically you prefer?  If it's in evidence, can we just go right to it?  Do you want us to approach?  Do you want me to ask permission?

             THE COURT:  You know, I can go either way.

        If something is in evidence, I -- my presumption's that you can publish it without having to ask.

        If, for some reason, you've got a problem, let me know right away.

             MR. O'ROURKE:  Right.

             THE COURT:  I'm just going to presume that anything that is -- has been admitted, whether by stipulation or by motion, will be published.  You don't have to keep seeking

permission to publish.

MR. O'ROURKE:  Is that also true, Your Honor, with the jury?

In other words, let's say a bottle of La Crema, we've stipulated.

THE COURT:  Yeah.

MR. O'ROURKE:  They can see that as part of the opening, for example.

THE COURT:  Yeah.  Yeah.

MR. O'ROURKE:  Yeah.

THE COURT:  Yeah.  And I just want to know in advance -- If there's a problem, some reason you don't want it published, then let me know.

MR. RHODES:  Okay.

MR. O'ROURKE:  We will.

THE COURT:  Because -- Part of what I ask you to do is also get together before each day, go over the lists of witnesses and the exhibits so you should have a head's up so that's coming up.

I'm just going to assume there's not a problem and you can publish anything you want.

MR. RHODES:  Okay.  Another dumb question:

We both are going to want to bring in exemplary bottles. I think you need a Court Order to do that.

Can we submit something to Your Honor to do that?

THE COURT:  Dish it out or something.  No.

(Laughter)

MR. RHODES:  We'll stick a couple cases -- No.

THE COURT:  Excellent.  That's off the record.  No.
Yeah, we can --

THE CLERK:  Yeah.  You have to submit an ex-parte
request.

MR. RHODES:  Yes.

THE CLERK:  Put in whatever you would bring in.  Make
a list and e-file that.

MR. RHODES:  Okay.  Yeah.

THE CLERK:  I mean, just take the order --

MR. RHODES:  Is that how you want us to do it?

THE CLERK:  -- with you -- yeah -- and then the
martial will let you in.

MR. RHODES:  Okay.  And then the last thing is
demonstratives.

I proposed with counsel that, you know -- you know, we're
going to both want to use demonstratives in opening.  I'm old
school so I usually sit there and don't object.  But, you know,
I -- Mr. O'Rourke might not like my style.  I propose that we
exchange them over the weekend.

If, for example, there was an objection to someone's
demonstrative, how would the Court want us to deal with that?

THE COURT:  I want to hear that, so before the jury

comes in.

The jury probably comes down around 9:00 by the time they finish getting through their orientation with everybody.

First thing Monday morning, I want to go over any problems with demonstratives, or anything else that you come up, and I intend to do the same thing every day before the jury comes out, 15 minutes before, to talk about any problems you anticipate.

**MR. O'ROURKE:**  We agreed to try to exchange those the weekend before the trial but, also, if something comes in, we've agreed to show it to each other the day before we come --

**THE COURT:**  Yes.

**MR. O'ROURKE:**  -- to court so it can be taken up.

**THE COURT:**  Yes.

**MR. O'ROURKE:**  Yeah.

**MR. RHODES:**  And, then, last thing on instructions:

Does the court generally conduct a charging conference at some point during the trial?  Yeah.

**THE COURT:**  Well, what I'm going to do is get out a first iteration and ask for your comments.  And at that point, I may schedule -- Depending on how -- how much of a problem we have, I may schedule the conference.

**MR. RHODES:**  Okay.

**THE COURT:**  I'd like to get the instructions pretty much squared away before we actually start, even though there

hasn't -- There may be some suggestions because you will want to know where we're going on these things before you do your openings.

I don't like to wait, like some judges, to do that the last day.

MR. RHODES:  You anticipated my last and final question, which is:

Assuming that instructions are done, is the Court going to have any issue with us using those in our opening?

THE COURT:  If I've just made a decision?

MR. RHODES:  Yes.

THE COURT:  I don't have a problem with that, unless -- unless you have an objection to -- to that.

MR. O'ROURKE:  I have to think about it.  I haven't seen -- I haven't seen that done in openings, but --

MR. RHODES:  Well, the main one is that, you know, in the Ninth Circuit, you have this eight-factor test on what the jury's looking for and, obviously --

THE COURT:  Essentially frame your opening?

MR. RHODES:  I'd like to be able to tell them:  These are the eight categories of stuff you're going to be hearing about and both of us are going to be putting evidence in front of --

MR. O'ROURKE:  I don't have a problem with that.

MR. RHODES:  Yeah.

THE COURT:  Especially at that level, that's fine.  If you start getting into the --

MR. RHODES:  No.

THE COURT:  -- detailed stuff --

MR. RHODES:  That's it.

THE COURT:  Because I -- My -- I generally don't -- Unless, again, you request, I generally don't read the substantive instructions to the jury at the outset, particularly since we're only talking about an eight-day trial. I don't think there's a need to do that.  Again, unless you think that would be helpful to the jury, I don't intend to do so.

MR. RHODES:  I would like to be able at least to refer to those eight factors so they have some clue why they're hearing the evidence they're hearing.

THE COURT:  Yes.

MR. O'ROURKE:  Sounds like it would be helpful.

MR. RHODES:  Yeah.

THE COURT:  That would be fine.

MR. RHODES:  Okay.  Thank you.

THE COURT:  All right.  Good luck tomorrow.

MR. O'ROURKE:  Thank you.

MR. RHODES:  Thank you, Your Honor.

THE COURT:  And, otherwise, I guess I will see you either at the trial, or we may again have a -- a pretrial

conference on the instructions.

          **MR. RHODES:**  Thank you.

          **MR. O'ROURKE:**   Thank you.

                    (Court adjourned at 5:26 p.m.)

Candace Yount, CSR# 2737, RMR, CCRR
Contract Court Reporter - United States District Court

## CERTIFICATE OF REPORTER

I, CANDACE YOUNT, Contract Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C-11-5639-EMC, Jackson Family Wines, Inc. and LC TM Holdings, LLC vs. Diageo North America, Inc., and Diageo Chateau & Estate Wines Co., were reported by me, a Certified Shorthand Reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.



_____

Candace Yount, CSR No. 2737, RMR, CCRR
Contract Court Reporter - United States District Court


Thursday, February 27, 2014